AMG REALTY COMPANY, A PARTNERSHIP ORGANIZED UNDER THE LAWS OF THE STATE OF NEW JERSEY AND SKYTOP LAND CORP., A NEW JERSEY CORPORATION, PLAINTIFFS, JOAN H. FACEY, REDVERS S. FACEY, JOHN W. KRAUS, MARY HELEN TUCHEN, MYKOLA BOJCZUK AND MAE BOJCZUK, HIS WIFE, INTERVENORS, v. TOWNSHIP OF WARREN, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT, AND TIMBER PROPERTIES, A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF, v. TOWNSHIP OF WARREN, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, PLANNING BOARD OF THE TOWNSHIP OF WARREN, AND WARREN TOWNSHIP SEWERAGE AUTHORITY, DEFENDANTS.

Superior Court of New Jersey
Law Division

Decided July 16, 1984.

*Joseph E. Murray* for plaintiffs AMG Realty Co. and Skytop Land Corp. (*McDonough, Murray & Korn,* attorneys).

*Raymond R. Trombadore* for plaintiff Timber Properties (*Trombadore & Trombadore,* attorneys).

*Robert H. Kraus* for intervenors Joan H. Facey, Redvers S. Facey, John W. Kraus and Mary Helen Tuchen (*Lieb, Kraus and Grispin,* attorneys).

*John T. Lynch* for intervenors Mykola Bojczuk and Mae Bojczuk.

*John E. Coley, Jr.* for defendant Township of Warren (*Kunzman, Coley, Yospin and Bernstein,* attorneys).

*Eugene W. Jacobs* for defendant Planning Board of the Township of Warren (*Handelman & Jacobs,* attorneys).

*J. Albert Mastro* for defendant Warren Township Sewerage Authority.

## Outline of Opinion

Introduction 393

I. Fair Share 397
 A. Fair Share Methodology 398
 1. Region 398
 2. Regional Need 400
 a. Present Need 401
 b. Prospective Need 403
 3. Allocation Factors 404
 a. Present Need 404
 b. Prospective Need 405
 B. Application of the Fair Share Methodology To Warren Township 410
 1. Region 410
 2. Regional Need 410
 3. Allocation Factors 410
 a. Present Need 410
 b. Prospective Need 411
 C. Justification of Methodology 412
 1. Region 412
 2. Regional Need 420
 a. Present Need 420
 b. Prospective Need 425
 c. Present and Prospective Need 428
 3. Allocation Factors 431
 a. Present Need 431
 (1) Growth Area 431
 (2) Present Employment 433
 (3) Median Income 434
 b. Prospective Need Factors 439
 (1) Applicability of the Three Present Need Factors 439
 (2) Employment Growth 440

II. Compliance 443

III. Builder's Remedy 447

IV. Conclusion 450

 Appendix
 A. Present Housing Need Regions 459
 B. Present Need Calculation 460
 C. Surplus Present Need Data 464
 D. Prospective Need Data 514
 E. Selected Urban Aid Municipalities 537
 F. Warren Township Commutershed Region 538

SERPENTELLI, J.S.C.

This *Mount Laurel* case, the first to be fully tried since the decision of the New Jersey Supreme Court in *Southern Burlington Cty. N.A.A.C.P. v. Mt. Laurel Tp.*, 92 *N.J.* 158 (1983) (hereinafter *Mount Laurel II*) presents the court with the opportunity to start the process of developing a method of fair share allocation and eliminating the confusion surrounding the issue. The process is critical to the implementation of the *Mount Laurel* principle because as long as uncertainty regarding the fair share obligation prevails, "the weakness of the constitutional doctrine will continue". *Id.* at 253. The development of a fair share methodology constitutes a primary step in achieving the ultimate goal of *Mount Laurel II*—the *actual construction* of low and moderate income housing. *Id.* at 352. Only after the court quantifies the fair share obligation can it determine whether the municipal ordinance fully complies with *Mount Laurel* and thereafter whether the plaintiff is entitled to a builder's remedy.

Therefore, this opinion will address three issues in the following order:

 I. *Fair Share*—What number of low and moderate income units of the regional need must Warren provide for through its land use regulations?

 II. *Compliance*—Has Warren, through its present land use regulations, provided a realistic opportunity for the construction of its fair share and thereby satisfied its *Mount Laurel* obligation?

 III. *Builder's Remedy*—Have plaintiffs demonstrated noncompliance, proposed a substantial lower income component for the project and can their plans be implemented without significant negative environmental or planning impact?

Based upon my analysis of the evidence, I hold that Warren Township has a fair share obligation of 946 dwelling units, for the decade of 1980–1990, that the township's land use ordinances do not comply with *Mount Laurel II* and that plaintiffs are entitled to a builder's remedy.

The opinion has the following structure. With respect to fair share, I will initially detail the methodology adopted before demonstrating how it produces Warren's obligation. This ex-

planation and application should enable any municipality affected by the methodology to understand the mechanics of it so that it can precisely identify its own obligation. Next, the opinion will elaborate on the justifications for the approach, the criticisms which have been voiced by others and any shortcomings the court perceives. This should facilitate refinement of the methodology. With respect to the compliance issue, the court will examine Warren's land use regulations to explain why they fail to make realistically possible the satisfaction of the township's fair share and identify some of the areas which should be addressed in the revision process. With respect to the builder's remedy, the court shall review the evidence which demonstrates that plaintiffs are entitled to the builder's remedy. Finally, the conclusion will explore the broader ramifications of this opinion.

Before proceeding to a discussion of each of these three issues, some background information is necessary. The trial began on January 3, 1984. Shortly after testimony commenced, the parties engaged in settlement negotiations. It appeared that the matter could be resolved if the township obtained a determination of its fair share and a declaration of compliance of its ordinances, which would provide it with repose from *Mount Laurel* litigation for a period of six years. *Id.* at 291–292. The court emphasized that it would only grant repose in a nonadversarial setting if defendant demonstrated to a court appointed master and then to the court, that the method used to calculate the fair share was reasonable.

As a first step, counsel authorized their planning experts to discuss an appropriate methodology for identifying Warren's fair share. Each of the experts had filed a report with the court setting forth their respective fair share analysis. Each of the experts possessed copies of expert reports filed by other court appointed experts in other pending *Mount Laurel* litigation. The consultants and the court had received the recently issued report of the Center for Urban Policy Research of Rutgers University, (hereinafter CUPR), entitled "Mount Lau-

rel II—Challenge and Delivery of Low-Cost Housing." During the process of discussions the consultants were given permission to confer freely with other recognized authorities in the field and individuals who have been involved in *Mount Laurel* litigation.

There evolved from the efforts of the experts a document which has become known as the "Warren Report." The planners developed a fair share allocation method applicable not only to the Warren Township case, but also, in their view, to municipalities throughout the State. Based upon the agreement of the planners, the parties were able to arrive at a fair share number for Warren and to resolve the other issues involved in the case including builder's remedies. Of course, the settlement was conditioned upon formal approval by Warren's governing body. The matter was adjourned for that purpose.

While the court awaited word as to the approval of the proposed settlement, it also received many inquiries concerning this first unified approach to fair share analysis. The Warren Report quickly became a topic of discussion in many case management conferences conducted by the court. One of those conferences took place in the matter of *Urban League of Greater New Brunswick v. Borough of Carteret,* one of the six consolidated cases in *Mount Laurel II* remanded to this court. Counsel in that case requested the opportunity to have all of the planners involved in that litigation attempt a consensus approach toward resolution of that case. Since there were eight plaintiffs and seven defendants joined in the suit, there was naturally some doubt as to whether the same sort of harmony was attainable. Nonetheless, the court agreed to the request made by counsel, and all of the planners were authorized by their respective attorneys to engage in a discussion toward the end of arriving at a fair share allocation approach which could be applied to that case.

The planning group was chaired by Carla L. Lerman, the court appointed expert in the *Urban League* case. It initially consisted of all of the retained planners in that case and was expanded to include some of the court appointed experts functioning in other matters. In addition, the advisory group was addressed by Dr. Robert Burchell and Dr. David Listokin who participated in the preparation of the CUPR Report. The group also received the input of the Office of the Public Advocate. After several day long meetings, continuous private consulta-. tion among various planners, delegation of various data collection duties to individual members of the group and the formation of a subcommittee to deal with a specific factor in the fair share allocation, out of a series of preliminary drafts a final report evolved. That report, dated April 2, 1984, (hereinafter Urban League Report or ULR) established a method of fair share allocation not only applicable to the seven defendants in the *Urban League* litigation, but also, in the view of the planners, to any other municipality in the State.

While the *Urban League* advisory group was in the process of developing its report, the court was informed by counsel in the *Warren* case that the tentative settlement could not be consummated. Therefore, that case was brought to trial on March 15, 1984. The intervenors, who had not sought *Mount Laurel* relief, chose not to participate. The three remaining planners in the *Warren* matter had participated in the *Urban League* advisory group. When the trial in the *Warren* case recommenced, plaintiff's planners modified their original approach and espoused the methodology developed in the *Urban League* case. More specifically, Timber Properties' expert completely embraced the *Urban League* plan and AMG Realty's expert did so with one minor reservation. Defendants (hereinafter referred to collectively as defendant) used two experts who accepted some of the fundamental assumptions of the *Urban League* blueprint, but disagreed with others. Therefore, the court was able to test, in a truly adversarial setting, the value of the accord reached in *Urban League*. In fact, the

case was tried as a test of that approach since defendant sought to modify it, rather than setting forth a separate analysis of its own.

## I.

## FAIR SHARE

Before addressing the sub-issues of region, regional need, and allocation, the larger issue of fair share, which embodies these three issues, must be placed in its proper perspective. In an effort to provide this perspective, it would be helpful to define exclusionary zoning, to list the goals the Supreme Court felt it had to achieve through *Mount Laurel II* to eliminate exclusionary zoning, and to explain how the fair share methodology established in this opinion promotes the Court's goals.

Justice Pashman defined exclusionary zoning as involving two distinct, but interrelated practices:

(1) the use of the zoning power by municipalities to take advantage of the benefits of regional development without having to bear the burdens of such development; and (2) the use of the zoning power by municipalities to maintain themselves as enclaves of affluence or of social homogeneity. [*So. Burl. Cty. N.A.A.C.P. v. Mt. Laurel Tp.*, 67 *N.J.* 151, 195 (1975) (Pushman, J., concurring) (hereinafter *Mount Laurel I*)].

In *Mount Laurel II*, Chief Justice Wilentz similarly expressed the two dimensional nature of exclusionary zoning:

But if sound planning of an area allows the rich and middle class to live there it must also realistically and practically allow the poor. And if the area will accommodate factories, it must also find space for workers. [92 *N.J.* at 211]

The *Mount Laurel II* Court determined that to eliminate exclusionary zoning, voluntary compliance with the constitutional obligation must be encouraged, litigation to enforce the obligation must be simplified and judicial remedies must be made more effective. *Id.* at 214. The development of a reasonable fair share methodology is, perhaps, the most important step in fulfilling these three purposes. First, the fair share methodology adopted in this opinion will promote voluntary compliance because each municipality now has the ability to calculate its fair share and thereafter design its land use regulations to

satisfy its responsibility. Second, the methodology will simplify litigation because the fair share number can be identified with ease, thereby limiting the remaining issues primarily to compliance and builder's remedy. Third, the methodology promotes the effectiveness of the judicial remedies which consist of three aspects: the grant of a builder's remedy, the appointment of a master, and the court imposed rezoning if the municipality fails in its effort to create a compliant ordinance. *See generally Mount Laurel II* at 278–292. The fair share methodology adopted here will render builder's remedies more effective because it will virtually eliminate the fair share issue which is the most time consuming and expensive component of the litigation. Experience has demonstrated that once the fair share is set, the other segments of the litigation require comparatively little time. The use of a master will be facilitated because just as demonstrating that the zoning ordinance is exclusionary is an element of the builder's remedy, it is also a prerequisite to the appointment of a master. Lastly, once the fair share number is established, the court is in a position to invoke its own remedies for noncompliance in the event that the municipality fails to satisfactorily revise its ordinance on its own.

A. *The Fair Share Methodology*

1. *Region*

The numerous expert reports received by the court in this and in other litigation generally demonstrate two different conceptual approaches to region, a fixed line approach and a commutershed approach. A fixed line approach defines a region through rigid lines derived by analyzing the standards for an appropriate region as articulated in *Mount Laurel II*. *Id.* at 256. In contrast, a commutershed approach defines a region by starting with the functional center of the municipality and identifying all points that could be reached during a reasonable commuting time by travelling outward in all directions on existing roadways. Thus, a commutershed approach requires

an individual analysis for each municipality to determine the points reached after a reasonable commute, whereas a fixed region approach merely requires an inquiry into which predetermined region the municipality falls.

I find that it is necessary to meld both concepts in order to arrive at the most equitable and accurate fair share number. Each municipality should have a present need region and a prospective need region. The present need region will be based on a large fixed area defined by county lines, intended to balance the high levels of need in the older urban core municipalities of that region and the resources to meet that need in the less dense and newer suburban areas of the region. The prospective need region shall be a modified commutershed area which reflects a predetermined commuting time from the functional center of any given municipality but it is intended to be large enough to account for special commuting patterns or employment concentrations ULR at 7.

The Urban League experts felt compelled to develop present need regions for the entire State so as to be sure that the present need region selected for the municipalities engaged in the *Urban League* litigation was compatible with the division of the balance of the State into fixed present need regions. The group divided the State into four present need regions as follows:

Region I—Bergen, Essex, Hudson, Hunterdon, Middlesex, Morris, Passaic, Somerset, Sussex, Union and Warren counties.
Region II—Monmouth and Ocean counties.
Region III—Burlington, Camden, Gloucester and Mercer counties.
Region IV—Atlantic, Cape May, Cumberland and Salem counties.

See Appendix A for a map depicting the regions. Regions II, III and IV are identical to CUPR's regions 4, 5, and 6.

I recognize it is not my prerogative to define regional configurations for counties not within my jurisdiction. However, I also recognize that to determine regions within my jurisdiction without evaluating their consistency with other potential regional configurations could promote the inconsistency which the

Supreme Court sought to avoid through the use of the three judge system. *Mount Laurel II* at 253–255. Given this disclaimer and based on the testimony given in the *Warren* case and the compatibility of Regions II, III and IV with the CUPR report, I believe that the recommendations of the consensus group are reasonable. Of course, my fellow *Mount Laurel* judges will address these regional configuration issues in their jurisdictions.

The prospective need region for any municipality shall be a commutershed measured in all directions from the functional center of a municipality based on a 30-minute drive time. The definition of functional center is three-tiered. The functional center shall be the generally recognized commercial-residential core of the community. Commonly referred to as the "downtown area," this center typically contains a commercial hub surrounded by residential development. In the absence of a commercial-residential core, the functional center shall be the municipal building. Absent either a recognized commercial-residential core or a municipal building, the functional center shall be the major crossroads within the municipality.

The 30-minute drive will be measured by the following speeds:

1. 30 miles per hour on local and county roads,
2. 40 miles per hour on state and federal highways,
3. 50 miles per hour on interstates, the Garden State Parkway and the New Jersey Turnpike.

The entire area of a county is to be considered included within the commutershed if the 30-minute drive time enters into that county at any point. Thus, the commutershed utilized here is a "modified" commutershed rather than a pure 30-minute commutershed because a pure commutershed would terminate wherever the 30-minute commute ended.

### 2. *Regional Need*

There shall be two separate methods for calculating present and prospective need.

### a. *Present Need*

Present need consists of the indigenous need of a municipality and the fair share of the reallocated excess need of the municipality's present need region. Indigenous need is defined as substandard housing currently existing in any municipality. Every municipality, regardless of its characterization in the State Development Guide Plan (hereinafter SDGP) is responsible for meeting its own indigenous need. However, certain municipalities, even though located in areas characterized as growth in the SDGP, have an indigenous need which far exceeds their fair share. They should not be expected to provide decent housing for a disproportionate share of the need. *Id.* at 243. Therefore, when the total regional housing stock is determined and the percentage of that stock which is substandard is identified, any municipality whose indigenous need in relationship to its housing stock is in excess of that regional percentage, will have its excess assigned to a reallocation pool. This pool will be distributed to all municipalities which contain any area designated as growth in the SDGP, excluding selected urban aid municipalities as hereafter identified.

A housing unit will be considered to fall into the indigenous need category if it has any one of the following characteristics:

1. Overcrowded units—defined as dwelling units occupied by more than 1.01 persons per room.

2. Units lacking complete plumbing facilities for the exclusive use of the occupants.

3. Units lacking adequate heating.

The number of such units can be obtained in an unduplicated count from the 1980 census figures in schedules STF–1 and STF–3. The identification of units lacking adequate heating requires a mathematical computation which need not be set forth here. An example of the process of deriving the total indigenous obligation is set forth in Appendix B. A total of the unduplicated count for these three categories will result in the total number of units hereinafter referred to as "substandard." To obtain the number of substandard units occupied by lower

income households, one additional adjustment is necessary. A study by the Tri-State Regional Planning Commission in 1978 reported that 18% of those people occupying substandard housing were not of low and moderate income. Therefore, to accurately compute the indigenous need, the gross number of substandard units must be multiplied times 82%.

As noted, the extent to which any municipality contributes to the present need pool depends on the relationship of its substandard housing percentage to that of its present need region. In order to arrive at that relationship and to establish the regional reallocation pool, the following steps must be taken. First, the total number of substandard units in the present need region must be identified and expressed as a percentage of the total housing stock of the region. For ease in discussion, this percentage will hereafter be referred to as the regional substandard housing percentage. Second, the total number of substandard units for each municipality in the present need region must be identified and expressed as a percentage of each municipality's housing stock. For ease in discussion, this percentage will hereafter be referred to as the municipal substandard housing percentage. Third, any municipality whose percentage of substandard housing exceeds the regional percentage shall have its number of substandard housing units reduced until it conforms to the regional percentage. The units subtracted from such a municipality shall form the pool of present need which will be reallocated to those towns containing any growth area, except for selected urban aid towns, through the use of the present need allocation factors discussed below. An appendix showing the surplus present need calculation by county, region and for each municipality in the State is annexed as Appendix C. It is included for the purposes of showing the derivation of Warren's present regional need discussed later and, as to all other municipalities not presumptively bound by this opinion, *id.* at 254, for informational purposes only.

b. *Prospective Need*

The term prospective need refers to household formation expected to occur between 1980 and 1990. Any need generated prior to 1980 and still existing constitutes present need. In order to project household formation, utilize two methods of population projection prepared by the New Jersey Department of Labor, Office of Demographic and Economic Analysis (hereinafter ODEA). The first method is known as the ODEA Economic/Demographic Model 1 (Economic Model) and the second method is known as the ODEA Demographic Cohort Model 2 (Demographic Model). These models divide expected population growth into age groups known as cohorts. The CUPR report provides data which predicts the expected percentage of household formation in each age cohort. That data is known as a headship rate.

To determine the prospective regional need, project the total population by age cohort for 1990 by averaging the two models. Next, multiply each age cohort by the projected 1990 headship rate for that cohort, and total all the cohorts to produce the number of households expected to exist in 1990. Then, subtract the number of households existing in the region as published in the 1980 census in order to derive the net increase or decrease in households during the ten year projection period. Finally, obtain the number of low and moderate households within the total projected household increase or decrease by multiplying that total times 39.4%. That figure has been recognized in *Mount Laurel II,* at 221 *n.* 8, and by most experts as the proportion of units which will be occupied by lower income households. An appendix showing the prospective need calculation for each county in the State is annexed as Appendix D. It is included for the purposes of showing the derivation of Warren's prospective regional need discussed later, and as to all other municipalities not presumptively bound by this opinion, *id.* at 254, for informational purposes only.

### 3. *Allocation Factors*

Having defined the present and prospective need regions and having identified a method for calculating the housing needs within those regions, I now turn to the appropriate formula to allocate the regional need among those municipalities having an obligation to assume a fair share. The present need allocation method uses three factors and the prospective need allocation method uses four factors.

#### a. *Present Need*

As noted above, all municipalities have the obligation to provide for at least some portion of their indigenous need and certain municipalities must provide for more than the indigenous need generated within the municipality. The surplus present need of certain municipalities forms the excess pool which is reallocated. The three factors used to reallocate are:

1. *Growth Area:* The percentage created by dividing the number of growth area acres within the municipality by the number of growth area acres within the present need region.

2. *Present Employment:* The percentage created by dividing the total number of private sector jobs as of 1982 covered by unemployment compensation within the municipality by the total number of covered jobs within the present need region.

3. *Median Income:* The ratio of municipal median income to the present need region median income.

In computing all three factors, exclude from the regional computation any data from any selected urban aid municipality as identified below or from any non-growth municipality.

Since the first two factors are expressed in terms of a percentage and the third factor in terms of a ratio, the third factor has to be expressed as a percentage so that the three factors can be averaged. This is accomplished by averaging the first two factors to create one percentage which is then multiplied by the median income ratio. The resulting percent-

age should then be averaged along with the first two percentages by dividing factors one, two and the converted third factor, by three to create a single percentage. The resulting number should be multiplied times the total reallocation pool for the region to determine the municipality's fair share of that pool.

This method of calculation of the present need is illustrated in section I–B of this opinion which applies the entire fair share methodology to Warren Township.

b. *Prospective Need*

The projected lower income households to be formed during the decade of 1980 to 1990 should be allocated through the use of the following four factors:

1. *Growth Area:* The percentage created by dividing the number of growth area acres within the municipality by the number of growth area acres within the prospective need region.

2. *Present Employment:* The percentage created by dividing the total number of private sector jobs as of 1982 covered by unemployment compensation within the municipality by the number of covered jobs within the prospective need region.

3. *Employment Growth:* The percentage created by dividing the covered employment growth from 1972 to 1982 within the municipality by the covered employment growth within the prospective need region for the same period.

4. *Median Income:* The ratio of municipal median income to the prospective need region median income.

In computing all four factors, exclude from the regional computation any data from any selected urban aid municipality as identified below or from any non-growth municipality.

Again, to express the median income factor as a percentage, average the first three factors to obtain one percentage and multiply that percentage against the median income ratio to

create a percentage. Thereafter, average the first three factors and the new resulting fourth factor by dividing by four to create a single percentage. Multiply that percentage by the prospective regional need to obtain the municipality's prospective need obligation. This method of calculation of the present need is illustrated in section I–B of this opinion which applies the entire methodology to Warren Township.

To fully understand the application of the present and prospective need factors, further clarifications are necessary. With respect to the growth area factor, exclude from the regional acreage computation those municipalities designated as urban aid by the State for the funding year 1984–85, only if they have one of the following characteristics:

1. The municipal substandard housing percentage exceeds the regional substandard housing percentage; or

2. The population density of the municipality exceeds 10,000 people per square mile; or

3. The population density of the municipality falls between 6,000 and 10,000 people per square mile, and the "Revised Statewide Housing Allocation Report for New Jersey," dated May 1978 assigns a value of zero to the municipality's vacant developable land.

The Urban League Report states that the application of these criteria to the municipalities designated as urban aid in the eleven county present need region results in the following list:

| COUNTY | MUNICIPALITY |
|--------|--------------|
| Bergen | Garfield |
| | Lodi |
| Essex | Belleville |
| | Bloomfield |
| | East Orange |
| | Irvington |
| | Montclair |
| | Newark |
| | Orange |
| Hudson | Bayonne |
| | Hoboken |
| | Jersey City |

| | North Bergen |
| | Union City |
| | Weehawken |
| | West New York |
| Middlesex | New Brunswick |
| | Perth Amboy |
| Passaic | Passaic |
| | Paterson |
| Union | Elizabeth |
| | Hillside |
| | Plainfield |

These municipalities represent the traditional urban core areas, as well as other towns also not likely to attract high density *Mount Laurel* type housing. Appendix E contains a listing of all urban aid municipalities in the State meeting the criteria. It is provided for informational purposes only with respect to the counties not located in Warren's regions.

With respect to the employment factors in both present and prospective need regions, four clarifications must be made. First, exclude from the computation of regional employment figures the covered employment in any non-growth municipality and in the selected urban aid municipalities. Second, in calculating the total regional employment growth figure, subtract from the total positive employment growth any negative employment growth because what is being measured is the net growth of the municipality to the net growth of the region. Third, in calculating the employment growth for the municipality and the region, use a linear regression approach instead of a straight arithmetical measurement of employment growth. Finally, it should be noted that the job figures used in the employment factors are obtained through what is designated as covered employment data that is produced by the New Jersey Department of Labor and Industry. "Covered employment"

refers to all those private sector jobs qualifying for unemployment compensation.

With respect to the median income factor, the 1980 census reports both the median household income and the number of households by county and municipality. The municipal median income ratio is obtained as follows:

(1) Identify the municipal median income.

(2) Identify the median income of each county in the region. Multiply the median income for each county times the number of households in that county thereby producing a gross county income, excluding the gross income of any urban aid or non-growth municipality in the process. Aggregate all of the gross county incomes and divide that figure by the total number of households in the region to obtain the regional median income.

(3) Derive the municipal median income ratio by dividing the municipal median income by the regional median income.

Through the proper application of the factors, the fair share of the municipality can be obtained by totaling the indigenous, the surplus present and the prospective need figures. However, once those figures are obtained, adjustment must be made to the surplus present and the prospective need figures to reflect inadequate vacant developable land and needed vacancy rates.

To provide for those municipalities which have inadequate vacant developable land to absorb their full fair share, increase the surplus present and prospective need of every municipality by 20%. As will be more fully explained, any municipality lacking adequate vacant developable land to satisfy its full fair share shall have the right to seek an adjustment downward of its fair share. By increasing by 20% the obligation of every municipality having a fair share responsibility, the units which will be lost to the vacant developable land defense will be offset.

The surplus present need and prospective need, as increased by 20%, should be further increased by 3%. That increase will provide for sufficient vacancies, so as to facilitate mobility in housing choice.

In order to round out the explanation of the fair share methodology, it is necessary to tie up some loose ends. First, the methodology which I have described assumes that all selected urban aid municipalities shall be exempt from any fair share obligation other than the portion of their indigenous need which represents the regional substandard housing percentage.

Second, *Mount Laurel II* requires the trial court to decide the proportion between low and moderate income housing in the process of determining fair share unless there are substantial reasons not to do so. *Id.* at 256–57. The evidence presented in this case justifies an equal division of Warren's fair share between low and moderate income housing, that is, 473 low and 473 moderate. Statewide, the *Mount Laurel* households are distributed approximately two-thirds low and one-third moderate. ULR at 29. However, expert testimony reveals that such a division is generally attainable only through the use of significant external subsidies in addition to the subsidies which the municipality may be called upon to provide. *Cf. Mount Laurel II* at 262–265. At the present time, the absence of subsidies requires the builders to internally absorb the loss involved in selling units below fair market value. Since there is greater loss on low income units than for moderate, the court must balance the needs of the builder against the needs of the poor and select a proportion which is most likely to result in actual construction of *Mount Laurel* housing. *Id.* at 257, 352.

Third, *Mount Laurel II* gives the trial judge the discretion to phase in the fair share obligation over a period of years. *Id.* at 219. Notwithstanding that phasing should be used with circumspection, Warren's fair share of the reallocated pool should be reduced from now to 1990 by approximately two-thirds. I do not address here phasing as it relates to the issue of when the lower income units must be completed in the construction schedule in a project consisting of lower and market value homes. *Id.* at 270, 281. Nor am I discussing the phasing which may be necessary to ameliorate the impact on the municipality which may occur because of the granting of a builder's remedy.

*Id.* at 331–332. Those aspects of phasing do not relate to development of a fair share methodology.

B. *Application of the Fair Share Methodology to Warren Township*

■ Warren Township is located entirely within a growth area and must provide for both indigenous and regional need. Consequently, all aspects of the fair share methodology described above apply to it.

1. *Region*

The present need region for Warren (Region I) consists of eleven counties: Bergen, Essex, Hudson, Hunterdon, Middlesex, Morris, Passaic, Somerset, Sussex, Union and Warren. Appendix A. The prospective need region for Warren consists of the following six counties: Essex, Hunterdon, Morris, Middlesex, Somerset and Union. Appendix F. Although the evidence created a dispute concerning whether the commutershed should also have included Hudson County, the court appointed an expert who, through the use of large scale maps, determined unequivocally that Hudson was not touched by the 30-minute commute.

2. *Regional Need*

The indigenous need of Warren is 52. The 11-county reallocated present need pool is 35,014, Appendix C, and the six-county prospective need is 49,004. Appendix D.

3. *Allocation Factors*

a. *Present Need*

Using the 11-county present need region, Warren's fair share of the reallocation pool of 35,014 is 162 for the decade of 1980–1990 based on the following calculation.

Warren's present need percentage of the present regional need is 1.126%. That figure is arrived at as follows:

| | |
|---|---|
| Growth Area | = 1.780% |
| Present Employment | = .179% |
| Median Income Ratio | = 1.45 |

$\dfrac{1.780 + .179}{2} = .9795\% \times 1.45$ = 1.420% (represents the percentage modified by the ratio)

$\dfrac{1.780 + .179 + 1.420}{3}$ = 1.126%

| | | |
|---|---|---|
| Reallocation Excess Pool | = | 35,014 |
| | | $\times$ 1.126 (Fair Share %) |
| Municipal Share | = | 394 |
| Phased in by one third (394/3) | | = 131 |
| Additional 20% reallocation (131 $\times$ 1.2) | | = 157 |
| Vacancy allowance (157 $\times$ 1.03) | | = 162 |
| Total Present Need is: | | |
| Indigenous | | 52 |
| Reallocated Present | | 162 |
| | | —— |
| | | 214 |

b. *Prospective Need*

Warren's fair share of the prospective regional need of 49,004 is 732 units for the decade of 1980–1990.

Warren's prospective need percentage of the prospective regional need is 1.208%. That figure is arrived at as follows:

| | | |
|---|---|---|
| Growth Area | = | 2.556% |
| Present Employment | = | .304% |
| Employment Growth | = | .428% |
| Median Income Ratio | = | 1.41 |

$\dfrac{2.556 + .304 + .428}{3} = 1.096\% \times 1.41$ = 1.545% (represents the percentage modifed by the ratio)

$$\frac{2.556 + .304 + .428 + 1.545}{4} \quad = \quad 1.208\%$$

| | | |
|---|---|---|
| Prospective Regional Need | = | 49,004 |
| | | $\times$ 1.208 (Fair Share %) |
| Municipal Share | = | 592 |
| Additional 20% | | |
| Reallocation (592 $\times$ 1.2) | = | 710 |
| Vacancy Allowance (710 $\times$ 1.03) | = | 732 |

Summary

| | | |
|---|---|---|
| Total Present Need | = | 214 |
| Total Prospective Need | = | 732 |
| Total Fair Share | = | 946 |

### C. Justification of Methodology

#### 1. Region

*Mount Laurel II* recognized the paramount importance of delineating regions in the development of a fair share methodology. Thus, referring to its opinion in *Oakwood at Madison, Inc. v. Township of Madison,* 72 *N.J.* 481 (1977), the *Mount Laurel II* Court said that:

> We also noted that the determination of region was more important in achieving the goals of *Mount Laurel* than the fair share allocation itself ("harm to the objective of securing adequate opportunity for lower income housing is less likely from imperfect allocation models than from undue restriction of the pertinent region ...") [92 *N.J.* at 253]

However, to keep the importance of the regional definition in perspective, this language of the Court should also be noted:

> Clearly, however, the method adopted was simply a judicial remedy of a constitutional injury. Achievement of the constitutional goal, rather than the method of relief selected to achieve it, was the constitutional requirement. [at 237]

Consequently, while the defining of regions is of paramount importance in designing a method to distribute fair share, it is only a vehicle towards accomplishing the ultimate goal—satisfaction of the constitutional obligation.

The *Mount Laurel II* Court provided some guidance towards the process of regional delineation. In its most direct statement, the Court reaffirmed its general approval of Judge

Furman's definition of region as "that general area which constitutes, more or less, the housing market area of which, the subject municipality is a part, and from which the prospective population of the municipality would substantially be drawn, in the absence of exclusionary zoning." *Id.* at 256. Yet, the Court also recognized that the trial judge could consider other factors and particularly those mentioned in Justice Pashman's concurring opinion in *Mount Laurel I,* 67 *N.J.* at 151. Justice Pashman cited the following relevant considerations which must be evaluated in fashioning regions:

1. the area included in the interdependent residential housing market;
2. the area encompassed by significant patterns of commutation;
3. the area served by major public services and facilities, and
4. the area in which the housing problem can be solved. [*Id.* at 215, *n.* 16]

The definitions provided by the Court highlight the conflicting goals which any methodology must accommodate. On the one hand, the Court stressed the strong connection between the housing market and commuting patterns by its reliance on Judge Furman's definition. That language provides support for a commutershed concept. On the other hand, the Court noted the importance of linking areas of significant need with the areas of significant resources to meet that need by its reference to Justice Pashman's concurring opinion. A needs-resources approach supports a large, fixed region concept.

This dichotomy reflects itself in an analysis of housing needs. The *present* housing needs arise out of substandard units which must be replaced or rehabilitated, and the shortage of decent housing units for lower income people. In contrast, the *prospective* housing needs arise out of a different aspect of the housing problem. The significant factors affecting future housing construction are location, availability and costs. Consequently, the problems are, where will housing be built for lower income people in relation to where they work, will supply meet the demand, and will the housing be affordable.

In light of the conflicting goals to be accommodated by the definition of region and given the difference between present

and prospective housing needs, there is practical difficulty in formulating one region which would achieve all the stated objectives. A region which focuses on enabling people to live in proximity to their work may satisfy prospective housing demands, but it may be too small to provide the resources necessary to absorb the excess present need generated by the urban areas. Conversely, a region which focuses on providing the resources necessary to absorb the excess present need of the urban areas may be too large to accurately address the prospective housing demand.

The answer to the problem is a dual region concept. A large region is needed to properly measure and allocate present housing needs. A smaller region, centered on the specific municipality involved, should be utilized to predict and allocate the future lower income housing demand generated by relationship of jobs to the place of residence. This will result in each municipality being part of fixed present need region and being at the heart of its own modified commutershed.

While one cannot find any literal support for this dual region concept, nothing in *Mount Laurel II* precludes such an approach. In fact, the Court provides support for both a commutershed and fixed region approach. Judge Furman's definition implicitly sanctions a commutershed theory. Since people would generally tend to live in proximity to where they work, the prospective population of a municipality would be drawn from the commutershed in the absence of exclusionary zoning. However, the Court also implicitly sanctions a fixed region concept:

> Except for municipalities on the outer edges of a region, the regional determinations are not likely to be significantly varied by the judges.... [*Mount Laurel II*, 92 *N.J.* at 254–255]

Because a municipality is always at the center of its own region in a commutershed approach and thus never "on its other edges," this language strongly supports a fixed region concept.

I note parenthetically that since the dual region concept was first introduced in the *Warren* case and thereafter carried over

into the Urban League Report, it has been widely embraced by members of the planning community as being much more reflective of the goals expressed in *Mount Laurel II* than any single region concept.

Aside from the value of the dual region concept as it relates to the goals of *Mount Laurel*, the development of large metropolitan regions, the limitation of the number of present need regions in the State, and the marriage of the fixed present need regions with the commutershed prospective need regions should sharply reduce the potential for conflict as compared to the regional configurations which have been previously suggested to this court. Regarding the present need regions, the creation of a few large configurations minimizes the possible number of conflicts. Regarding the prospective need regions, the creation of the configuration is merely a component of developing the fair share allocation of that municipality. Once the allocation is developed, the prospective need region disappears and any conflict with another municipality's region disappears with it. Finally, since the prospective need region typically represents the largest portion of the municipality's fair share, the extent of any regional conflict is even further reduced.

Now I will move from the general justification for a dual region concept to the specific justifications for an 11-county present need region (Region I) and the modified commutershed explained above. The evidence reveals that Region I contains over 60% of the State's population, over 50% of the State's land area, over 50% of the State's growth area, and approximately 70% of the selected urban aid municipalities. These statistics demonstrate that the vast majority of the State's housing need exists in Region I, as well as the majority of the growth area necessary to accommodate that need.

The expansiveness of the region is dictated by the large concentration of lower income housing located within it. This bottled up need is the product of many years of exclusionary practices. It requires large land areas to release it. Counties

like Somerset, in which Warren is located, can contribute their resources to the need. But, because of the magnitude of the need, many other counties must be called upon to assist. Further support for the use of large regions is found in *Oakwood at Madison, Inc. v. Township of Madison, supra.* There the Court appeared to approve a region of *at least* seven counties. 72 *N.J.* at 528, *n.* 35.

The question remains is it necessary to create a region of the configuration of Region I? Should it be larger or smaller? Should it involve different counties?

Region I is part of the greater New York metropolitan area. It represents a classic core, suburb, exurb and rural configuration radiating outward from the urban core in concentric rings. It is tied together by a network of major highways, rail links and growth corridors. Approximately 90% of the surplus present need of Region I emanates from the core in Hudson, Essex, Passaic, and southern Bergen counties and seeks the resources lying in the outer rings.

Any reduction of Region I would require either a shrinkage of the radius of the region or a slicing of the pie into smaller pieces. Shrinking the radius, in this case, could cause the excluded counties to become out of balance in terms of the needs-resources goals which underlie the satisfaction of the present need within their own newly created regions. Conversely, the reduced Region I would be robbed of the resources it needs to satisfy its large existing demand. Specifically, the most likely reduction in the radius would exclude such counties as Sussex, Warren, and Hunterdon. While it is true that there is presently not a large amount of growth area in those counties, there is even less demand. Given the major highway links of Routes 80 and 78, the radiating of growth corridors from east to west and the magnitude of the need which must be satisfied, there is no reason to exclude these counties. Furthermore, examination of the 1980 census data concerning county commutation patterns reveals a substantial relationship of

these three counties to the remaining counties in Region I. Lastly, notwithstanding the limited growth acreage in these counties, one cannot ignore the rapid growth occurring there.

Slicing Region I in a manner which does not follow county lines creates significant problems in terms of reliable data. In contrast, slicing Region I along county lines disrupts the needs-resources balance both in the new region created and the leftover pieces of the excluded counties. This view is best illustrated by an evaluation of the region proposed for Somerset County by the CUPR. That area, designated as Region III, consists of Middlesex, Hunterdon, Warren and Somerset. Simply stated, it has significant resources but fails to capture a significant portion of the present need.

Any expansion of Region I to include either Mercer or Monmouth would also be inappropriate. While it may be conceded that either Mercer or Monmouth have substantial relationships with the counties bordering them on the north and beyond, their orientation makes them the logical division line between Region I and other regions. Monmouth County is linked to Ocean County by geography, transportation, and the sharing of the seashore corridor. The most vivid demonstration of Ocean's link to Monmouth is that approximately 44% of Ocean's residents travelling out of the county commute to Monmouth. Clearly, Ocean would not stand alone as a region. The CUPR designation of Region IV, consisting of Monmouth and Ocean further supports this conclusion.

Mercer County uniquely has its strongest commutation pattern internally. Nearly 90% of its residents commute within the county. Mercer and Burlington have a significant commutation relationship and, in the larger perspective, they can be viewed as part of the Philadelphia consolidated metropolitan area. The CUPR Region V supports this southern orientation of Mercer by including it in a region with Burlington, Camden and Cloucester. Thus while the outer lines of a region tend to be tenuous, I believe that Region I is properly balanced to meet

its needs and resources and that the division line between counties included and excluded is amply justified.

As is more fully discussed above, the modified commutershed used to delineate the prospective need region includes all counties touched by a 30-minute commute as measured from the functional center of the municipality. Various aspects of that somewhat novel concept deserve more detailed comment.

The three-tiered definition of functional center is designed to promote certainty. This certainty overcomes any objection of arbitrariness. While in physically small towns the distinction will make no difference, in physically large towns, the distance between the geographic center and the functional center could make the difference in whether a county is included in or excluded from the commutershed.

In designing an appropriate commutershed, the following factors must be considered:

1. It must be big enough to adequately reflect the large percentage of commutation occurring to and from the municipality.

2. It must have easily ascertained boundaries, and

3. Reliable data for the fair share analysis must be available.

The evidence reveals that in Warren Township, as in most other municipalities, approximately 59% of the population travels to work in 30 minutes or less, and that 84% of the population travels to work in 45 minutes or less. That means that close to half of the population is travelling more than 30 minutes and that a commutershed based on 45 minutes would be entirely reasonable. Indeed, it has been suggested in testimony before this court and in prior litigation elsewhere that even a sixty minute commute is a commonly acceptable limit for commutation. *Cf. Oakwood at Madison, Inc. v. Township of Madison, supra* at 528. The difficulty with using a pure 45-minute commutershed is that the configuration created will split municipal or county boundaries. That, in turn, creates two other difficulties. First, when a political subdivision is split, is it included or excluded and should that decision be based on the amount of land area touched, the amount of population in-

volved, or other factors? Second, even if this problem can be resolved, a more significant obstacle cannot be overcome. Specifically, most experts agree that municipally based data is not as reliable as that compiled for counties or other political subdivisions. Most federal and state data is gathered utilizing county lines. Therefore, the decision to use only a 30-minute commutershed, but to include the entire county if touched by that commute generates a region that has definite boundaries, has a reliable data base and generally reflects established patterns of commutation. Thus, the three ingredients of a sound commutershed are present.

I recognize that including the entirety of a county touched could create a travel time exceeding 45 minutes. As noted, a travel time beyond 45 minutes is not inherently unreasonable. For example, a significant employment center might be located a short distance beyond the 45-minute commute which would nonetheless attract job seekers. Also, the evidence before the court indicates that seldom will the travel time significantly exceed 45 minutes. Finally and most importantly, the reliability of the county data justifies any arbitrariness that may arise from the touch-the-county standard.

Two final details concerning the commutershed concept warrant attention. First, the use of specific speeds for various types of roads is based on accepted planning standards. That approach seems far more reliable than to depend upon the vagaries inherent in measuring the commute by actual driving experience. Today's commute may differ drastically from yesterday's based on the difference in weather, road conditions, the driving habits of the other people on the road or indeed, of the driver measuring the commute. Second, when the modified commutershed was first introduced, some suggested that this approach would create a multitude of overlapping regions. No overlap exists. Establishing a prospective need region is merely a step in the process of reaching a fair share number for a municipality. One planner has described the creation of the prospective need region as analagous to the construction of

scaffolding for a building. The scaffolding is constructed merely for the purposes of putting the building in place and thereafter removed to another location so that another building might be constructed. Similarly, the formulation of a commutershed is done solely for the purpose of permitting the computation of the fair share number. Once that has been accomplished the individual municipality's commutershed no longer has any relevance.

## 2. *Regional Need*

The determination of regional need has the potential, statewide, to impact on each municipality's fair share number more significantly than any reasonable fair share factor which has been considered by this court. Therefore, the subject deserves a detailed analysis. I will first address issues directly related to present need, then prospective need. Thereafter, I will address issues that concern both.

### a. *Present Need*

As noted, the present need of a municipality consists of two components. The indigenous need within the municipality must be added to that municipality's share of the reallocated excess regional need. Both the indigenous and reallocated excess need represents units lacking complete plumbing, or adequate heating or units that are overcrowded. The reallocated excess pool for Region I consists of 35,014 units.

The three categories used here to determine substandard units grow out of a recommendation contained in the Urban League Report. These categories represent readily identifiable classifications which can be obtained in an unduplicated count from the 1980 census. Moreover, few would argue that a unit lacking adequate plumbing or heating or which is overcrowded is not "substandard" as that word is commonly understood. The CUPR expands upon these categories. CUPR at 100–118. It establishes a two-level analysis depending on whether the

unit was built before 1940 or after. If the unit was built before 1940, it will be considered substandard if it has any one of six deficiencies. If built after 1940, the unit is substandard if it has any two of the same six deficiencies. These six deficiencies include the three categories used in the Urban League Report as well as lack of exclusive access, lack of complete kitchen facilities and lack of an elevator in a structure of four stories or more.

The CUPR acknowledges that there is no unambiguous way of testing the validity of these categories. CUPR at 111. It also recounts, at some length, the difficulties inherent in properly measuring the need. CUPR at 100 *et seq.* Unfortunately, it does not address the apparent anomaly that a unit which is substandard in 1939 may become standard in 1940. I find that the Urban League approach is less ambiguous, more accurately reflects substandardness and is easier to work with. Finally, an examination of the statistics contained in the CUPR reveals that the resulting pool of substandard units is substantially equivalent to that derived from the Urban League method.

Defendant's experts have not challenged the mathematical accuracy of the count in any of the three categories, they have not suggested utilizing any other categories, nor have they challenged the propriety of including overcrowded units in the present housing need. Defendant's experts argue against the inclusion of units lacking adequate heating or plumbing because they have been or can be rehabilitated or demolished. Depending on which of defendant's experts was relied upon, the present need pool would be reduced by 25% to 50%, to as low as 17,875 units.

One of defendant's experts cited figures as to the extent of rehabilitation or demolition which has occurred in Newark or Jersey City since 1980. However, he made no effort to ascertain whether that activity was offset since 1980 by further deterioration elsewhere in the urban core or in the ring of municipalities surrounding the core. It could as easily be

assumed that the pool number has increased since 1980 due to the continuing decay of the cities and the evaporation of subsidies. Furthermore, the identification of indigenous need does not include unoccupied units. Therefore, the demolition of unoccupied units would not reduce the pool number, as assumed by defendant's experts.

The effort to remove from the pool all units which can be rehabilitated fails for two reasons. First, there is no reason to believe that the urban aid towns which contain the vast majority of present need that must be reallocated, have the capacity to repair the physically deficient units. As mentioned, the ability of those municipalities to undertake substantial rehabilitation has decreased in recent years due to the paucity of governmental subsidies. Second, the approach taken by defendant's experts is fundamentally unfair because it places on the urban poor municipalities an obligation beyond their fair share of their indigenous need. *Mount Laurel* goes the other way and relieves the core cities of that obligation. *Mount Laurel II*, 92 *N.J.* at 243.

On the other side of the ledger, an argument was made that the present need count should not only include substandard units, but also include units in which lower income families are paying a disproportionate share of their income for housing. The Court has suggested that not more than 25% of a household's income should be spent for housing costs. *Id.* at 221, *n.* 8. The inclusion of the financial need category would dramatically increase the present need. The Urban League Report states that the regional percentage of substandard housing in Region I is 6.4%. ULR at 18. In contrast, the financial need in Region I ranges from 16% to 35% of lower income households paying in excess of 30% of income for housing. ULR at 18.

Some argue that to include all of those households in the fair share number would make that number unattainable. The testimony in this case indicates that Warren's fair share could increase as much as 380 units if a financial need category was

included. The sheer size of the numbers does not justify their exclusion from the formula. However, other more specific reasons support their exclusion. In the first instance, it must be recognized that many people do not fully report their income. Second, there are many people who by choice are willing to pay a disproportionate amount of their income for housing. Third, there is a considerable housing "mismatch." On the one hand, some rental units which meet the affordability standards are occupied by families not in a lower income category. On the other hand, lower income families are occupying units which they cannot afford. If the families and units could be matched up, more affordable units, particularly for moderate income households, could be occupied by needy families. Fourth, it must be recognized that many people of retirement age have developed substantial assets which allows them to acquire homes. However, based upon their reported income, they could nonetheless fall into the category of financial need at least within the *Mount Laurel II* definition. At 221, *n.* 8. Fifth, some argue that the needs of lower income households can be met more appropriately through income maintenance programs or other extended rent supplement programs rather than the construction of new housing. Sixth, many families in financial need are occupying substandard units thereby creating a duplication in the count of present need. For all of these reasons, it is most difficult to develop a trustworthy count of financial need which should be satisfied through *Mount Laurel* solutions. In summary, notwithstanding that there is some unmet need, the untrustworthiness of the data and the desire to avoid questionable assumptions compels me to not incorporate this category.

Assuming that all the reasons to exclude a financial component could be overcome, *Mount Laurel II* is not entirely clear as to whether the inclusion of a financial need category is expected. The Supreme Court mentioned the inclusion of a financial component in Mount Laurel's fair share number. *Id.*

at 299–300. However, the Court made no mention of that category when it directly discussed present need:

As noted before, *all* municipalities' land use regulations will be required to provide a realistic opportunity for the construction of their fair share of the region's present lower income housing need generated by present *dilapidated or overcrowded* lower income units, including their own. Municipalities located in "growth areas" may, of course, have an obligation to meet the present need of the region that goes far beyond that generated in the municipality itself.... [at 243; emphasis in original as to "all"; emphasis supplied as to "dilapidated or overcrowded"]

Nothing that has been said here concerning exclusion of a financial component should countenance a municipality's failure to undertake an aggressive program of pursuing any available rent supplement programs which may be available to assist those who are in financial need.

I now shift from a consideration of what constitutes the present need to a determination of what triggers the creation of the excess pool. As discussed earlier, the excess of deficient units in any municipality over the region's percentage of substandard units will be placed in the pool, which will be allocated to growth area municipalities at or below the regional percentage. In this case, I have found that the regional percentage of substandard housing in Region I is 6.4%. Thus, a contribution to the pool is triggered when a municipality's percentage of substandard housing stock exceeds 6.4%.

It should be kept in mind that the 6.4% is not a ceiling. The percentage is developed to create the pool and to exclude the selected urban aid municipalities from any obligation beyond that percentage. The percentage was not intended to exclude the possibility that a growth area municipality which was reduced to the 6.4% level in the process of forming the excess pool, but was not an a selected urban aid municipality, would still receive a reallocation taking it over 6.4%. Nor was the figure intended to preclude the possibility that a municipality which was under the 6.4% of substandard units would exceed that percentage by virtue of reallocation. No effort was made to make all municipalities a mirror image of each other. *Cf.*

*Mount Laurel II* at 350. The point is that the identification of the excess pool is merely a step in the process of determining a municipality's obligation. The final step is to make a fair distribution of the pool in a manner which reflects the Supreme Court's decision.

One final aspect of the calculation of the present need requires attention. The computation of Warren's fair share number allows for its reallocated excess obligation of 394 units to be phased in over 18 years in three almost equal portions of 131. That represents a reduction of the fair share to 1990 of 263. The concept of automatically phasing present need was developed by the Urban League Report, despite the Court's warning that the power should be exercised sparingly. *Id.* at 218–219. As noted above, I have allowed Warren Township's present need to be phased in over three, six-year periods. However, I do not support the concept of the automatic phasing of present need. The circumstances of each case should dictate the result. For example, it would seem questionable to phase a small present need number over a long period of time. In this case, however, the phasing is warranted. The present need pool has been accumulating over many decades. It should be our goal to empty that pool as rapidly as possible. I could not justify the automatic phasing of prospective need in this case or any other case based on the size of the number alone. There would have to be other circumstances to warrant it. *Ibid.* The prospective need number should be met, if it can be met, so as to prevent it from becoming part of the 1990 present need pool. It seems reasonable therefore, given the size of the present need number, to allow the township to satisfy its obligation over a longer period of time. That should further ensure Warren's ability to meet its prospective need, and start towards the goal of eliminating its present obligation.

b. *Prospective Need*

As explained earlier, the prospective need is calculated by projecting population increases by age cohort through the aver-

aging of two projection models, applying a headship rate to obtain the number of households expected to be formed and by multiplying that number by the percentage of the population which is classified as lower income. Defendant vigorously attacks the propriety of this method.

The two models used to project population are the Economic/Demographic (Model 1) and Demographic Cohort (Model 2). The central difference between the two models is the manner in which migration is projected. Model 1 projects migration of the population in response to labor market conditions. If the labor demand is higher than the supply then in-migration is projected to match the demand. If the labor demand is lower than the supply, out-migration occurs. Model 2 projects migration based on historical patterns of the prior decade. It assumes that the rate of increase or decrease of migration in the prior decade will be duplicated in the present decade.

Exclusive use of either model is risky. Model 2 predicts based on past trends. We do not know that what happened in the past will happen in the future. Some testimony suggested that the out-migration from the northeastern states to the sun belt is diminishing. Model 1 predicts the future based on economic and demographic analysis. Projections of what will happen without reference to history is also difficult. Some testimony suggested that the anticipated labor demand is overly optimistic. One of defendant's experts asserted that the Model 1 projections were so overstated that the 1980 projection developed during the 1970's was 238% higher than actual growth for the 1970 decade. It was his position that at most, New Jersey will grow at a pace equal to the 1970–1980 rate during the 1980's and in all likelihood, the rate would be even slower. Consequently, he suggested the use of historical growth rates similar to Model 2. Though he insisted that the growth rate of the 1970's was not likely to be duplicated during the 1980's, he agreed to assume the same rate of growth as a concession to those who would argue that he was underestimating. The approach suggested by this expert flies in the face of

*Mount Laurel II.* In addition to the inherent weaknesses of a purely historical approach outlined above, it is unknown to what extent the lack of household formation in the 1970's reflects exclusion.

The purpose of utilizing two population projection methods is to even out the possible wide fluctuations in those projections. The Urban League Report, through the averaging of the two models projected an increase in our State's population by 1990 to approximately 7,735,000. The accuracy of the result achieved by averaging is demonstrated by an analysis of census data. According to a publication of the bureau of census entitled "Estimates of Populations of States, by Age: July, 1981," the population of New Jersey as of April 1, 1980 was approximately 7,365,000. That same document projected a 1990 population of 7,513,000. The census estimates are periodically updated by provisional projections during the decade. The most recent estimates published in 1984, entitled "Estimates of Populations of States: July 1, 1981 to 1983" (advanced report) contain population estimates as of July 1, 1983, as well as information concerning the average annual percentage of change. Those figures show that the New Jersey population is estimated at 7,468,000 as of July 1, 1982. That represents an average annual growth of .464%—nearly ½% a year. That compares to the earlier projection of an average annual growth of .20%. If one accepts the census bureau estimate of New Jersey's population in 1980 as the most reliable data available and projects growth for the decade of the 1980's at the rate of .464% on a straight-line cumulative basis, the projected 1990 population would be 7,714,000—a figure virtually identical to the 7,735,000 projected by averaging the two models.

The only other criticism of the prospective regional need calculation which defendant vigorously pursued was the argument that defendant's prospective obligation should be reduced by 40% because it is being assessed in 1984 for the ten-year period from 1980 to 1990. As defendant concedes, its prospective need obligation did start in 1980. Any reduction of the fair

share based on the elimination of responsibility for the first four years would cause 40% of the decade's need to be lost. It would also encourage towns to hide from their obligation as long as they could, since the number would continue to reduce as long as it is based on a 1980–1990 projection. To the extent that defendant is arguing that the township cannot satisfy a need developed over ten years in six years, the issue is compliance. If, when the defendant submits revised land use regulations, it can demonstrate that it cannot satisfy its obligation by 1990, *despite its best efforts,* the court will have to fashion an appropriate schedule. To the extent that defendant suggests that the compliance period should be from 1984–1994, the argument fails for two reasons. First, as already explained, it will leave four years of need unaccounted for. Second, it will require projection of prospective need into the 1990's. That will force reliance upon a 1980 data base for projection into the 1990's. For example, a municipality sued in 1988 would have its prospective need projected to 1998 thereby creating an 18-year projection. It is obviously preferable to maintain as current a data base as possible by taking advantage of the 1990 Census. That is the reason why Warren's prospective need has been calculated to 1990.

### c. *Present and Prospective Need*

Certain criticisms raised by defendant relate to both the present and prospective need methodology. Specifically, the defendant objects to the 20% adjustment for vacant developable land and the three percent adjustment for vacancies.

As discussed above, the methodology increases the surplus present and prospective need number of each municipality by 20% across the board. Underlying the concept of this adjustment is the desire to avoid the loss of housing units which occurs by virtue of the reduction of fair share obligations due to the absence of adequate land or credits given for prior *Mount Laurel* compliance. If the fair share methodology generates a number which a town cannot accommodate because

it has inadequate land or if the town is entitled to a credit against that number because it has already built some lower income housing, the obligation of the town must be reduced. However, the regional need remains. That need is not a theoretical number. It represents housing required for lower income households. Unless that responsibility is transferred elsewhere, it is lost.

This concept is not new. A similar approach was embodied in "A Revised Statewide Housing Allocation Report for New Jersey," dated May, 1978. In that report, the New Jersey Division of State and Regional Planning evaluated all municipalities to determine whether they had adequate vacant land to absorb the housing obligation which the report assigned to them. If a municipality lacked adequate land, that portion of its allocation which could not be absorbed was reallocated to the remaining municipalities. To prevent the possibility that reallocation brought borderline municipalities over their ability to absorb their allocation, a second evaluation was undertaken. This process was repeated until the entire need was satisfied without exceeding the capacity of any municipality. The judiciary cannot utilize this administrative technique because it does not have the opportunity to determine the fair share of all of the municipalities in the state in a single case. However, through the 20% readjustment a similar result can be accomplished.

The housing allocation report estimates that it was necessary to reallocate 23% of all presently needed housing units. Virtually all experts agree that there is no reliable statewide data concerning vacant developable land today. However, a reasonable assumption can be made that the need for reallocation is of approximately the same magnitude today as it was in 1978. Therefore, the Urban League Report recommended the use of a 20% reallocation across the board ULR at 12. I find the recommendation to be sound.

One of defendant's experts agreed that some reallocation procedure was appropriate. The other defendant's expert asserted it should be eliminated. Both of them contended that the 20% adjustment makes the fair share number too large. It is not enough to say that the adjustment should be reduced or eliminated merely because it is one's subjective view that the resulting number is too high. The question is whether the adjustment is reasonable standing alone. Objective reasons have not been presented to me to justify its modification.

The reallocation procedure accomplishes several goals. It enables the judiciary to engage in statewide reallocation even though it is setting fair share obligations on a case-by-case basis. It avoids the loss of needed housing units. It permits the court to give repose to a municipality without concern that after repose the court might be required to reallocate additional housing to that municipality based on the inability of other towns in the region to absorb their fair share.

Note that the reallocation procedure is made necessary because of the absence of reliable vacant land data. At such time as verifiable data becomes available, the reallocation procedure might be revised.

In addition to the 20% adjustment, the methodology increases the fair share by 3% to allow for mobility in the housing market. If fair share numbers were designed to match evenly the need and the fair share numbers were satisfied, any family desiring to move could not do so unless another family also moved to make room for them. Therefore, there must be a reserve of unoccupied units to permit mobility. The planning community generally recognizes the need for a vacancy allowance of 1.5% in sales housing and 5% in rental housing. However, the Urban League Report, ULR at 25, and plaintiffs' experts noted the likelihood that presently, most *Mount Laurel* housing will be satisfied through sales units. Therefore, it recommended the use of 3%. Again, defendant's experts do not challenge the theory of the adjustment, but rather its result.

Again, they contend it makes the fair share number too large. The answer is the same. The question is whether the adjustment is reasonable standing alone.

### 3. *Allocation Factors*

The last step in this analysis of the fair share methodology is to examine the rationale for each of the factors selected.

#### a. *Present Need Factors*

#### (1) *Growth Area*

This factor measures the amount of growth area acres in a municipality as compared to the growth area acres in the region. Any reasonable methodology must account for a municipality's physical capacity to provide space for new construction. The growth area factor is designed to reflect that capacity. It identifies that area within the municipality which has been earmarked by the SDGP as an appropriate place for development. Moreover, the Supreme Court strongly supported the use of this factor when, in referring to circumstances in which exceptions would be made to SDGP classifications, it said:

> The foregoing exceptions will allow a party to have the court impose a *Mount Laurel* obligation on a municipality that has no growth area as shown on the concept map, or to impose a greater *Mount Laurel* obligation by, in effect, proving that the growth area should be enlarged, or, conversely, to relieve a municipality from any *Mount Laurel* obligation even though the concept map shows it as including a "growth area," or to diminish the obligation by proving that the "growth area" shown on the concept map should be cut down. [*Mount Laurel II* at 241]

Also, the strong implications of the Supreme Court's instruction in two of its *Mount Laurel* remands was that the extent of the growth area should affect the extent of the fair share. In *Round Valley v. Township of Clinton,* the Court directed that:

> On remand the trial court shall determine whether the fair share can be accommodated completely in the growth area consistent with sensible planning. If it can, then the fair share determination below shall stand; if not, it shall be revised appropriately. [*Mount Laurel II* at 329]

In *Urban League of Greater New Brunswick v. Borough of Carteret,* the Court instructed:

> In determining fair share, the trial court shall review the SDGP's characterization of each of the municipalities before it.... As previously stated, determination of fair share must take into consideration, where it is a fact, the inclusion within particular municipalities of non-growth areas where, according to the plan, growth is to be "discouraged." [*Mount Laurel II* at 351; *cf.* 225, 227.]

It should be recognized that a municipality's capacity to accept lower income housing would be better measured by a factor which identifies the amount of vacant developable land within the growth area. Not all growth area land is vacant or suitable for development. Some towns designated as growth are fully developed. Other vacant land is either physically constrained due to slopes, watercourses or other conditions or is inappropriate for *Mount Laurel* high density development because of other planning or environmental concerns. The decision not to use vacant developable land is dictated by the inherent unreliability of that data. The last effort to compile such data was undertaken in the early 1970's. An aerial survey was made of the State. There is virtual agreement in the planning community that these photos are so outdated that they are unusable for allocation purposes. Therefore, despite the desirability of using only vacant developable land in a growth area as a land factor, I cannot utilize that alternative. To the extent that land within a growth area is developed or constrained, the vacant developable land defense can be raised to reduce the town's fair share.

A second alternative would be to use vacant developable land as a factor in lieu of growth area. Aside from the unreliability problem, the language of the Court just cited emphasizes the importance of linking the land factor to growth area considerations.

The last alternative is to eliminate any land factor on the theory that it cannot be assumed that a growth area designation assures that the land in the growth area is either vacant or developable for high density construction and on the theory

that no other land factor is suitable. This would leave the allocation of fair share heavily dependent upon employment factors. That, in turn, would shift the obligation to the already developed, industrialized municipalities—those municipalities least able to handle the responsibility. Conversely, those towns with substantial vacant land but little employment would have their fair share reduced. Finally, the fact of the matter is, no fair share methodology would be complete without a factor which assesses the physical capacity of a municipality to accommodate development in that area into which the Supreme Court sought to channel *Mount Laurel* growth.

### (2) *Present Employment*

This factor measures the number of existing jobs in a municipality as compared to existing jobs in the region. The Supreme Court has singled out the importance of employment as an allocation factor, *id.* at 256, as have all planning experts before this court. A major goal of *Mount Laurel* is to enable people to live in decent housing near their place of employment. *Id.* at 210–211, *n.* 5. This factor represents a present housing demand since the existence of jobs creates the need for shelter. It may also reflect a policy of exclusion which has existed for many years because some towns have invited factories but excluded the workers. It is just as exclusionary to prevent workers from living near their workplace as it is to prevent the poor from living in more affluent communities. *Id.* at 211. Finally, to the extent that jobs create ratables, it affects the municipality's fiscal capacity.

Defendant's experts embrace the use of employment as a factor but assert that it should be more heavily weighted and question the adequacy of the data upon which it is based. While accepting the three present need factors, one of the experts contended that present employment should represent 50% of the equation rather than 33⅓%. Regrettably, he provided no justification for weighting. In the absence of some clear reason to do so, it should not be done. There is a built-in

relationship of all of the factors in the methodology, a balance, which is crucial to its overall structure. As just discussed, overemphasizing employment tends to move the fair share back to the more industrialized towns which are usually developed. It would move it away from the suburban bedroom communities which have less employment but more land.

Defendant challenges the reliability of the data for this factor. The factor uses "covered employment" information provided by the New Jersey Department of Labor and Industry. Covered employment represents all private sector jobs covered by unemployment compensation. Consequently, the figures do not include military employment, state employees and some other smaller categories. Also, the data reports jobs based on a post-office address rather than actual location. Therefore, if a job is located in a town which uses another town's post office or if the place of employment crosses municipal boundaries but uses only one post office address, the figures can be misleading with respect to a municipality. From a regional standpoint, in most cases, the figures would not be misleading because they would be counted only once in the regional total. Despite the isolated problems with municipal data, the figures are the most reliable data available. They represent the vast majority of people in the work force and constitute a valid figure in most cases. In special circumstances, adjustments can be made on a case-by-case basis. No such circumstances exist in Warren. The critical importance of including a job factor mandates referral to some statistical base. No one has even suggested a better source.

### (3) *Median Income*

This factor measures the relative position of a municipality's median income as compared to the regional median income. It is intended to account for the town's ability to defray the infrastructure costs of high density building, to identify prior exclusionary policies or to reward prior inclusionary efforts. This factor, like the other factors, has its roots in *Mount*

*Laurel II.* As to the ability to absorb infrastructure, the Court recognized that satisfaction of the *Mount Laurel* obligation may impose substantial financial burdens on a municipality. *Id.* at 265. The factor seeks to equitably distribute those burdens. As to exclusion, the Supreme Court emphasized that towns must plan for all income levels. *Id.* at 211. As to inclusionary efforts, fairness requires that prior inclusionary construction, even if it does not qualify for credit toward the fair share, should be rewarded.

The criticism leveled at this factor centers on the wisdom of using any economic factor and on its manner of implementation, if it is to be used at all. Those who would eliminate the median income factor argue that the mere existence of a higher median income does not support the conclusion that the municipality can absorb greater infrastructure costs, nor the conclusion that the municipality can absorb greater infrastructure costs, nor the conclusion that the municipality has been exclusionary in the past. The proponents of the use of the factor stress that insofar as *Mount Laurel* is an economic decision, the use of an income factor is entirely appropriate. They also contend that a municipality which has inclusionary zoning or assisted housing will probably have a lower median income than a municipality which has been more exclusionary. For example, a municipality that has permitted substantial multiple dwelling construction will likely have a lower median income than one which has restricted development to single family homes on large lots. Warren illustrates this proposition. It has no multiple dwelling developments. Most single-family zoning is large lot and its median income is over 140% of its regions.

While I have some reservations as to whether further experience will demonstrate that this factor will accomplish its objectives, those concerns are overridden by the importance of having an economic indicator which mirrors fiscal capacity, prior exclusion, and most importantly, past inclusion. Eventually, the planners and statisticians may develop data which will verify whether there is a connection between median in-

come and these objectives. At such time, the assumptions made here can be retested and the factor can be reevaluated.

Those who find the manner of implementing an economic factor troublesome argue that the median income should be computed in a different manner or that a different economic factor should be used.

The argument that the median income should be computed in a different manner arises out of the fact that, in the present formula, median income is initially expressed as a ratio whereas all other factors are expressed as a percentage. That is, the other factors represent the municipality's *proportion* of the regional growth area or employment while median income represents the *position* of the municipality in relationship to the regional median. Thus, factors expressed as percentages of a region will total 100% when the percentages for each municipality in the region are added. The same is not true with a ratio which, for example, in Warren's case is expressed as approximately 140% of its regions median income.

The methodology in this opinion uses the ratio as a modifier by multiplying it by the average percentage of the other factors. Two alternative means of calculation have been suggested. First, the ratio could be maintained as a ratio and multiplied times the fair share number produced by the other percentages. Second, the ratio could be converted to a percentage and multiplied directly times the fair share number rather than being incorporated into the formula and divided equally as in the methodology adopted in this opinion. The difference is most graphically illustrated using Warren's prospective need calculation. For ease of comparison, the examples shall not include the 20% vacant land or 3% vacancy adjustments.

### 1. *The methodology used in this opinion*

2.556 (Growth Area) + .304 (Present Emp.) + .428 (Emp. Growth) = 1.096
1.096 (sum of 3 factors divided by 3) × 1.41 (141% median income) = 1.545%

The fourth factor of 1.545%, which represents the three-factor percentage modified by the median income ratio, is then added to the equation and a final percentage obtained as follows:

$$\frac{2.556 + .304 + .428 + 1.545}{4} = 1.208\%$$

The new percentage of 1.208% is multiplied times the regional need to obtain the fair share as follows:

$$
\begin{array}{rr}
\text{Prospective Need} = & 49,004 \\
\times & 1.208 \\
\hline
\text{Fair Share} & 592
\end{array}
$$

2. *As a ratio multiplied times the fair share produced by three factors*

As noted in 1 above, the three factors divided by three generate a percentage of 1.096. When multiplied times the regional need of 49,004 they produce a fair share of 537. If the median income ratio is multiplied by that number, instead of being averaged as a fourth percentage, the following results:

$$
\begin{array}{llr}
\text{3 Factor Fair Share} & = & 537 \\
& \times & 1.41 \ \text{Ratio} \\
\hline
\text{New Fair Share} & = & 757
\end{array}
$$

3. *As a fourth percentage multiplied times the fair share produced by three factors*

As noted in 1 above, the three factors produce a percentage of 1.096 and the ratio modifies this percentage to 1.545. The three factors multiplied times the regional need produced a fair share of 537. If the median income ratio expressed as a percentage is multiplied times 537, instead of being averaged as a fourth percentage, the following results:

$$
\begin{array}{llr}
\text{3 Factor Fair Share} & = & 537 \\
& \times & 1.545 \ \text{(modified \%)} \\
\hline
\text{New Fair Share} & = & 830
\end{array}
$$

To summarize, the fair share number without an income factor would be 537. With the median income as a modifier of the three-factor percentage, the number increases by approximately 10% to 592. The median income used as a ratio multiplier causes an increase of approximately 41% to 757. The median income ratio expressed as a percentage and used as a multiplier causes an increase of approximately 55% to 830.

As has been repeatedly emphasized throughout this opinion, the touchstone of a well-designed methodology is that it relies on sound data and that no aspect of it overpowers the formula. It should be a system of checks and balances. The mathematical analysis set forth above demonstrates that the use of alternative means of calculating median income can have a disproportionate effect upon the overall fair share analysis. Furthermore, the mere fact that the median income factor is initially stated as a ratio and then used as a modifier of a percentage does not detract from its validity. The purpose of the use of a ratio is to reflect the position of a municipality in relation to other municipalities and to do it in a manner which does not skew the results.

Another alternative suggested by one of defendant's experts was to avoid expressing median income as a ratio altogether and instead create what he saw as a "true percentage." This expert would derive what he has labelled the municipal median income percentage by multiplying municipal median income times the number of households in the town to produce a gross municipal income. He would then follow the same procedure for all other municipalities in the region and aggregate the municipal totals to obtain a gross regional income. By dividing the municipal gross income by the regional gross income, a municipal median income percentage could be arrived at without ever using a ratio.

This method produces some obviously unsatisfactory results. An example will illustrate. Assume a region having a total gross median income of 60 million dollars. Assume next that Town A has a median income of $30,000 and 100 households. The gross median income of that town would be three million dollars. Assume that Town B has a median income of $20,000, but 1,000 households. The gross median income of that town would be 20 million dollars. Therefore, Town A's regional percentage of median income would be 5%, and Town B's would be 33⅓%. Yet, by virtue of its substantial growth, Town B might very well have been less exclusionary than Town A.

This expert's approach would, in all likelihood, decrease the fair share number of those smaller, affluent towns having large vacant developable land and fewer households. In fact, if applied to Warren, the prospective fair share (without including the 20% vacant land or 3% vacancy adjustments) would be reduced by approximately 25%.

Having completed the analysis of the median income factor, two alternative economic factors should be considered. One recommendation is to use tax ratables as an economic factor. Another is to use the change in the proportion of lower income households in the municipality in relationship to all municipal households.

The use of a ratable factor tends to duplicate the employment growth factor, but less accurately, because of unavoidable deviations in assessment and equalization practices throughout the State. Empirical testing of the ratable factor by the Urban League group demonstrated its disparate results.

The use of a factor based on the change of the proportion of lower income households emanates from an analysis of footnote 49 in *Mount Laurel II.* *Id.* at 297. This factor appears to identify exclusion. However, not only does it have a tenuous connection to fiscal capacity but also there is a data problem. Footnote 49 refers to statistics for families. This information is now accumulated for households instead of families. Since this factor is intended to measure a trend over many years, insufficient comparable data is available. Alternatively, it would be necessary to convert the family figures to households and that conversion requires assumptions that would render the data base unreliable. The family to household ratio is a figure which is subject to much debate and frequent change.

### b. *Prospective Need Factors*

#### (1) *Applicability of the Three Present Need Factors*

The methodology allocates the prospective regional need through the use of the three present need factors analyzed

above, as well as a fourth factor—employment growth. Before discussing the fourth factor, it should be noted that the rationale supporting the use of the three factors for allocation of present need apply equally to their use in the prospective need formula. The allocation of future housing, as with the distribution of present housing, is directly related to the availability of land, the financial capacity to absorb infrastructure costs and the extent of the municipality's past exclusionary practices. Thus, the growth area and median income factors are as appropriate for allocating prospective need as for present need. The present employment factor is intended to show the current job status of the municipality. It represents a present need for housing because the existence of jobs also dictates the need for housing. It also reflects prior employment history and to the extent that jobs create ratables, it reflects upon a municipality's financial capacity. The reasons supporting the present employment factor have equal applicablity to the prospective need and, as will be seen, the factor also serves as a balancing mechanism to the employment growth factor.

### (2) *Employment Growth*

The employment growth factor is intended as a predictor of future job growth. It measures employment trends and mirrors the land use policies promoted by the municipality. It is tied together with the current employment factor by the fact that people are attracted to live in the area in which they are employed. As noted, *Mount Laurel II* specifically favors the use of employment factors in fair share allocation. *Id.* at 256. The presence of the two employment factors in the prospective need formula tends to avoid the unfair results which could occur if only employment growth were considered. For example, a municipality which historically had little employment, but has had a recent, sudden and possibly aberrant burst of employment could be assessed a fair share number which might be unrealistically high. Again, the two factors check and balance each other.

Three criticisms of the employment growth factor should now be considered. Defendant suggests weighting the employment factors and also argues with the reliability of the employment data. Those arguments have been fully addressed above in the discussion of the present employment factors.

The last argument raised by defendant concerns the mathematical method by which employment growth is projected. Defendant contends that a straight arithmetic measurement is preferable to the linear regression method used in this opinion. The straight arithmetic approach involves identifying the job base in the first year of the period to be measured and the job base in the last year of the period to be measured. Assuming there has been any job growth, the number of jobs in the first year would be subtracted from the number of jobs in the last year. The number produced would be divided by the number of years spanned and would represent the average job growth over that period. The linear regression method involves a much more sophisticated statistical approach, the complexities of which need not be addressed in this opinion. Suffice it to say that the purpose of using linear regression analysis is to establish a trend line which is truly reflective of the employment growth picture. It does so by evening out sharp increases and decreases which occur over the trend period and by reducing the impact of a sharp increase or decrease occurring in the last year of the trend period.

The value of the linear regression method over the straight line method is amply demonstrated in this case and, indeed, to Warren's benefit. The testimony discloses that for the decade 1972–1973 to 1983–1984, Warren had an employment growth of 539 jobs or roughly 54 jobs per year. Plaintiff's rebuttal testimony, utilizing employment statistics which became available towards the close of the case, revealed that Warren had experienced a growth in the 1983–1984 period of 1786 jobs. If the projection decade is moved forward one year to include the new data, the average employment growth on a straight line for the new decade would be 242 jobs per year—almost a 350%

increase. If the full 11-year period for which covered employment figures are available was utilized on a straight line, the average growth would be 211 jobs per year or almost a 300% increase. The result of applying linear regression would be to soften the impact of the tremendous growth in 1983–1984. Again, the desire to avoid extreme results controls the selection of the proper method.

Before completing the discussion of the allocation factors, it is again necessary to tie up some loose ends. As to the calculation of all four factors, the regional figure, which is the denominator used to obtain the percentage, excludes data from all selected urban aid and non-growth municipalities. There is a common theme which justifies this exclusion as well as specific reasons pertinent to each factor.

The common theme evolves from the fact that non-growth municipalities have no responsibility to the regional need. Similarly, selected urban aid municipalities do not have an obligation to handle more than the regional average of substandard housing and, therefore, they have no regional obligation, because realism requires a recognition that their present circumstances render it impossible for them to absorb more than the regional average. *Id.* at 243. Since the fair share methodology seeks to distribute 100% of the obligation among those municipalities who have it, it is unreasonable to include the data of those municipalities which have no regional obligation. That is so because in dividing up the regional pie equitably, the primary consideration is the relationship of every municipality having the obligation to every other municipality having the obligation. Inclusion of municipalities having no obligation would distort that relationship.

Specific reasons concerning each factor also call for this exclusion. This formula excludes selected urban towns from the growth area calculation because they are the traditional core areas or similar towns not likely to attract *Mount Laurel* type housing and because they generally lack significant vacant

land. Non-growth municipalities obviously cannot contribute to a count of growth acreage. This formula excludes selected urban aid municipalities from both employment figures because it would unreasonably diminish the responsibility of towns having a fair share obligation. If the high concentration of employment, albeit declining, in the selected urban aid municipalities was included in the regional total it would decrease the percentage of all municipalities having a regional obligation. The formula excludes selected urban aid municipalities in the calculation of the regional median income in order to make it more likely that towns which have made inclusionary efforts will be rewarded. If the median income of the selected urban aid municipalities were included, it would probably depress the regional median income so low that virtually no town having a fair share obligation would fall below the median. Therefore, even the most commendable efforts would go unrewarded.

## II.

## COMPLIANCE

Having determined that Warren Township's fair share is 946, it is now necessary to evaluate Warren's ordinances to ascertain whether they meet the *Mount Laurel* obligation. A finding that the land use ordinances are compliant requires a showing that Warren has removed all excessive restrictions and exactions which would preclude actual construction of its fair share. *Id.* at 258–259. If the removal fails to generate compliance, then Warren must employ affirmative devices such as, subsidies and inclusionary zoning. *Id.* at 260–274.

With this legal framework in mind the township's response should be reviewed. On December 2, 1982, the township adopted ordinance 82–19 which amended its existing zoning ordinance. That amendment purports to establish two high density zones (R–20th and R–20tha) consisting of three parcels. The ordinance provides for density bonuses which, in one district, would allow a density level up to seven units per acre and,

in the other, up to eight units per acre. The amendment also rezoned three other parcels, only one of which was offered by defendant for *Mount Laurel* compliance purposes. That parcel was rezoned R–10 to allow 10,000-square foot lots which could be varied in size down to a minimum of 7,500 square feet if sufficient lots are increased in size to maintain an average lot size of 10,000 square feet. On December 1, 1983, ordinance 83–20 was adopted providing for the mandatory construction of 30% lower income homes in any developments constructed in R–20th and R–20tha zones created by ordinance 82–19 but not for R–10 zones. Ordinance 83–20 also provided for the submission of a *pro forma* statement concerning low and moderate income housing, mechanisms to guarantee the maintenance of housing at lower income levels, provision for a waiver or reduction of the 30% mandatory set aside and allowance for least cost housing, in lieu of lower income units.

By defendant's own admission these modifications would result, at best, in 324 units of lower income housing. In light of defendant's additional admission that the fair share obligation is at least 419 units, there is no question that the zoning ordinance does not comply with *Mount Laurel*. The conclusion is even more powerfully buttressed by the court's finding that Warren's fair share if 946 and by the finding that the modifications to the ordinance will not generate even the 324 units that defendant claims it will produce.

Given defendant's admissions that its modifications are inadequate to reach its fair share number, it is not necessary to spend a substantial amount of time analyzing Warren's land use regulations. However, to provide some guidance to the master and the township in its revision efforts, certain aspects of the ordinance warrant comment.

*Removal of Excessive Restrictions and Exactions*

The removal of excessive restrictions or exactions refers to both the zone plan and those provisions of the zoning ordinance which would prevent actual construction of lower

income housing. *Id.* at 258–259. Even if the zone plan allows for sufficient density, it may also be necessary to remove other provisions of the ordinance to insure actual construction. The vast majority of the residential zoning in the town is restricted to 1½-acre lots. Such large lot zoning will not produce *Mount Laurel* housing. Furthermore, even the "smaller" lot zoning requires a minimum average of 10,000 square feet (approximately ¼ acre) and imposes other conditions which render it useless for *Mount Laurel* compliance. *Cf. Mount Laurel I*, 67 *N.J.* at 183. The township's efforts at high density rezoning are also suspect. Ordinance 82–19 does not contain any density bonus for lower income housing. Rather, the bonuses are for such things as energy conservation, senior citizen housing, voluntary square footage limitation and open space. Finally, the multiple housing and density bonuses permitted in the high density zones are only permitted on a conditional use basis, thus requiring anyone seeking to construct lower income housing to undertake a possibly lengthy approval process.

▉▉▉ Other excessive restrictions and exactions will merely be noted. As to chapter XVI of the township codification dealing with zoning, see the following:

1. § 16–4.5(b) requires all townhouses to have a private garage.

2. § 16–5.18 requires every townhouse to have a significantly different design from every other townhouse within 150 feet of the lot upon which the structure is erected.

3. § 16–10.3(b)(2) appears to require excessive setback provisions, which could be either cost generating or severely constrain the site layout thereby affecting densities.

As to chapter XV, see the following:

1. § 15–13(d)(3) requires parking and traffic problems to be "resolved". This vague language could inhibit the approval process.

2. § 15–13(d)(5), dealing with screening requirements, would appear to apply to high density development and apparently requires screening in the front yard of such developments.

3. § 15–13(d)(7) appears to give the broad discretion to deny an application if the use were not deemed to be in the public interest. Such site plan provisions are inherently suspect as a matter of law since the purpose of the site plan ordinance is not to countermand zoning provisions. Furthermore, that vague language could be used as a method of inhibiting the approval process.

4. § 15–19, dealing with design standards of roads, appears to have inadequate flexibility concerning road widths and other requirements as it relates to multiple dwellings for *Mount Laurel* purposes. *Mount Laurel* construction frequently necessitates waiver or modifications of requirements for curbs, road construction standards and other design standards.

5. The provisions of § 15–20 dealing with environmental assessment should be reviewed. Some of the requirements apparently go beyond issues of environmental concern and speak to the question of whether the use should be allowed at all. Again, that is not the function of a site plan ordinance. There is also some very subjective and vague language including such terms as "disruption of desirable community and regional growth" in § 15–20(c)(5), evaluation of "social impact" in § 15–20(c)(7) and similar phrases which could disrupt the expeditious handling of applications. Note, additionally, § 15–20(c)(7) which requires the applicant to provide a statement of alternative uses in the event that the proposed use is not acceptable, including an alternative of no project at all. Such a provision is patently unreasonable and the requirement that the applicant must substantiate numerous alternatives is without bounds. A site plan ordinance should address planning standards and not the issue of whether the use should be permitted. It should address those standards in clear, concise language which avoids cost generation.

### Using Affirmative Devices

With respect to the municipality's use of affirmative devices, ordinance 83–20 provides for a 30% mandatory set aside for lower income housing. Plaintiffs argue that a mandatory set aside of 30% is not feasible and that, in the absence of subsidies, not more than 20% of the housing can be devoted to lower income housing. For a mandatory set aside to be effective, the set aside must be reasonable and the unit density must be reasonable. If the set aside is reasonable and the density is reasonable, actual construction will result. If the set aside is too high or the density too low, no construction will occur because the project must be profitable. *Cf., id.* at 268, 279, *n.* 37. If plaintiff's argument in this case is correct, an issue not passed upon at this time, the 30% mandatory set aside could actually frustrate the construction of lower income housing. The township must reexamine its position. The provision in ordinance 83–20, which allows the waiver of the 30% requirement, may be an inadequate answer to this concern. As noted, the waiver is part of a conditional use procedure, which may be

cost generating and the existence of the waiver provision could be abused so as to result in no lower income housing at all.

The foregoing comments are not intended to pass upon the validity of any of the sections noted, nor are they intended to catalogue completely the potential inadequacies of the existing ordinance. The revision of the ordinance should not be done by court review or fiat at this time. Rather the governing body, planning board, the master and all those interested in the process should have the opportunity to submit a compliant ordinance to the court.

## III.

### BUILDER'S REMEDY

*Mount Laurel II* requires that a builder's remedy be granted if the builder has succeeded in the litigation and proposes to construct a substantial amount of lower income housing, and if the municipality has failed to prove that the proposed project would either substantially harm the environment or be otherwise clearly contrary to sound land use planning. *Id.* 92 *N.J.* at 279–280.

It is evident from what I have said that plaintiffs have succeeded in demonstrating that Warren's ordinances fail to comply with *Mount Laurel* guidelines. Furthermore, plaintiffs have demonstrated their intention to construct a minimum of 20% lower income housing units through concept plans and the testimony of their principals. The only defense raised to the builder's remedy concerns the suitability of the properties from an environmental standpoint. In that regard, *Mount Laurel* places a heavy burden on the defendant raising this defense to prove that the danger is substantial and very real. *Mount Laurel I*, 67 *N.J.* at 186–187; *Mount Laurel II* at 331, *n.* 68.

Defendants attempted to establish, through the testimony of an expert in waste water management, that the proposed projects would have a negative effect upon the Dead River and

also that there was inadequate sewer capacity within the township to accommodate the projects. Plaintiffs sought to counter that testimony through their own waste water expert who took the position that adequate existing capacity could be found or a method of treatment could be developed which would not degrade the water quality in the Dead River. Most of the testimony centered around the issues of whether governmental approval could be obtained by plaintiffs for the use or expansion of existing sewer facilities and the right to discharge the volume of effluent involved. Warren's expert pointed to the Wastewater Facility Plans affecting Warren (commonly known as the 201 studies) and the Water Quality Management Plans pertaining to Warren (commonly known as the 208 studies). Both studies are planning tools designed to establish a blueprint well into the twenty-first century for avoiding water pollution. The plans are developed based on expected water flow which, in turn, is extrapolated from population projection. The projections are made by the State predicated upon existing land use regulations in each municipality. Once the projections are aggregated, a total wastewater flow figure is obtained by using standard ratios of population to wastewater. Thereafter, the expected flows are disaggregated to the counties and ultimately to the municipalities. The municipalities or regional authorities, then develop wastewater management treatment plans utilizing their allocation of anticipated flow. Based on this allocation, Warren constructed its treatment plants through a subscription procedure which required landowners who desired sewer capacity to pay for a portion of the cost of the facility. In exchange, the property owner received a subscription contract which entitled the owner to a gallonage reserve. As a result, defendant argues that the growth of the township is necessarily limited by the wastewater allocation to Warren and the commitment Warren has made to its prospective users.

The reasoning is fallacious. The state population projections embody existing zoning patterns. In Warren's case

and others, that zoning is exclusionary. To permit Warren to hide behind a state policy which incorporates exclusionary zoning, is to permit Warren to do indirectly what it cannot do directly. Furthermore, testimony revealed that while these studies are useful long range planning tools, they are subject to modification upon proper application. As our Supreme Court has emphasized, without the assistance of the municipalities, the prospect of lower income housing is practically impossible. *Id.* at 263. The court expects that Warren will do whatever is necessary to help plaintiffs obtain modification of existing limitations.

At this posture the court will invite the master's opinion as to whether, notwithstanding the township's best efforts, the builders' projects are precluded by the unavailability of sewer capacity or the likelihood that no means are available to handle their effluent in the foreseeable future. Certainly, the court does not want to award a builder's remedy which cannot be fulfilled. The master should carefully scrutinize this issue so that the court can be assured that the builder's remedy received by plaintiffs is likely to be implemented within a reasonable time frame. If the court cannot be so assured, Warren will be called upon to satisfy its obligation elsewhere.

The court does not pass upon the densities requested by the builders or other specific aspects of the concept plans submitted. The governing body, planning board, plaintiffs, the master and other interested parties should all confer with respect to plaintiffs' proposed project for the purposes of attempting to agree upon appropriate development plans. *Id.* at 280. To the extent that the interest of the municipality and the parties can be accommodated within the bounds of *Mount Laurel II* requirements, the court should defer to those judgments. Of course, in the event that the positions of the parties cannot be reconciled, the master should recommend to the court a solution to the problem for the court's subsequent review.

In light of the court's finding that the land development ordinances of Warren violate *Mount Laurel II*, Warren Township is hereby directed to revise its ordinances within a period of 90 days of the filing of this opinion. Warren shall eliminate from its ordinances all cost generating provisions which would stand in the way of the construction of lower income housing. If necessary it shall also incorporate in its revised ordinances all affirmative devices necessary to lead to the construction of its fair share of lower income housing. *See generally Mount Laurel II* at 258–278.

I shall appoint by separate order, a special master to assist the municipal officials in developing constitutional zoning and land use regulations in conformity with *Mount Laurel II.*

## IV.

## CONCLUSION

The authoring of this opinion has strained my literary capacity to make the subject matter easily intelligible while at the same time not sacrificing accuracy and thoroughness. No doubt the opinion has also strained the reader's patience. However, the tedium is now over, for this conclusion will address the broader issues underlying the technical concepts discussed above.

Notwithstanding the importance of a fair share methodology in fulfilling the stated purposes of *Mount Laurel II*, the bottom line to all those involved in the litigation is the number generated. Despite the imprecision of the tools used for calculating the number, the Supreme Court requires me to fix a precise number because it believes that requirement is most likely to achieve the goals of *Mount Laurel. Id.* at 257. As in other areas of the law, a plaintiffs' and defendants' bar has developed in *Mount Laurel* litigation. Plaintiffs complain that the numbers produced by most of the formulas suggested are too low because they will not meet the need, because they are too low in areas most suited for lower income construction and because

they are too low to attract builders to sue. Plaintiffs' first complaint assumes that, in the absence of governmental subsidies, not more than 20% of any project will consist of lower income units. Based on that assumption and the statement that 40% of the state's families qualify as lower income, *id.* at 221–222, *n.* 8, one-half of the need will not be met in each project. Plaintiffs' second complaint, that the allocation methods do not give the most suitable municipalities a larger burden, rests on their assertion that the methodology adopted emphasizes employment. They theorize that this emphasis shifts the obligation to the more industrialized and developed communities. Plaintiffs' third contention, that the numbers are too low to attract builders, rests on principles of economics. Where fair share numbers are low, the builders are not likely to be attracted to those communities. The low numbers mean that few parcels are available. This, in turn, can inflate the market price, cause the availability of the tracts to depend on the individual predilections of the owners, subject those owners to political pressures and otherwise depress the activity of the real estate market for *Mount Laurel* housing. *Id.* at 261–262, *n.* 26. In short, there must be a climate created that fosters *Mount Laurel* construction.

Defendant argues that the numbers are too high because it will be necessary to build more market units than are needed to satisfy the lower income demand, because the size of the obligation will discourage voluntary compliance and because the magnitude of the construction is bound to damage the environment. The first argument presupposes that, in order to build one lower income unit without external subsidies, it is necessary to construct an additional four market units. Hypothetically, if there is a total regional need for 100,000 housing units and 40,000 (40%—the approximate state average) of those are to be lower income units, it would be necessary to build 200,000 units to satisfy the lower income need. In the process of constructing the 40,000 *Mount Laurel* homes, a surplus of 100,000 market value homes would be built. A corollary argu-

ment is that historically, building rates in New Jersey have never reached a level which could satisfy this volume of construction by 1990. Defendant's second argument, that the numbers discourage voluntary compliance, rests on the hypothesis that if the numbers were lower, the towns would be less prone to fight them. If they are too high, they must fight because the numbers are unattainable without degrading the quality of life in the municipality. The third environmental argument is related to the second in that defendant equates large construction with irreparable environmental damage.

While all of plaintiffs' and defendant's arguments concerning the numbers game have varying degrees of merit, it is not necessary to address them individually. Depending on one's philosophical bent, degree of concurrence with *Mount Laurel's* objectives and propensity for subjective analysis, one could easily join plaintiffs' or defendants' bar. However, while others may be entitled to such perspectives, I am not. The Supreme Court has charged the three *Mount Laurel* judges with the responsibility of formulating a methodology which identifies the housing needs of lower income people and thereafter fairly distributes the needs. Once the need is identified, it cannot be ignored to satisfy defendants or inflated to satisfy plaintiffs. The answer to the numbers game is squarely addressed by the Supreme Court:

> The provision of decent housing for the poor is not a function of this Court. Our only role is to see to it that zoning does not prevent it, but rather provides a realistic opportunity for its construction as required by New Jersey's Constitution. The actual construction of that housing will continue to depend, in a much larger degree, on the economy, on private enterprise, and on the actions of the other branches of government at the national, state and local level. We intend here only to make sure that if the poor remain locked into urban slums, it will not be because we failed to enforce the Constitution. [*Id.* at 352]

In designing a fair share methodology, subjective preconceptions should not control. Rather, the methodology should seek to determine objectively the precise extent to which a municipality must open its doors to the poor. Once that need is identified and the obligation imposed, the economy, private enterprise and

other branches of government will decide whether the need will be satisfied.

The pivotal question is not whether the numbers are too high or low, but whether the methodology that produces the numbers is reasonable. Any reasonable methodology must have as its keystone three ingredients: reliable data, as few assumptions as possible, and an internal system of checks and balances. Reliable data refers to the best source available for the information needed and the rejection of data which is suspect. The need to make as few assumptions as possible refers to the desirability of avoiding subjectivity and avoiding any data which requires excessive mathematical extrapolation. An internal system of checks and balances refers to the effort to include all important concepts while not allowing any concept to have a disproportionate impact.

The emphasis on these three ingredients is the continuous thread weaving itself throughout the fabric of the justification of the methodology. For example, with regard to reliability, the methodology relies heavily on census data wherever possible since all concede it is generally the most trustworthy source. A primary reason for adopting a prospective need region based on county lines was to obtain the benefit of county data which is more reliable than municipal data. *Cf. Mount Laurel II* at 258. In choosing a land allocation factor, the formula utilized only growth area because it is significantly more reliable than the data on vacant developable land. Finally, the employment factors used covered employment data, by all accounts, the most accurate statistics available.

With regard to the effort to avoid assumptions, several examples will illustrate. The methodology avoids subjectivity by focusing the definition of substandard housing only on three factors because they are the clearest indicators of deficient housing. The inclusion of other categories of deficiencies are less certain indicators of substandardness. The methodology avoids excessive mathematical extrapolation by rejecting an

economic factor devised from *Mount Laurel II. Id.* at 297, n. 49. That factor would evaluate exclusionary or inclusionary efforts premised upon the changes in the percentage of lower income families residing in the town. One reason for dismissing it was that it involved a conversion of family data into household data since reporting methods have changed. That conversion requires assumptions which, if even slightly incorrect, can create a large margin of error.

With regard to internal checks and balances, two examples will suffice. The projection of population to determine prospective regional need averages two population models, one which is considered to be conservative and the other more liberal. The allocation factors contain numerous checks and balances. The growth factor tends to draw fair share to large areas of suitable land and thereby offsets the pull of the employment factors to more urban and developed areas. The two employment factors in the prospective need formula tend to check each other because one reflects past trends and the other, future projections. The median income and growth area factors tend to balance the absence of significant employment in the bedroom communities by their emphasis on greater wealth and greater land capacity.

Not only must any reasonable methodology have as its keystone the three ingredients just discussed, but also it must be sufficiently structured to produce consistent results and it must be sufficiently flexible to deal with extreme cases at both ends of the spectrum. In the *Mount Laurel* context, the need for a bright line standard is paramount because "confusion, expense and delay have been the primary enemies of constitutional compliance in this area." *Id.* at 292. Our Supreme Court has eloquently described the result:

> The waste of judicial energy involved at every level is substantial and is matched only by the often needless expenditure of talent on the part of lawyers and experts. The length and complexity of trials is often outrageous, and the expense of litigation is so high that a real question develops whether the municipality can afford to defend or the plaintiffs can afford to sue. [*Id.* at 200]

Such results compelled the Court "to put some steel," *ibid,* into the *Mount Laurel* doctrine by providing certainty in its implementation. The Court itself resorted to bright line standards. Thus, the SDGP replaced the developing standard. *Id.* at 225. The precise fair share number standard replaced the numberless approach. *Id.* at 222. The centralized management by three judges replaced the county based management of the cases. *Id.* at 253. Similarly, the methodology set forth in this opinion draws bright lines which should eliminate confusion and strengthen the doctrine.

Despite the imperative of certainty, the methodology is not blindly rigid. It recognizes that some towns will lack the vacant developable land to handle the fair share the formula would assign—and so creates the vacant developable land defense. It acknowledges that some towns have made inclusionary efforts—and so rewards them through the use of the median income factor and by direct credits where appropriate. It understands that the methodology will not produce equitable results in every case—and so in extreme cases the litigants shall have the opportunity to persuade the trial court that an adjustment is appropriate. *Cf. Mount Laurel II* at 239–240.

This opinion would not be complete without commenting upon the task which has confronted this court and the challenge that lies ahead. The Supreme Court aptly characterized the assignment as follows:

> The most troublesome issue in *Mount Laurel* litigation is the determination of fair share. It takes the most time, produces the greatest variety of opinions, and engenders doubt as to the meaning and wisdom of *Mount Laurel* .... Each of these issues (region, regional need and allocation) produces a morass of facts, statistics, projections, theories and opinions sufficient to discourage even the staunchest supporters of *Mount Laurel.* The problem is capable of monopolizing counsel's time for years, overwhelming trial courts and inundating reviewing courts with a record on review of superhuman dimensions. [*Id.* at 248]

While the Supreme Court provided some general guidance concerning fair share, it envisioned that the specialized trial court it created would undertake the task of devising a comprehensive approach to the subject. *Id.* at 253–255.

Over the year which has elapsed since my assignment, I have had the opportunity to examine innumerable fair share reports, to engage in many court proceedings centering on fair share and have presided over two full blown trials which focused on fair share issues. This exposure has provided me with exactly the background which the Supreme Court foresaw as essential to resolving the difficult issues involved in fair share allocation. In that process, the Urban League Report has evolved. It has captured the attention of counsel in litigation and in conferences. I have become fully familiar with it, examined it as well as any other alternatives, in light of all of my experience. The methodology, both in its individual elements and as a whole, has survived every test and remains as the most carefully conceived approach presented to me. To those who would say that this opinion merely rubber stamps the Urban League approach, I invite them to examine the justifications for the methodology set forth in this opinion and, I urge them to offer a better alternative.

Indeed, the methodology represents the beginning of the refinement process. It is not written in stone and it should therefore provide the impetus for those in the legal and planning community, as well as others, to improve upon it or replace it with something better. However, in the interim, the *Mount Laurel* doctrine which has too long awaited a political consensus must not wait as long for a judicial resolution. *Id.* at 212. A substantial segment of the planning community has had its chance to achieve agreement and it has now done so. They could have debated for years over equally reasonable alternatives. Over the course of that debate, the uncertainty which has plagued the doctrine would have continued, the doctrine would have remained weak and the day when housing opportunities for lower income citizens became realistic would have been delayed. Instead, the planners have put aside their academic differences and taken a significant step towards the certainty contemplated by the Supreme Court, *id.* at 252–253, until a clearly preferable approach evolves. This decision is

intended to take another step toward the achievement of the goal of consistency, which is critical to the fulfillment of the constitutional obligation. *Id.* at 254.

This opinion has explored in depth the most minute aspects of fair share allocation and the broadest implications of the methodology espoused. Yet, it should not be forgotten that all that has been said most directly affects the residents of Warren Township. This community of approximately 20 square miles and 10,000 people is nestled in the Watchung range in a portion of our State known for its rural character and scenic beauty. It has significant undeveloped land, has relatively little commerce, has had comparatively slow population growth and its housing includes many high cost homes on spacious lots. In short, it is a very desirable place to live. Nonetheless, Warren is in the process of change. The construction of Route 78 and other factors have caused the entire Clinton corridor, of which Warren is a part, to burgeon. As a result Warren and its neighbors have drawn highly desirable commercial development along with the executives seeking to live in comfort near their place of employment. Absent *Mount Laurel,* Warren would experience substantial attractive ratable growth and continued exclusive residential development. With *Mount Laurel,* change will also occur, but of a different character. Warren is also appealing for *Mount Laurel* development because it is located entirely within a growth area, has an excellent employment picture and has a much higher income base than its regions. Although the exact affect of lower income development cannot be gauged, there will be demands on the infrastructure and the public services may require expansion. Warren complains that it must accept this alternative and that it must do so without assurance that other municipalities will do their part.

The issue is one of equity—the "fair" in fair share. Warren's complaints are understandable. Naturally it cherishes its character and it has a right to expect others to equally bear the burden of housing the poor. Warren's equity argument is

two-fold. It is unfair to require Warren to satisfy its fair share before other municipalities do their part. Secondly, it is unfair to bring such change to Warren.

As to the equity amongst municipalities, complete equity is not reachable, as the Supreme Court clearly stated:

> There may be inequities between and among these municipalities located within growth areas, as there undoubtedly are between all of them and municipalities outside of growth areas, for the tax and other burdens caused by the location of lower income housing will not be fairly spread. [*Id.* at 239; *cf.* 304, *n.* 54]

As to the equity between those who live in Warren and those who do not, candor requires a recognition that when Warren fulfills its *Mount Laurel* obligation there will be significant change. However, this decision represents only the first step in an ongoing process. The real challenge lies ahead in sensibly and sensitively planning the change which must occur. Our Supreme Court emphasized that the change caused by the satisfaction of the fair share need not be destructive. All who are involved in the process—the governing body, the planning board, plaintiffs, the master and the court must strive to devise a solution which will maximize the housing opportunity for the poor and minimize the impact on Warren. In the final analysis, in striking the appropriate balance between the rights of the residents of Warren and the rights of those who have been excluded, Warren must make the changes necessary to receive our lower income citizens if their constitutional rights are to be enforced.

## APPENDIX A
## Present Housing Need Regions

# APPENDIX B

### PRESENT NEED CALCULATION: TOWN X

| | A | B | C | D | E | F | G | H | I | J | K | L | M |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | STF-1 | STF-1 | STF-1 | STF-3 | STF-3 | STF-3 | | | | | | | |
| | Tbl 18 | Tbl 13 | Tbl 15 | XII-35 | X-17 | X-17 | % Units w/o ctrl htn,with inad.htng | Units Lacking Adequate Heating | Total Present Need | Adjusted Present Need | Occupied Dwelling Units | Fair Share Cap | Surplus Present Need |
| | Ovrcrwded Units | Ttl Units Lack Com Plumbing | Net Units Lack Com Plumbing Not o/c | Units Lack Cntr Heat not o/c | Room Heaters w/flue | Other Units lck ctr heating | | | | | | | |
| TOWN X | 57 | 16 | 14 | 156 | 107 | 68 | .38857143 | 61 | 132 | 108 | 2591 | 166 | -58 |

EXPLANATION OF APPENDIX B

PRESENT NEED CALCULATION

A. To determine the number of substandard units in Town X, use the table shown on the previous page as follows:

1. Identify the number of overcrowded units by using column A.

2. Identify the number of units lacking complete plumbing for the household's exclusive use, but which are not overcrowded by using column C.

3. Identify the number of units reported in the 1980 census which qualify as substandard as a result of having one of three types of heating deficiencies: (1) have room heaters with no flue; (2) are heated by fireplaces, stoves or portable room heaters; or (3) have no heating whatsoever. The census also reports a fourth type of heating deficiency—room heaters with a flue. This fourth category is not considered substandard. To identify the substandard heating units in an unduplicated count, utilize columns D through H, which represent the following:

Column D—Represents units not overcrowded, with one of the four types of deficiencies.

Column E—Represents all units with the fourth type of heating deficiency—even if those units are also overcrowded.

Column F—Represents all units with any of the first three types of heating deficiencies—even if those units are also overcrowded.

Column G—Represents the percentage of units with the three types of heating deficiencies that qualify a unit as substandard, in relationship to the total number of units with the four types of heating deficiencies. This number is derived by dividing column F by the total of columns E and F.

Column H—Represents all units with the three types of heating deficiencies that render a unit substandard—which are NOT overcrowded. This number is derived by multiplying column G by column D.

Column D, E, and F represent data taken directly from the 1980 census. Columns G and H represent computations that must be done with the census data to identify those units, which have one of three heating deficiencies that render them substandard, and which also are not overcrowded.

There are two reasons why these computations are necessary:

First: Column D cannot be used alone because it includes units having room heaters with flues—that is units with heating deficiencies which do not render them substandard.

Second: Column E cannot be subtracted from column D or, in the alternative, column F cannot be used alone to obtain a clear count of unit with the three heating deficiencies because columns E and F include units with heating deficiencies even if they are also overcrowded. Since column A already accounts for overcrowded units, inclusion of any of the overcrowded units in columns E and F would constitute double counting.

The computations involved in deriving columns G and H solve these two problems by initially determining the percentage of units with any of four deficiencies as compared to those having the three deficiencies considered substandard (column G). By multiplying this percentage times the number representing the total of units which have any of the four deficiencies and which are not overcrowded, (column D) the resulting number represents those units which have any of the three critical types of heating deficiencies and which are not overcrowded. Thus, those units that are substandard as a result of heating deficiencies are provided in an unduplicated count. However, there is implicit assumption in this calculation that the ratio of room heaters with flues (column E) as compared to the other units lacking adequate heating (column F) is the same in both overcrowded and non-overcrowded units.

Warren Township's data cannot be used to illustrate the procedures discussed above because none of the units that fall into any of the four categories of heating deficiency in columns E and F are also overcrowded. Thus, it is not necessary to go through the computations to determine the extent to which column D represents units with one of the three deficiencies which are not overcrowded. Instead, the extent to which

heating deficient units contribute to Warren's total count of substandard units comes directly from column F.

4. Determine Town X's total number of substandard units by adding columns A, C and H. Note that column B plays no role in the derivation of the municipality's obligation. This column represents a category of substandardness provided for informational purposes only. Note also that the data for Atlantic, Cape May, Cumberland, Monmouth, Ocean and Salem counties omits column B. Therefore, when using the Town X example for those counties treat the second column as column C, the third column as D and so forth.

B. Once the total number of substandard units is ascertained, Town X's indigenous need is determined by reducing that total by 18% to reflect those households living in substandard units that do not qualify as lower income. Column J reports Town X's indigenous need.

C. To determine whether Town X contributes to the present need pool, compare the municipal substandard housing percentage to the regional substandard housing percentage. The municipal substandard housing percentage consists of the indigenous need (reported in column J) divided by the total number of occupied units within the municipality (represented by column K). The regional substandard housing percentage is 6.4% for Region I of which Town X is assumed to be a part. By multiplying 6.4% times the number of occupied dwelling units within the municipality, the number of units that would have to be substandard within the municipality for the municipal substandard housing percentage to equal the regional substandard housing percentage can be ascertained. That number is reported in column L. Since column L exceeds column J, that means Town X has fewer substandard units than the number produced by the regional average. That number is shown with a minus sign in column M. Had column L been less than column J, then Town X would have had a higher number of substandard units than its number produced by the regional percentage. In such

a case, the difference between columns L and J would have represented Town X's contribution to the surplus present pool and would be shown in column M without a minus sign.

## APPENDIX C

### SURPLUS PRESENT NEED DATA

DISCLAIMER

This appendix is based on documents prepared by a member of the Urban League advisory group. It is provided *for informational purposes only* as to those municipalities not included in Warren Township's present need region.

PURPOSE OF APPENDIX C

The summary sheet on the following page is designed to enable the reader to understand the derivation of the surplus present need for each present need region set forth in Appendix A. The summary sheet also permits the reader to identify the surplus present need generated by any other regional configurations, providing those regions follow county lines and providing the same method for identifying surplus present need is used.

The five pages, which follow the summary sheet, lists by county each municipality having a present surplus need.

The remainder of Appendix C is the source data for the surplus present regional need for each municipality listed by county. With regard to Warren's present need region, no litigant has challenged the mathematical accuracy of the data. With regard to the counties not in Warren's present need region, the source data has not been the subject of adversarial litigation before this court.

## SURPLUS PRESENT NEED TOTALS

## BY COUNTY AND REGION

### COUNTY

| | | | |
|---|---|---|---|
| 1. Atlantic | 714 | 12. Middlesex | 1,463 |
| 2. Bergen | 229 | 13. Monmouth | 1,827 |
| 3. Burlington | 832 | 14. Morris | 89 |
| 4. Camden | 2,313 | 15. Ocean | 735 |
| 5. Cape May | 239 | 16. Passaic | 6,106 |
| 6. Cumberland | 762 | 17. Salem | 222 |
| 7. Essex | 13,511 | 18. Somerset | 0 |
| 8. Gloucester | 463 | 19. Sussex | 348 |
| 9. Hudson | 10,718 | 20. Union | 2,199 |
| 10. Hunterdon | 174 | 21. Warren | 177 |
| 11. Mercer | 1,284 | | |

### REGION

| | |
|---|---|
| Region I: | 35,014 |
| Region II: | 2,562 |
| Region III: | 4,892 |
| Region IV: | 1,937 |

### REGION I

Bergen County

| | |
|---|---|
| Fairview | 33 |
| Garfield | 188 |
| Wallington | 8 |
| | 229 |

Essex County

| | |
|---|---|
| East Orange | 1,165 |
| Irvington | 425 |
| Newark | 11,406 |
| Orange | 515 |
| | 13,511 |

Hudson County

| | |
|---|---|
| Bayonne | 352 |
| East Newark | 31 |

| | | |
|---|---|---|
| | Guttenberg | 68 |
| | Harrison | 203 |
| | Hoboken | 2,141 |
| | Jersey City | 4,921 |
| | North Bergen | 167 |
| | Union City | 1,732 |
| | Weehawken | 146 |
| | West New York | 957 |
| | | 10,718 |
| **Hunterdon County** | | |
| | Alexandria | 13 |
| | Bethlehem | 5 |
| | Califon | 5 |
| | East Amwell | 12 |
| | Glen Gardner | 1 |
| | Kingwood | 36 |
| | Lambertville | 43 |
| | Lebanon Township | 58 |
| | Union | 1 |
| | | 174 |
| **Middlesex County** | | |
| | New Brunswick | 701 |
| | Perth Amboy | 762 |
| | | 1,463 |
| **Morris County** | | |
| | Dover | 36 |
| | Jefferson | 47 |
| | Victory Garden | 6 |
| | | 89 |
| **Passaic County** | | |
| | Passaic | 1,997 |
| | Paterson | 4,072 |
| | Prospect Park | 6 |
| | West Milford | 31 |
| | | 6,106 |
| **Somerset County** | | |
| | None | |
| **Sussex County** | | |
| | Andover | 1 |
| | Frankford | 31 |
| | Hamburg | 5 |
| | Hardyston | 18 |
| | Lafayette | 17 |

| | | |
|---|---|---:|
| | Montague | 37 |
| | Sandyston | 47 |
| | Stillwater | 18 |
| | Sussex | 30 |
| | Vernon | 51 |
| | Walpack | 2 |
| | Wantage | 91 |
| | | 348 |

Union County

| | | |
|---|---|---:|
| | Elizabeth | 1,975 |
| | Plainfield | 224 |
| | | 2,199 |

Warren County

| | | |
|---|---|---:|
| | Blairstown | 47 |
| | Franklin | 4 |
| | Frelinghuysen | 13 |
| | Hardwick | 32 |
| | Harmony | 22 |
| | Hope | 9 |
| | Knowlton | 24 |
| | Liberty | 15 |
| | Washington Twp. | 1 |
| | White | 10 |
| | | 177 |

REGIONAL TOTAL = 35,014

REGION II

Monmouth County

| | | |
|---|---|---:|
| | Aberdeen Township | 25 |
| | Asbury Park | 525 |
| | Belmar | 72 |
| | Bradley Beach | 77 |
| | Englishtown | 7 |
| | Freehold Borough | 56 |
| | Highlands | 14 |
| | Howell | 52 |
| | Keansburg | 150 |
| | Keyport | 44 |
| | Long Branch | 394 |
| | Manasquan | 21 |
| | Millstone | 52 |
| | Neptune Township | 201 |

| | |
|---|---|
| Red Bank | 48 |
| Roosevelt | 3 |
| Shrewsbury Township | 12 |
| South Belmar | 11 |
| Union Beach | 48 |
| Upper Freehold | 15 |
| | 1,827 |

Ocean County

| | |
|---|---|
| Barnegat Township | 19 |
| Barnegat Light | 5 |
| Eagleswood | 15 |
| Harvey Cedars | 1 |
| Jackson Township | 18 |
| Lacey Township | 47 |
| Lakehurst | 58 |
| Lakewood | 219 |
| Little Egg Harbor | 39 |
| Long Beach | 3 |
| Ocean Township | 9 |
| Ocean Gate | 13 |
| Plumsted Township | 89 |
| Seaside Heights | 48 |
| Seaside Park | 12 |
| Ship Bottom | 13 |
| South Toms River | 43 |
| Stafford Township | 36 |
| Surf City | 6 |
| Tuckerton | 42 |
| | 735 |

REGIONAL TOTAL = 2,562 dwelling units

REGION III

Mercer County

| | |
|---|---|
| Hightstown | 27 |
| Trenton | 1,257 |
| | 1,284 |

Burlington County

| | |
|---|---|
| Bass River | 25 |
| Beverly | 20 |
| Bordentown City | 30 |

| | |
|---|---|
| Burlington City | 42 |
| Burlington Township | 21 |
| Fieldsboro | 1 |
| Hainesport | 11 |
| Mansfield | 18 |
| Mt. Holly | 61 |
| New Hanover | 28 |
| No. Hanover | 24 |
| Pemberton Borough | 5 |
| Pemberton Township | 340 |
| Riverside | 24 |
| Riverton | 4 |
| Shamong | 12 |
| Springfield | 26 |
| Tabernacle | 25 |
| Washington | 34 |
| Woodland | 44 |
| Wrightstown | 37 |
| | 832 |

Gloucester County

| | |
|---|---|
| Clayton | 28 |
| Deptford | 77 |
| Elk | 36 |
| Franklin | 109 |
| Glassboro | 56 |
| Harrison | 10 |
| Logan | 10 |
| Monroe | 8 |
| National Park | 9 |
| Paulsboro | 46 |
| S. Harrison | 11 |
| Swedesboro | 39 |
| Woolwich | 24 |
| | 463 |

Camden County

| | |
|---|---|
| Barrington | 19 |
| Camden | 2,132 |
| Chesilhurst | 7 |
| Gloucester City | 20 |
| Lawnside | 34 |
| Winslow | 101 |
| | 2,313 |

REGIONAL TOTAL = 4,892 dwelling units

470

REGION IV

Atlantic County

| | |
|---|---|
| Atlantic City | 424 |
| Buena Vista | 53 |
| Corbin City | 1 |
| Egg Harbor City | 8 |
| Estelle Manor | 21 |
| Hamilton | 29 |
| Mullica | 142 |
| Port Republic | 6 |
| Weymouth | 30 |
| | 714 |

Cape May County

| | |
|---|---|
| Cape May Point | 2 |
| Dennis | 80 |
| Middle | 44 |
| Upper | 7 |
| West Cape May | 9 |
| West Wildwood | 2 |
| Wildwood | 80 |
| Woodbine | 15 |
| | 239 |

Cumberland County

| | |
|---|---|
| Bridgeton | 81 |
| Commercial | 186 |
| Deerfield | 15 |
| Downe | 75 |
| Fairfield | 80 |
| Greenwich | 20 |
| Lawrence | 61 |
| Maurice River | 104 |
| Stow Creek | 16 |
| Vineland | 124 |
| | 762 |

Salem County

| | |
|---|---|
| Alloway | 30 |
| Lalloway Creek | 20 |
| Mannington | 37 |
| Penns Grove | 52 |
| Pilesgrove | 8 |
| Quinton | 28 |
| Salem | 35 |
| Upper Pittsgrove | 12 |
| | 222 |

REGIONAL TOTAL
= **1937 dwelling units**

## ATLANTIC

| MNCPLTY | STF-1 Tbl 18 Ovrcrwded Units | STF-1 Tbl 15 Units Lack Com Plumbing not o/c | STF-3 XII-35 Units Lack Heat Ctrl not o/c | STF-3 X-17 Room Heaters w/flue | STF-3 X-17 Other Units Lack Ctr Heating | % Units w/o Ctrl Htn, With Inad Htng | Units Lacking Adequate Heating | Total Present Need | Adjusted Present Need | Occupied Dwelling Units | Fair Share Cap | Surplus Present Need |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ATLANTIC | | | | | | | | | | | | |
| Absecon | 30 | 11 | 60 | 65 | 46 | .41441441 | 25 | 66 | 54 | 2297 | 148 | -94 |
| AtlantCity | 956 | 333 | 1717 | 1658 | 765 | .31572431 | 542 | 1831 | 1502 | 16736 | 1078 | 424 |
| Brigantine | 48 | 17 | 115 | 107 | 118 | .52444444 | 60 | 125 | 103 | 3443 | 222 | -119 |
| Buena | 41 | 17 | 44 | 42 | 12 | .22222222 | 10 | 68 | 56 | 1267 | 82 | -26 |
| BuenaVista | 108 | 18 | 253 | 197 | 135 | .40662651 | 103 | 229 | 188 | 2085 | 134 | 53 |
| CorbinCity | 1 | 4 | 12 | 20 | 15 | .42857143 | 5 | 10 | 8 | 109 | 7 | 1 |
| EggHarbor | 198 | 37 | 543 | 416 | 215 | .34072900 | 185 | 420 | 344 | 6809 | 438 | -94 |
| EggHrbCity | 82 | 39 | 102 | 109 | 30 | .21582734 | 22 | 143 | 117 | 1695 | 109 | 8 |
| EstelleMnr | 10 | 3 | 59 | 30 | 41 | .57746479 | 34 | 47 | 39 | 270 | 17 | 21 |
| Folsom | 21 | 2 | 39 | 21 | 18 | .46153846 | 18 | 41 | 34 | 566 | 36 | -3 |
| Galloway | 111 | 34 | 334 | 224 | 171 | .43291139 | 145 | 290 | 237 | 3915 | 252 | -15 |
| Hamilton | 118 | 46 | 332 | 245 | 163 | .39950980 | 133 | 297 | 243 | 3321 | 214 | 29 |
| Hammonton | 157 | 55 | 178 | 152 | 60 | .28301887 | 50 | 262 | 215 | 4099 | 264 | -49 |
| Linwood | 20 | 3 | 44 | 27 | 17 | .38636364 | 17 | 40 | 33 | 1941 | 125 | -92 |
| Longport | 6 | 1 | 11 | 11 | 23 | .67647059 | 7 | 14 | 12 | 561 | 36 | -24 |
| MargateCty | 32 | 16 | 159 | 167 | 138 | .45245902 | 72 | 120 | 98 | 3844 | 248 | -149 |

| MNCPLTY | STF-1 Tbl 18 Ovrcrwded Units | STF-1 Tbl 15 Units Lack Com Plumbing not o/c | STF-3 XII-35 Units Lack Ctrl Heat not o/c | STF-3 X-17 Room Heaters w/flue | STF-3 X-17 Other Units Lack Ctr Heating | % Units w/o Ctrl Htn, With Inad Htng | Units Lacking Adequate Heating | Total Present Need | Adjusted Present Need | Occupied Dwelling Units | Fair Share Cap | Surplus Present Need |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Mullica | 114 | 15 | 267 | 136 | 248 | .64583333 | 172 | 301 | 247 | 1626 | 105 | 142 |
| Northfield | 38 | 3 | 96 | 86 | 34 | .28333333 | 27 | 68 | 56 | 2518 | 162 | -106 |
| Pleasantvl | 212 | 53 | 375 | 387 | 115 | .22908367 | 86 | 351 | 288 | 4662 | 300 | -12 |
| PortRepub | 1 | 1 | 34 | 6 | 31 | .83783784 | 28 | 30 | 25 | 298 | 19 | 6 |
| SomersPnt | 67 | 19 | 129 | 121 | 34 | .21935484 | 28 | 114 | 94 | 4295 | 277 | -183 |
| VentnorCty | 46 | 49 | 194 | 195 | 152 | .43804035 | 85 | 180 | 148 | 5031 | 324 | -176 |
| Weymouth | 19 | 10 | 61 | 28 | 53 | .65432099 | 40 | 69 | 57 | 418 | 27 | 30 |
| TOTALS | 2436 | 786 | 5158 | 4450 | 2634 | | 1895 | 5117 | 4196 | 71806 | 4624 | |

## BERGEN

| MNCPLTY | Ovrcrwded Units (STF-1 Tbl 18) | Lack Com Plumbing Units (STF-1 Tbl 13) | Net Units Lack Com Plumbing not o/c (STF-1 Tbl 15) | Units Lack Com Ctr Heat Heaters not o/c (STF-3 XII-35) | Room Heaters w/flue (STF-3 X-17) | Other Units Heating (STF-3 X-17) | % Units w/o Ctrl Htn, Inad Htng (STF-3 X-17) | Units Lacking Adequate Heating | Total Present Need | Adjusted Present Need | Occupied Dwelling Units | Fair Share Cap | Surplus Present Need |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **BERGEN** | | | | | | | | | | | | | |
| Allendale | 8 | 0 | 0 | 6 | 0 | 6 | 1 | 6 | 14 | 11 | 1700 | 109 | -97 |
| Alpine | 1 | 1 | 0 | 18 | 2 | 18 | .9 | 16 | 17 | 14 | 495 | 32 | -18 |
| Bergenfld | 208 | 79 | 73 | 297 | 217 | 90 | .29315961 | 87 | 368 | 302 | 8836 | 566 | -264 |
| Bogota | 71 | 33 | 31 | 46 | 34 | 18 | .34615385 | 16 | 118 | 97 | 2856 | 183 | -86 |
| Carlstadt | 54 | 47 | 45 | 80 | 42 | 45 | .51724138 | 41 | 140 | 115 | 2311 | 148 | -33 |
| Cliffsd Pk | 232 | 221 | 199 | 288 | 210 | 122 | .36746988 | 106 | 537 | 440 | 9055 | 580 | -139 |
| Closter | 31 | 11 | 11 | 49 | 33 | 28 | .45901639 | 22 | 64 | 53 | 2622 | 168 | -115 |
| Cresskill | 28 | 2 | 2 | 37 | 25 | 12 | .32482432 | 12 | 42 | 34 | 2357 | 151 | -116 |
| Demarest | 9 | 1 | 1 | 17 | 17 | 0 | 0 | 0 | 10 | 8 | 1520 | 97 | -89 |
| Dumont | 110 | 49 | 46 | 128 | 96 | 32 | .25 | 32 | 188 | 154 | 6095 | 390 | -236 |
| E Ruther | 72 | 69 | 67 | 166 | 77 | 89 | .53614458 | 89 | 228 | 187 | 3122 | 200 | -13 |
| Edgewater | 73 | 41 | 39 | 92 | 63 | 50 | .44247788 | 41 | 153 | 125 | 2080 | 133 | -8 |
| Elmwood Pk | 181 | 80 | 74 | 128 | 89 | 39 | .3046875 | 39 | 294 | 241 | 6715 | 430 | -189 |
| Emerson | 32 | 5 | 5 | 35 | 11 | 24 | .68571429 | 24 | 61 | 50 | 2216 | 142 | -92 |
| Englewood | 384 | 129 | 111 | 327 | 235 | 159 | .40355330 | 132 | 627 | 514 | 8612 | 551 | -87 |
| Englwd Clf | 20 | 4 | 3 | 19 | 19 | 0 | 0 | 0 | 23 | 19 | 1751 | 112 | -93 |

| MNCPLTY | STF-1 Tbl 18 Ovrcrwded Units | STF-1 Tbl 13 Ttl Units Lack Com Plumbing | STF-1 Tbl 15 Net Units Lack Com Plumbing not o/c | STF-3 XII-35 Units Lack Ctrl Heat not o/c | STF-3 X-17 Room Heaters w/flue | STF-3 X-17 Other Units Lack Ctr Heating | % Units w/o Ctrl Htn, With Inad Htng | Units Lacking Adequate Heating | Total Present Need | Adjusted Present Need | Occupied Dwelling Units | Fair Share Cap | Surplus Present Need |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fair Lawn | 98 | 49 | 48 | 140 | 104 | 36 | .25714286 | 36 | 182 | 149 | 11571 | 741 | -591 |
| Fairview | 159 | 135 | 121 | 187 | 113 | 107 | .43636364 | 91 | 371 | 304 | 4230 | 271 | 33 |
| Fort Lee | 411 | 230 | 209 | 343 | 233 | 134 | .36512262 | 125 | 745 | 611 | 14884 | 953 | -341 |
| Frnkln Lks | 17 | 3 | 3 | 12 | 5 | 7 | .58333333 | 7 | 27 | 22 | 2504 | 160 | -138 |
| Garfield | 363 | 345 | 321 | 821 | 479 | 422 | .46636848 | 385 | 1069 | 876 | 10754 | 688 | 188 |
| Glen Rock | 17 | 4 | 4 | 15 | 9 | 6 | .4 | 6 | 27 | 22 | 3740 | 239 | -217 |
| Hackensk | 701 | 377 | 332 | 414 | 289 | 214 | .42544732 | 176 | 1209 | 991 | 15827 | 1013 | -21 |
| Harngtn Pk | 12 | 1 | 1 | 14 | 7 | 7 | .5 | 7 | 20 | 16 | 1341 | 86 | -69 |
| Hsbrck Hts | 47 | 42 | 41 | 63 | 32 | 31 | .49206349 | 31 | 119 | 98 | 4445 | 284 | -187 |
| Haworth | 3 | 0 | 0 | 14 | 14 | 0 | 0 | 0 | 3 | 2 | 1087 | 70 | -67 |
| Hillsdale | 32 | 18 | 18 | 37 | 6 | 39 | .86666667 | 32 | 82 | 67 | 3222 | 206 | -139 |
| Hohokus | 7 | 3 | 2 | 0 | 0 | 0 | 0 | 0 | 9 | 7 | 1381 | 88 | -81 |
| Leonia | 39 | 24 | 23 | 62 | 44 | 21 | .32307692 | 20 | 82 | 67 | 3095 | 198 | -131 |
| LttleFerry | 129 | 67 | 58 | 100 | 86 | 42 | .328125 | 83 | 220 | 180 | 3751 | 240 | -60 |
| Lodi | 361 | 185 | 172 | 319 | 268 | 114 | .29842932 | 95 | 628 | 315 | 9323 | 597 | -82 |
| Lyndhurst | 192 | 155 | 148 | 167 | 129 | 46 | .26285714 | 44 | 384 | 315 | 7402 | 474 | -159 |
| Mahwah | 63 | 25 | 21 | 137 | 117 | 76 | .39378238 | 54 | 138 | 113 | 3721 | 238 | -125. |
| Maywood | 43 | 41 | 40 | 26 | 17 | 22 | .56410256 | 16 | 99 | 81 | 3630 | 232 | -151 |

| MNCPLTY | STF-1 Tbl 18 Ttl Units Ovrcrwded Units | STF-1 Tbl 13 Lack Com Plumbing | STF-1 Tbl 15 Net Units Lack Com not o/c | STF-3 XII-35 Units Lack Heat Ctrl not o/c | STF-3 X-17 Room w/flue Heating | STF-3 X-17 Other Units Lack Ctr Heating | % Units w/o Ctrl Htn, Inad Htng | Units Lacking Adequate Htn, Heating | Total Present Need | Adjusted Present Need | Occupied Dwelling Units | Fair Share Cap | Surplus Present Need |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Mdlnd Park | 26 | 25 | 23 | 68 | 34 | 39 | .53424658 | 36 | 85 | 70 | 2563 | 164 | -94 |
| Montvale | 15 | 7 | 7 | 37 | 19 | 18 | .48643649 | 18 | 40 | 33 | 2276 | 146 | -113 |
| Moonachie | 25 | 11 | 9 | 63 | 54 | 14 | .20588235 | 13 | 47 | 39 | 1003 | 65 | -26 |
| New Milford | 93 | 25 | 24 | 49 | 35 | 14 | .28571429 | 14 | 131 | 107 | 6209 | 397 | -290 |
| NArlington | 120 | 75 | 72 | 106 | 74 | 32 | .30188679 | 32 | 224 | 184 | 6471 | 414 | -230 |
| Northvale | 30 | 6 | 6 | 20 | 16 | 10 | .38461588 | 8 | 44 | 36 | 1506 | 96 | -61 |
| Norwood | 19 | 4 | 4 | 23 | 0 | 23 | 1 | 23 | 46 | 38 | 1292 | 83 | -45 |
| Oakland | 39 | 13 | 13 | 97 | 57 | 51 | .47222222 | 46 | 98 | 80 | 3880 | 248 | -168 |
| OldTappan | 9 | 1 | 1 | 13 | 7 | 6 | .46158846 | 6 | 16 | 13 | 1177 | 75 | -62 |
| Oradell | 22 | 3 | 3 | 27 | 24 | 6 | .2 | 5 | 30 | 25 | 2769 | 177 | -152 |
| Plsds Pk | 172 | 130 | 122 | 140 | 75 | 65 | .46428571 | 65 | 359 | 294 | 5520 | 353 | -59 |
| Paramus | 73 | 25 | 24 | 70 | 52 | 22 | .29729730 | 21 | 118 | 97 | 7644 | 489 | -398 |
| Park Ridge | 29 | 16 | 16 | 58 | 17 | 46 | .73015873 | 42 | 87 | 72 | 2758 | 177 | -105 |
| Ramsey | 29 | 9 | 9 | 96 | 64 | 32 | .33333333 | 32 | 70 | 57 | 4134 | 265 | -207 |
| Ridgefield | 77 | 59 | 57 | 65 | 47 | 32 | .40506329 | 26 | 160 | 131 | 3895 | 249 | -118 |
| Rdgfld Pk | 107 | 90 | 88 | 72 | 47 | 32 | .40506329 | 29 | 224 | 184 | 4867 | 311 | -128 |
| Ridgewood | 61 | 35 | 35 | 140 | 55 | 91 | .62328767 | 87 | 183 | 150 | 8318 | 532 | -382 |
| River Edge | 33 | 14 | 12 | 79 | 41 | 38 | .48101266 | 38 | 83 | 68 | 4113 | 263 | -195 |
| River Vale | 18 | 6 | 6 | 24 | 0 | 27 | 1 | 24 | 48 | 39 | 2850 | 182 | -143 |

| MNCPLTY | STF-1 Tbl 18 Ovrcrowded Units | STF-1 Tbl 13 Ttl Units Lack Com Plumbing | STF-1 Tbl 15 Net Units Lack Com Plumbing not o/c | STF-3 XII-35 Units Lack Ctrl Heat Heaters not o/c | STF-3 X-17 Room w/flue | STF-3 X-17 Other Units Lack Ctr Heating | % Units w/o Ctrl Htn, Inad Htng | Units Lacking Adequate Heating | Total Present Need | Adjusted Present Need | Occupied Dwelling Units | Fair Share Cap | Surplus Present Need |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RochellePk | 24 | 16 | 16 | 33 | 27 | 6 | .18181818 | 6 | 46 | 38 | 2056 | 132 | -94 |
| Rockleigh | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 56 | 4 | -3 |
| Rutherford | 100 | 80 | 78 | 200 | 67 | 139 | .67475728 | 135 | 313 | 257 | 6883 | 441 | -184 |
| Saddle Brook | 60 | 28 | 28 | 130 | 52 | 82 | .61194030 | 80 | 168 | 137 | 4798 | 307 | -170 |
| Saddle Rvr | 0 | 3 | 3 | 35 | 23 | 12 | .34285714 | 12 | 15 | 12 | 882 | 56 | -44 |
| S Hack | 28 | 19 | 19 | 23 | 17 | 10 | .37087087 | 9 | 56 | 46 | 742 | 47 | -2 |
| Teaneck | 238 | 59 | 53 | 250 | 185 | 76 | .29118774 | 73 | 364 | 298 | 12899 | 826 | -527 |
| Tenafly | 42 | 17 | 14 | 77 | 26 | 57 | .68674699 | 53 | 109 | 89 | 4677 | 299 | -210 |
| Teterboro | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 10 | 1 | -1 |
| UpSdleRvr | 15 | 8 | 7 | 31 | 16 | 41 | .71929825 | 22 | 44 | 36 | 2277 | 146 | -109 |
| Waldwick | 58 | 10 | 10 | 42 | 29 | 21 | .42 | 18 | 86 | 70 | 3287 | 210 | -140 |
| Wallingt | 109 | 112 | 107 | 286 | 142 | 157 | .52508361 | 150 | 366 | 300 | 4572 | 293 | 8 |
| Washington | 23 | 4 | 2 | 46 | 43 | 7 | .14 | 6 | 31 | 26 | 2811 | 180 | -154 |
| Westwood | 59 | 50 | 47 | 69 | 45 | 42 | .48275862 | 33 | 139 | 114 | 3791 | 243 | -128 |
| Wdcliff Lk | 4 | 1 | 1 | 14 | 8 | 6 | .42857143 | 6 | 11 | 9 | 1614 | 103 | -94 |
| Wood Ridge | 36 | 16 | 16 | 61 | 54 | 7 | .11475410 | 7 | 59 | 48 | 2805 | 180 | -131 |
| Wyckoff | 15 | 9 | 0 | 63 | 30 | 39 | .56521739 | 36 | 51 | 41 | 4749 | 304 | -262 |
| TOTALS | 6017 | 3462 | 3201 | 7213 | 4604 | 3356 | | 3032 | 12240 | 10087 | 300410 | 19226 | -9096 |

## BURLINGTON

| MNCPLTY | STF-1 Tbl 18 Ttl Units Ovrcrwded Units Plumbing | STF-1 Tbl 13 Lack Com Plumbing not o/c | STF-1 Tbl 15 Net Units Lack Com not o/c | STF-3 XII-35 Units Lack Units not o/c | STF-3 X-17 Room Heaters Heat Heaters w/flue | STF-3 X-17 Other Units Lack Ctr Heating | % Units w/o Ctrl Htn, With Inad Htng | Units Lacking Adequate Heating | Total Present Need | Adjusted Present Need | Occupied Dwelling Units | Fair Share Present Cap | Surplus Present Need |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BURLINGTON | | | | | | | | | | | | | |
| Bass River | 17 | 9 | 9 | 46 | 30 | 51 | .62962963 | 29 | 55 | 45 | 489 | 20 | 25 |
| Beverly | 36 | 9 | 8 | 89 | 77 | 37 | .32456140 | 29 | 73 | 60 | 982 | 40 | 20 |
| Brdntn Cty | 37 | 15 | 15 | 154 | 102 | 92 | .47422680 | 73 | 125 | 103 | 1761 | 72 | 30 |
| Brdntn Twp | 38 | 14 | 14 | 105 | 97 | 17 | .14912281 | 16 | 68 | 55 | 2467 | 101 | -46 |
| BrlngtnCty | 98 | 63 | 61 | 229 | 175 | 96 | .35424354 | 81 | 240 | 197 | 3783 | 155 | 42 |
| BrlngtnTwp | 186 | 24 | 24 | 181 | 142 | 68 | .32380952 | 59 | 219 | 179 | 3858 | 158 | 21 |
| Chstrfld | 10 | 4 | 4 | 35 | 14 | 21 | .6 | 21 | 35 | 29 | 735 | 30 | -1 |
| Cinnamnsn | 45 | 12 | 11 | 147 | 120 | 57 | .32203390 | 47 | 103 | 85 | 4600 | 189 | -104 |
| Delanco | 16 | 15 | 15 | 17 | 17 | 0 | 0 | 0 | 31 | 25 | 1282 | 53 | -27 |
| Delran | 64 | 26 | 25 | 127 | 74 | 84 | .53164557 | 68 | 157 | 128 | 4768 | 195 | -67 |
| Eastampton | 18 | 14 | 14 | 50 | 45 | 24 | .34782609 | 17 | 49 | 41 | 1473 | 60 | -20 |
| Edgwtr Pk | 61 | 27 | 25 | 71 | 53 | 23 | .30263158 | 21 | 107 | 88 | 3374 | 138 | -50 |
| Evesham | 52 | 10 | 10 | 133 | 103 | 41 | .28472222 | 38 | 100 | 82 | 6796 | 279 | -197 |
| Fieldsboro | 10 | 0 | 0 | 0 | 0 | 3 | 1 | 0 | 10 | 8 | 184 | 8 | 1 |
| Florence | 65 | 28 | 26 | 201 | 143 | 67 | .31904762 | 64 | 155 | 127 | 3307 | 136 | -8 |
| Hainesport | 25 | 7 | 7 | 46 | 9 | 41 | .82 | 38 | 70 | 57 | 1125 | 46 | 11 |

| MNCPLITY | STF-1 Tbl 18 Ovrcrwded Units | STF-1 Tbl 13 Lack Com Plumbing Units Plumbing | STF-1 Tbl 15 Net Units Lack Com Plumbing not o/c | STF-3 XII-35 Units Lack Heat Ctr Heaters not o/c | STF-3 X-17 Room Heaters w/flue | STF-3 X-17 Other Units Lack Ctr Heating Heating | % Units w/o Ctrl Htn, Inad Htng | Units Lacking With Adequate Heating | Total Present Need Heating | Adjusted Present Need | Occupied Dwelling Units | Fair Share Cap | Surplus Present Need |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Lumberton | 36 | 11 | 9 | 57 | 24 | 45 | .65217391 | 37 | 82 | 67 | 2002 | 82 | -15 |
| Mansfield | 14 | 11 | 8 | 55 | 15 | 48 | .76190476 | 42 | 64 | 52 | 827 | 34 | 18 |
| MapleShade | 142 | 49 | 48 | 158 | 105 | 53 | .38544304 | 53 | 243 | 199 | 8576 | 352 | -152 |
| Medford | 47 | 13 | 13 | 144 | 60 | 108 | .64285714 | 93 | 153 | 125 | 5466 | 224 | -99 |
| MedfrdLkes | 5 | 5 | 5 | 58 | 12 | 59 | .83098592 | 48 | 58 | 48 | 1483 | 61 | -13 |
| Moorestown | 30 | 27 | 26 | 79 | 65 | 24 | .26966292 | 21 | 77 | 63 | 5268 | 216 | -153 |
| Mt. Holly | 146 | 52 | 51 | 186 | 159 | 78 | .32911392 | 61 | 258 | 212 | 3679 | 151 | 61 |
| Mt. Laurel | 40 | 23 | 23 | 160 | 48 | 116 | .70731707 | 113 | 176 | 144 | 5429 | 223 | -78 |
| NewHanover | 64 | 15 | 13 | 57 | 49 | 14 | .22222222 | 13 | 90 | 74 | 1107 | 45 | 28 |
| NoHanover | 86 | 25 | 23 | 154 | 105 | 67 | .38953488 | 60 | 169 | 139 | 2784 | 114 | 24 |
| Palmyra | 44 | 15 | 15 | 119 | 85 | 41 | .32539683 | 39 | 98 | 80 | 2707 | 111 | -31 |
| PmbrtnBor | 12 | 6 | 6 | 31 | 26 | 13 | .33333333 | 10 | 28 | 23 | 450 | 18 | 5 |
| PmbrtnTwp | 481 | 75 | 66 | 803 | 606 | 394 | .394 | 316 | 863 | 708 | 8979 | 368 | 340 |
| Riverside | 57 | 30 | 30 | 252 | 191 | 100 | .34364261 | 87 | 174 | 142 | 2884 | 118 | 24 |
| Riverton | 7 | 25 | 25 | 31 | 4 | 31 | .88571429 | 27 | 59 | 49 | 1088 | 45 | 4 |
| Shamong | 14 | 8 | 8 | 117 | 60 | 64 | .51612903 | 60 | 82 | 68 | 1343 | 55 | 12 |
| Southamton | 33 | 18 | 18 | 105 | 74 | 72 | .49315068 | 52 | 103 | 84 | 3518 | 144 | -60 |

| MNCPLTY | STF-1 Tbl 18 Ovrcrwded Units | STF-1 Tbl 13 Lack Com Plumbing | STF-1 Tbl 15 Net Units Com Plumbing not o/c | STF-3 XII-35 Units Lack Ctrl Heat not o/c | STF-3 X-17 Room Heaters Heating w/flue | STF-3 X-17 Other Units Lack Ctr Heating | % Units w/o Ctrl Htn, Inad Htng | Units Lacking Adequate Heating | Total Present Need | Adjusted Present Need | Occupied Dwelling Units | Fair Share Present Cap | Surplus Present Need |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sprngfield | 22 | 14 | 13 | 60 | 25 | 46 | .64788732 | 39 | 74 | 61 | 844 | 35 | 26 |
| Tabernacle | 36 | 17 | 14 | 141 | 73 | 74 | .50340136 | 71 | 121 | 99 | 1808 | 74 | 25 |
| Washington | 24 | 6 | 6 | 40 | 28 | 47 | .62666667 | 25 | 55 | 45 | 271 | 11 | 34 |
| Westamton | 11 | 2 | 2 | 51 | 21 | 30 | .58823529 | 30 | 43 | 35 | 1115 | 46 | -10 |
| Willingbor | 300 | 4 | 4 | 226 | 138 | 90 | .39473684 | 89 | 393 | 322 | 10915 | 448 | -125 |
| Woodland | 15 | 26 | 25 | 50 | 23 | 44 | .65671642 | 33 | 73 | 60 | 377 | 15 | 44 |
| Wrightstwn | 52 | 11 | 11 | 46 | 17 | 38 | .69090909 | 32 | 95 | 78 | 986 | 40 | 37 |
| TOTALS | 2446 | 765 | 780 | 4811 | 3214 | 2418 | | 2052 | 5228 | 4287 | 114890 | 4710 | |

## CAMDEN

| MNCPLTY | STF-1 Tbl 18 Ovrcrwded Units Units Plumbing | STF-1 Tbl 13 Ttl Units Lack Com Plumbing | STF-1 Tbl 13 Lack Com Plumbing not o/c | STF-1 Tbl 15 Net Units Lack Com Plumbing Ctrl not o/c | STF-3 XII-35 Units Lack Heat Heaters not o/c | STF-3 X-17 Room Lack Ctr Heating w/flue | STF-3 X-17 Other Units Lack Ctr Htn, Inad Htng | % Units w/o Ctrl Htn, With Inad Htng | Units Lacking Adequate Heating | Present Need | Total Adjusted Present Need | Adjusted Occupied Present Dwelling Units | Occupied Dwelling Share Cap | Fair Surplus Share Present Cap Need |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CAMDEN | | | | | | | | | | | | | | |
| Audubon | 27 | 29 | 27 | 27 | 76 | 74 | 2 | .02631579 | 2 | 56 | 46 | 3592 | 147 | -101 |
| Audubon Pk | 17 | 1 | 1 | 1 | 33 | 31 | 4 | .11428571 | 4 | 22 | 18 | 495 | 20 | -2 |
| Barrington | 45 | 16 | 16 | 16 | 114 | 22 | 149 | .87134503 | 99 | 160 | 131 | 2744 | 113 | 19 |
| Bellmawr | 144 | 17 | 15 | 16 | 220 | 195 | 63 | .24418605 | 54 | 213 | 174 | 4462 | 183 | -9 |
| BerlinBor | 32 | 16 | 16 | 16 | 89 | 92 | 26 | .22033898 | 20 | 68 | 55 | 1847 | 76 | -20 |
| BerlinTwp | 57 | 10 | 10 | 10 | 45 | 63 | 7 | .1 | 5 | 72 | 59 | 1646 | 67 | -9 |
| Brooklawn | 16 | 2 | 2 | 2 | 9 | 16 | 0 | 0 | 0 | 18 | 15 | 778 | 32 | -17 |
| Camden | 2455 | 440 | 375 | 375 | 4767 | 5108 | 1681 | .24760642 | 1180 | 4010 | 3288 | 28204 | 1156 | 2132 |
| Cherry Hil | 196 | 92 | 87 | 87 | 366 | 241 | 146 | .37726098 | 138 | 421 | 345 | 21855 | 896 | -551 |
| Chesilhrst | 24 | 1 | 1 | 1 | 38 | 38 | 8 | .17391304 | 7 | 32 | 26 | 467 | 19 | 7 |
| Clementon | 64 | 19 | 17 | 17 | 71 | 67 | 22 | .24719101 | 18 | 99 | 81 | 2202 | 90 | -9 |
| Collingswd | 91 | 74 | 69 | 69 | 245 | 160 | 92 | .36507937 | 89 | 249 | 205 | 6469 | 265 | -61 |
| Gibbsboro | 10 | 1 | 1 | 1 | 47 | 31 | 16 | .34042553 | 16 | 27 | 22 | 758 | 31 | -9 |
| Gloucester | 251 | 55 | 51 | 51 | 504 | 453 | 104 | .18671454 | 94 | 396 | 325 | 15052 | 617 | -292 |
| GlestrCity | 111 | 45 | 41 | 41 | 354 | 279 | 114 | .29007634 | 103 | 255 | 209 | 4606 | 189 | 20 |
| Haddon | 55 | 40 | 39 | 39 | 108 | 89 | 24 | .21238938 | 23 | 117 | 96 | 6247 | 256 | -160 |

| MNCPLTY | Ovrcrwded Units (STF-1 Tbl 18) | Lack Com Plumbing Units (STF-1 Tbl 13) | Net Units Lack Com Plumbing not o/c (STF-1 Tbl 15) | Ttl Units Lack Ctrl Heat Units not o/c (STF-3 XII-35) | Room Heaters w/flue (STF-3 X-17) | Lack Ctr Heating (STF-3 X-17) | Other Units Heating (STF-3 X-17) | % Units w/o Ctrl Htn, Inad Htng | Units Lacking Adequate Heating | Total Present Need | Adjusted Present Need | Occupied Dwelling Units | Fair Share Cap | Surplus Present Need |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Haddonfld | 18 | 20 | 20 | 42 | 26 | 16 | .38095238 | 16 | 54 | 44 | 4486 | 184 | -140 |
| HaddonHts | 18 | 30 | 28 | 108 | 66 | 57 | .46341463 | 50 | 96 | 79 | 3091 | 127 | -48 |
| Hi-Nella | 11 | 6 | 5 | 23 | 15 | 8 | .34782609 | 8 | 24 | 20 | 487 | 20 | 0 |
| Laurel Spr | 12 | 7 | 7 | 25 | 6 | 19 | .76 | 19 | 38 | 31 | 770 | 32 | 0 |
| Lawnside | 43 | 7 | 7 | 152 | 136 | 54 | .28421053 | 43 | 93 | 76 | 1039 | 43 | 34 |
| Lindenwold | 192 | 32 | 29 | 291 | 283 | 83 | .22677596 | 66 | 287 | 235 | 7566 | 310 | -75 |
| Magnolia | 43 | 5 | 5 | 69 | 69 | 0 | 0 | 0 | 48 | 39 | 1651 | 68 | -28 |
| Merchntvle | 12 | 18 | 18 | 39 | 20 | 19 | .48717949 | 19 | 49 | 40 | 1572 | 64 | -24 |
| Mt. Ephraim | 34 | 5 | 5 | 95 | 84 | 11 | .11578947 | 11 | 50 | 41 | 1865 | 76 | -35 |
| Onklyn | 16 | 18 | 18 | 45 | 38 | 15 | .28301887 | 13 | 47 | 38 | 1765 | 72 | -34 |
| Pennsauken | 179 | 57 | 54 | 351 | 290 | 101 | .25831202 | 91 | 324 | 265 | 11537 | 473 | -208 |
| Pine Hill | 105 | 11 | 10 | 135 | 100 | 37 | .36305732 | 49 | 164 | 134 | 3304 | 135 | -1 |
| Pine Vally | 0 | 0 | 0 | 0 | 0 | 0 | | | | | 11 | 0 | |
| Runnemede | 73 | 25 | 23 | 97 | 79 | 18 | .18556701 | 18 | 114 | 93 | 3292 | 135 | -41 |
| Somerdale | 45 | 11 | 11 | 112 | 91 | 29 | .24166667 | 27 | 83 | 68 | 1996 | 82 | -14 |
| Stratford | 55 | 14 | 13 | 59 | 50 | 9 | .15254237 | 9 | 77 | 63 | 2605 | 107 | -44 |
| Tavistock | 0 | 0 | 0 | 0 | 0 | 0 | | | | | 4 | 0 | |

| MNCPLTY | STF-1 Tbl 18 Ovrcrwded Units | STF-1 Tbl 13 Ttl Units Lack Com Plumbing | STF-1 Tbl 15 Net Units Lack Com Plumbing not o/c | STF-3 XII-35 Units Lack Ctrl Heating not o/c | STF-3 X-17 Room Heaters w/flue | STF-3 X-17 Other Units Lack Ctr Heating | % Units w/o Ctrl Htn, Inad Htng | Units Lacking With Adequate Heating | Total Present Need | Adjusted Present Need | Occupied Dwelling Units | Fair Share Cap | Surplus Present Need |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Voorhees | 58 | 9 | 7 | 100 | 75 | 37 | .33035714 | 33 | 98 | 80 | 4605 | 189 | -108 |
| Waterford | 44 | 5 | 4 | 138 | 108 | 50 | .31645570 | 44 | 92 | 75 | 2462 | 101 | -26 |
| Winslow | 153 | 132 | 128 | 333 | 216 | 164 | .48157895 | 144 | 425 | 348 | 6029 | 247 | 101 |
| Woodlynne | 23 | 8 | 8 | 18 | 18 | 0 | 0 | 0 | 31 | 25 | 947 | 39 | -13 |
| TOTAL | 4729 | 1278 | 1168 | 9818 | 8729 | 3205 | | 2510 | 8407 | 6894 | 162508 | 6663 | |

## CAPE MAY

| MNCPLTY | Ovrerwded Units (STF-1 Tbl 18) | Lack Com Plumbing Units not o/c (STF-1 Tbl 15) | Lack Heat Ctrl Heat Units not o/c (STF-3 XII-35) | Room Heaters w/flue (STF-3 X-17) | Other Units Lack Ctr Heating (STF-3 X-17) | % Units w/o Ctrl Htn, With Inad Htng | Units Lacking Adequate Heating | Total Present Need | Adjusted Present Need | Occupied Dwelling Units | Fair Share Cap | Surplus Present Need |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Total Surplus Present Need, Atlantic County 714 | | | | | |
| CAPE MAY | | | | | | | | | | | | |
| Avalon | 8 | 4 | 71 | 75 | 60 | .4444444 | 32 | 44 | 36 | 927 | 60 | −24 |
| Cape May | 36 | 18 | 97 | 97 | 51 | .34459459 | 33 | 87 | 72 | 1847 | 119 | −47 |
| CapeMayPt | 2 | 0 | 14 | 5 | 15 | .75 | 11 | 13 | 10 | 131 | 8 | 2 |
| Dennis | 46 | 18 | 183 | 66 | 174 | .725 | 133 | 197 | 161 | 1268 | 82 | 80 |
| Lower | 161 | 39 | 598 | 426 | 501 | .54045307 | 323 | 523 | 429 | 6719 | 433 | −4 |
| Middle | 129 | 39 | 612 | 534 | 284 | .34718826 | 212 | 380 | 312 | 4159 | 268 | 44 |
| NWildwood | 29 | 28 | 238 | 193 | 130 | .40247678 | 96 | 153 | 125 | 1992 | 128 | −3 |
| OceanCity | 86 | 60 | 269 | 188 | 170 | .47486034 | 128 | 274 | 224 | 6255 | 403 | −178 |
| SeaIsleCty | 13 | 12 | 68 | 60 | 25 | .29411765 | 20 | 45 | 37 | 1086 | 70 | −33 |
| StoneHrbr | 3 | 6 | 51 | 32 | 34 | .51515152 | 26 | 35 | 29 | 581 | 37 | −8 |
| Upper | 34 | 19 | 200 | 71 | 168 | .70292887 | 141 | 194 | 159 | 2361 | 152 | 7 |
| WCapeMay | 10 | 5 | 63 | 35 | 39 | .52702703 | 33 | 48 | 40 | 481 | 31 | 9 |
| WWildwood | 5 | 3 | 36 | 35 | 9 | .20454545 | 7 | 15 | 13 | 160 | 10 | 2 |
| Wildwood | 86 | 37 | 337 | 258 | 178 | .40825688 | 188 | 261 | 214 | 2081 | 134 | 80 |
| WildwdCrst | 27 | 27 | 111 | 103 | 52 | .33548387 | 37 | 91 | 75 | 1686 | 109 | −34 |
| Woodbine | 40 | 9 | 72 | 70 | 22 | .23913043 | 17 | 66 | 54 | 613 | 39 | 15 |
| TOTALS | 715 | 324 | 3020 | 2248 | 1912 | | 1387 | 2426 | 1989 | 32347 | 2083 | |

CUMBERLAND

| MNCPLTY | STF-1 Tbl 18 Ovrcrwded Units | STF-1 Tbl 15 Units Lack Com Plumbing not o/c | STF-3 XII-35 Units Lack Ctrl Heat not o/c | STF-3 X-17 Room Heaters w/flue | STF-3 X-17 Other Units Lack Ctr Heating | % Units w/o Ctrl Htn, With Inad Htng | Units Lacking Adequate Heating | Total Present Need | Adjusted Present Need | Occupied Dwelling Units | Fair Share Cap | Surplus Present Need |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CUMBERLAND | | | | | | | | | | | | |
| Bridgeton | 365 | 101 | 905 | 960 | 203 | .17454858 | 158 | 624 | 512 | 6681 | 430 | 81 |
| Commercial | 102 | 125 | 340 | 335 | 192 | .36432638 | 124 | 351 | 288 | 1583 | 102 | 186 |
| Deerfield | 43 | 11 | 79 | 63 | 36 | .36363636 | 29 | 83 | 68 | 815 | 52 | 15 |
| Downe | 34 | 38 | 119 | 109 | 150 | .57915058 | 69 | 141 | 116 | 635 | 41 | 75 |
| Fairfield | 152 | 29 | 250 | 273 | 75 | .21551724 | 54 | 235 | 193 | 1754 | 113 | 80 |
| Greenwich | 10 | 7 | 52 | 27 | 49 | .64473684 | 34 | 51 | 41 | 331 | 21 | 20 |
| Hopewell | 25 | 11 | 87 | 66 | 34 | .34 | 30 | 66 | 54 | 1332 | 86 | -32 |
| Lawrence | 42 | 34 | 83 | 62 | 89 | .58940397 | 49 | 125 | 102 | 651 | 42 | 61 |
| MauriceRiv | 48 | 29 | 265 | 149 | 179 | .54573171 | 145 | 222 | 182 | 1202 | 77 | 104 |
| Millville | 239 | 12 | 628 | 458 | 263 | .36477115 | 229 | 589 | 483 | 9007 | 580 | -97 |
| Shiloh | 3 | 2 | 19 | 121 | 9 | .42857143 | 8 | 13 | 11 | 210 | 14 | -3 |
| Stewcreek | 11 | 5 | 54 | 20 | 47 | .70149254 | 38 | 54 | 44 | 438 | 28 | 16 |
| UpDeerfld | 74 | 13 | 259 | 301 | 58 | .16155989 | 42 | 129 | 106 | 2255 | 145 | -40 |
| Vineland | 914 | 204 | 1446 | 1263 | 481 | .27580275 | 399 | 1517 | 1244 | 17898 | 1120 | 124 |
| TOTALS | 2062 | 730 | 4586 | 4098 | 1865 | | 1406 | 4198 | 3442 | 44287 | 2852 | |

ESSEX

| MNCPLTY | STF-1 Tbl 18 Ovrcrwded Units Lack Com Plumbing | STF-1 Tbl 13 Ttl Units Lack Com Plumbing | STF-1 Tbl 15 Net Units Lack Com Plumbing not o/c | STF-3 XII-35 Units Lack Ctrl Htm not o/c | STF-3 X-17 Room Heaters Lack Htng w/flue | STF-3 X-17 Other Units Lack Ctr Heating | % Units w/o Ctrl Htn, Inad Htng | Units Lacking Adequate Heating | Total Present Need | Adjusted Present Need | Occupied Dwelling Units | Fair Share Cap | Surplus Present Need |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ESSEX | | | | | | | | | | | | | |
| Bellevile | 354 | 233 | 220 | 504 | 365 | 193 | .34587814 | 174 | 748 | 614 | 13108 | 839 | −225 |
| Bloomfld | 298 | 242 | 235 | 500 | 305 | 237 | .48726937 | 219 | 752 | 616 | 18587 | 1190 | −573 |
| Caldwell | 42 | 26 | 25 | 59 | 29 | 43 | .59722222 | 35 | 102 | 84 | 3003 | 192 | −108 |
| CedarGrove | 23 | 19 | 19 | 48 | 44 | 6 | 12 | 6 | 48 | 39 | 3792 | 243 | −204 |
| E Orange | 2021 | 889 | 785 | 1833 | 1146 | 951 | .45350501 | 831 | 3637 | 2983 | 28398 | 1817 | 1165 |
| EssexFells | 6 | 0 | 0 | 22 | 16 | 6 | .27272727 | 6 | 12 | 10 | 718 | 46 | −36 |
| Fairfield | 23 | 15 | 14 | 56 | 39 | 29 | .42647059 | 24 | 61 | 50 | 2217 | 142 | −92 |
| Glen Ridge | 18 | 4 | 4 | 24 | 11 | 19 | .63333333 | 15 | 37 | 31 | 2442 | 156 | −126 |
| Irvingtn | 1280 | 626 | 572 | 1843 | 1551 | 739 | .32270742 | 595 | 2447 | 2006 | 24714 | 1582 | 425 |
| Livingston | 40 | 5 | 5 | 84 | 42 | 42 | .5 | 42 | 87 | 71 | 8513 | 545 | −473 |
| Maplewood | 59 | 47 | 46 | 216 | 111 | 105 | .48611111 | 105 | 210 | 172 | 8017 | 513 | −341 |
| Millburn | 26 | 20 | 20 | 55 | 27 | 32 | .54237288 | 30 | 76 | 62 | 6969 | 446 | −384 |
| Montclair | 278 | 275 | 266 | 590 | 441 | 225 | .33783784 | 199 | 743 | 610 | 14500 | 928 | −318 |
| Newark | 13665 | 5117 | 4184 | 10876 | 7807 | 6509 | .45466611 | 4718 | 22567 | 18505 | 110912 | 7098 | 11406 |
| NCaldwell | 8 | 4 | 3 | 11 | 11 | 0 | 0 | 0 | 11 | 9 | 1589 | 102 | −93 |
| Nutley | 181 | 77 | 74 | 312 | 208 | 114 | .35408727 | 110 | 365 | 300 | 10518 | 673 | −373 |
| Orange | 828 | 474 | 430 | 793 | 678 | 453 | .40053050 | 318 | 1576 | 1292 | 12138 | 777 | 515 |

| MNCPLTY | STF-1 Tbl 18 Ovrcrwded Units | STF-1 Tbl 13 Lack Com Plumbing | STF-1 Tbl 15 Net Units Lack Com Plumbing not o/c | STF-3 XII-35 Units Ttl Units Lack Com Plumbing Ctrl not o/c | STF-3 X-17 Room Heaters w/flue | STF-3 X-17 Other Units Lack Ctr Heating | % Units w/o Ctrl Htn, Inad Htng | Units Lacking Adequate Heating | Total Present Need | Adjusted Present Need | Occupied Dwelling Units | Fair Share Cap | Surplus Present Need |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Roseland | 6 | 6 | 6 | 23 | 18 | 11 | .37931034 | 9 | 21 | 17 | 1793 | 115 | –98 |
| SOrange | 43 | 53 | 52 | 132 | 91 | 62 | .40522876 | 53 | 148 | 122 | 5173 | 331 | –209 |
| Verona | 43 | 22 | 22 | 108 | 61 | 53 | .46491228 | 50 | 115 | 94 | 5197 | 333 | –238 |
| WCaldwell | 30 | 11 | 10 | 22 | 22 | 0 | 0 | 0 | 40 | 33 | 3609 | 231 | –198 |
| WOrange | 207 | 127 | 122 | 379 | 261 | 146 | .35872236 | 136 | 465 | 381 | 14027 | 898 | –516 |
| TOTALS | 19479 | 8292 | 7114 | 17990 | 13284 | 9975 | | 7675 | 34268 | 28100 | 299934 | 19196 | 8904 |

## GLOUCESTER

| MNCPLTY | STF-1 Tbl 18 Ttl Units Ovrcrwded Units | STF-1 Tbl 13 Lack Com Plumbing | STF-1 Tbl 15 Net Units Lack Com Plumbing Ctrl not o/c | STF-3 XII-35 Units Lack Heat Heaters not o/c | STF-3 X-17 Room Lack Heaters Heating w/flue | STF-3 X-17 Other Units Lack Ctr Heating | % Units w/o Ctrl Htn, With Inad Htng | Units Lacking Adequate Heating | Total Present Need | Adjusted Present Need | Occupied Dwelling Units | Fair Share Cap | Surplus Present Need |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **GLOUCESTER** | | | | | | | | | | | | | |
| Clayton | 78 | 17 | 16 | 109 | 75 | 38 | .33628319 | 37 | 131 | 107 | 1930 | 79 | 28 |
| Deptford | 257 | 43 | 38 | 428 | 291 | 184 | .38736842 | 166 | 461 | 378 | 7329 | 300 | 77 |
| E. Greenwch | 13 | 14 | 14 | 54 | 22 | 32 | .59259259 | 32 | 59 | 48 | 1311 | 54 | −5 |
| Elk | 37 | 19 | 17 | 149 | 171 | 68 | .28451883 | 42 | 96 | 79 | 1054 | 43 | 36 |
| Franklin | 155 | 44 | 38 | 291 | 172 | 145 | .45741325 | 133 | 326 | 267 | 3856 | 158 | 109 |
| Glassboro | 200 | 45 | 39 | 247 | 219 | 80 | .26755853 | 66 | 305 | 250 | 4724 | 194 | 56 |
| Greenwich | 22 | 7 | 6 | 75 | 51 | 24 | .32 | 24 | 52 | 43 | 1778 | 73 | −30 |
| Harrison | 16 | 9 | 8 | 54 | 6 | 55 | .90163934 | 49 | 73 | 60 | 1221 | 50 | 10 |
| Logan | 16 | 20 | 18 | 56 | 36 | 40 | .52681579 | 29 | 63 | 52 | 1016 | 42 | 10 |
| Mahtua | 71 | 18 | 17 | 226 | 194 | 55 | .22088353 | 50 | 138 | 113 | 2839 | 116 | −3 |
| Monroe | 179 | 47 | 44 | 559 | 525 | 173 | .24785100 | 139 | 362 | 296 | 7039 | 289 | 8 |
| Natl Park | 53 | 5 | 4 | 52 | 49 | 9 | .15517241 | 8 | 65 | 53 | 1086 | 45 | 9 |
| Newfield | 9 | 2 | 1 | 28 | 17 | 14 | .45161290 | 13 | 23 | 19 | 520 | 21 | −3 |
| Paulsboro | 103 | 22 | 21 | 276 | 263 | 59 | .18322981 | 51 | 175 | 143 | 2372 | 97 | 46 |
| Pitman | 30 | 28 | 28 | 115 | 99 | 32 | .24427481 | 28 | 86 | 71 | 3399 | 139 | −69 |
| S Harrison | 12 | 6 | 6 | 38 | 21 | 19 | .475 | 18 | 36 | 30 | 458 | 19 | 11 |
| Swedesboro | 25 | 25 | 22 | 102 | 86 | 50 | .36764706 | 37 | 84 | 69 | 737 | 30 | 39 |

| MNCPLTY | STF-1 Tbl 18 Ttl Units Ovrcrwded Units Plumbing | STF-1 Tbl 13 Lack Com Plumbing | STF-1 Tbl 15 Net Units Lack Com Plumbing Ctrl not o/c | STF-3 XII-35 Units Lack Heat Heaters not o/c | STF-3 X-17 Room Heating w/fue | STF-3 X-17 Other Units Heating | % Units w/o Ctrl Htn, Inad Htng | Units Lacking Adequate Heating | Total Present Need | Adjusted Present Need | Occupied Dwelling Units | Fair Share Cap | Surplus Present Need |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Washington | 92 | 16 | 16 | 214 | 158 | 70 | .30701754 | 66 | 174 | 142 | 8207 | 336 | −194 |
| Wenonah | 4 | 3 | 3 | 23 | 14 | 11 | .44 | 10 | 17 | 14 | 775 | 32 | −18 |
| W Deptford | 100 | 19 | 19 | 218 | 183 | 51 | .21794872 | 48 | 167 | 137 | 6415 | 263 | −126 |
| Westville | 28 | 10 | 10 | 106 | 107 | 12 | .10084034 | 11 | 49 | 40 | 1838 | 75 | −35 |
| Woodbury | 76 | 65 | 64 | 194 | 187 | 58 | .23673469 | 46 | 186 | 152 | 3827 | 157 | −4 |
| Wdbry Hts | 12 | 7 | 7 | 17 | 11 | 6 | .35294118 | 6 | 25 | 20 | 1025 | 42 | −22 |
| Woolwich | 12 | 16 | 13 | 29 | 11 | 37 | .77083333 | 22 | 47 | 39 | 373 | 15 | 24 |
| TOTALS | 1600 | 507 | 469 | 3660 | 2968 | 1322 | | 1130 | 3199 | 2623 | 65129 | 2670 | |

HUDSON

| MNCPLTY | STF-1 Tbl 18 Ttl Units Ovrcrwded Units | STF-1 Tbl 13 Lack Com Plumbing Units | STF-1 Tbl 15 Net Units Lack Com Plumbing not o/c | STF-3 XII-35 Units Lack Heat Ctrl not o/c | STF-3 X-17 Room Heaters w/flue | STF-3 X-17 Other Units Lack Ctr Heating | % Units w/o Ctrl Htn, With Inad Htng | Units Lacking Adequate Heating | Total Present Need | Adjusted Present Need | Occupied Dwelling Units | Fair Share Cap | Surplus Present Need |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| HUDSON | | | | | | | | | | | | | |
| Bayonne | 763 | 636 | 604 | 2170 | 1325 | 1232 | .48181463 | 1046 | 2413 | 1978 | 25405 | 1626 | 352 |
| E Newark | 57 | 14 | 12 | 81 | 77 | 27 | .25961538 | 21 | 90 | 74 | 664 | 42 | 31 |
| Guttenberg | 153 | 96 | 87 | 217 | 126 | 104 | .45217391 | 98 | 338 | 277 | 3265 | 209 | 68 |
| Harrison | 219 | 113 | 107 | 645 | 404 | 292 | .41954023 | 271 | 597 | 489 | 4472 | 286 | 208 |
| Hoboken | 1604 | 789 | 672 | 3002 | 2011 | 2111 | .51213003 | 1587 | 3813 | 3127 | 15407 | 985 | 2141 |
| Jer Cty | 7346 | 3227 | 2759 | 7987 | 6529 | 2477 | .27503886 | 2197 | 12302 | 10087 | 80720 | 5166 | 4921 |
| Kearny | 416 | 273 | 255 | 667 | 525 | 246 | .31906615 | 213 | 884 | 725 | 12942 | 828 | -104 |
| N Bergen | 771 | 735 | 685 | 656 | 514 | 256 | .33246753 | 218 | 1674 | 1373 | 18833 | 1205 | 167 |
| Secaucus | 96 | 72 | 71 | 168 | 113 | 59 | .34302326 | 58 | 225 | 184 | 4899 | 314 | -129 |
| Union Cty | 2127 | 1092 | 936 | 1780 | 1375 | 831 | .37669991 | 671 | 3734 | 3061 | 20781 | 1330 | 1732 |
| Weehawken | 320 | 189 | 168 | 241 | 181 | 98 | .35125448 | 85 | 573 | 470 | 5050 | 323 | 146 |
| West NY | 1245 | 749 | 669 | 1218 | 925 | 555 | .375 | 457 | 2871 | 1944 | 15419 | 987 | 957 |
| TOTALS | 15117 | 7985 | 7025 | 18832 | 14105 | 8288 | | 6870 | 29012 | 23790 | 207857 | 13303 | 10487 |

## HUNTERDON

| MNCPLTY | STF-1 Tbl 18 Ovrcrwded Units | STF-1 Tbl 13 Ttl Units Lack Com Plumbing | STF-1 Tbl 15 Net Units Lack Com Plumbing not o/c | STF-3 XII-35 Units Lack Heat Heaters not o/c | STF-3 X-17 Room w/flue | STF-3 X-17 Other Units Lack Ctr Heating | % Units w/o Ctrl Htn, Inad Htng | Units Lacking Htn, With Adequate Heating | Total Present Need | Adjusted Present Need | Occupied Dwelling Units | Fair Share Cap | Surplus Present Need |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| HUNTERDON | | | | | | | | | | | | | |
| Alexandria | 9 | 4 | 4 | 87 | 20 | 90 | .81818182 | 71 | 84 | 69 | 877 | 56 | 13 |
| Bethlehem | 12 | 6 | 5 | 66 | 6 | 68 | .91891892 | 61 | 78 | 64 | 918 | 59 | 5 |
| Bloomsbry | 7 | 5 | 4 | 16 | 8 | 10 | .55555556 | 9 | 20 | 16 | 308 | 20 | -3 |
| Califon | 3 | 4 | 4 | 31 | 5 | 30 | .85714286 | 27 | 34 | 28 | 352 | 23 | 5 |
| Clinton | 5 | 6 | 6 | 28 | 15 | 17 | .53125 | 15 | 26 | 21 | 697 | 45 | -23 |
| ClintonTwp | 26 | 24 | 24 | 67 | 24 | 52 | .68421053 | 46 | 96 | 79 | 2110 | 135 | -56 |
| Delaware | 18 | 17 | 16 | 86 | 26 | 70 | .72916667 | 63 | 97 | 79 | 1263 | 81 | -2 |
| EastAmwell | 15 | 17 | 15 | 80 | 9 | 89 | .90816327 | 73 | 103 | 84 | 1134 | 73 | 12 |
| Flemington | 30 | 47 | 45 | 89 | 62 | 27 | .30337079 | 27 | 102 | 84 | 1794 | 115 | -31 |
| Franklin | 15 | 9 | 9 | 35 | 12 | 24 | .66666667 | 23 | 47 | 39 | 752 | 48 | -9 |
| Frenchtown | 8 | 10 | 10 | 25 | 14 | 14 | .5 | 13 | 31 | 25 | 586 | 38 | -12 |
| Glen Gard | 8 | 5 | 5 | 22 | 15 | 13 | .46428571 | 10 | 23 | 19 | 278 | 18 | 1 |
| Hampton | 12 | 7 | 7 | 22 | 7 | 17 | .70833333 | 16 | 35 | 28 | 557 | 36 | -7 |
| HighBridge | 18 | 14 | 13 | 53 | 0 | 53 | 1 | 53 | 84 | 69 | 1142 | 73 | -4 |
| Holland | 15 | 8 | 8 | 94 | 12 | 99 | .89189189 | 84 | 107 | 88 | 1485 | 95 | -7 |
| Kingwood | 22 | 20 | 16 | 111 | 39 | 91 | .7 | 78 | 116 | 95 | 922 | 59 | 36 |
| Lambrtvle | 34 | 31 | 29 | 253 | 90 | 75 | .45454545 | 115 | 178 | 146 | 1613 | 103 | 43 |

| MNCPLTY | STF-1 Tbl 18 Ovrcrwded Units | STF-1 Tbl 13 Ttl Units Lack Com Units Plumbing | STF-1 Tbl 15 Net Units Lack Com Plumbing Ctrl not o/c | STF-3 XII-35 Units Lack Heat Heaters not o/c | STF-3 X-17 Room Lack w/flue | STF-3 X-17 Other Units Lack Ctr Heating | % Units w/o Ctrl Htn, With Inad Htng | Units Lacking Adequate Heating | Total Present Need | Adjusted Present Need | Occupied Dwelling Units | Fair Share Cap | Surplus Present Need |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Lebanon | 5 | 0 | 0 | 14 | 13 | 9 | .40909091 | 6 | 11 | 9 | 279 | 18 | −9 |
| LebanonTwp | 29 | 32 | 29 | 181 | 48 | 207 | .81176471 | 147 | 205 | 168 | 1719 | 110 | 58 |
| Milford | 9 | 4 | 4 | 28 | 10 | 18 | .64285714 | 18 | 31 | 25 | 484 | 31 | −6 |
| Raritan | 40 | 26 | 25 | 73 | 48 | 88 | .64705882 | 47 | 112 | 92 | 2563 | 164 | −72 |
| Readington | 54 | 35 | 34 | 88 | 47 | 56 | .54368932 | 48 | 136 | 111 | 3317 | 212 | −101 |
| Stockton | 1 | 2 | 2 | 29 | 16 | 14 | .46666667 | 14 | 17 | 14 | 252 | 16 | −3 |
| Tewkssbury | 8 | 10 | 10 | 79 | 11 | 71 | .86585366 | 68 | 86 | 71 | 1285 | 82 | −11 |
| Union | 9 | 10 | 9 | 81 | 16 | 65 | .80246914 | 65 | 83 | 68 | 1053 | 67 | 1 |
| WestAmwell | 13 | 14 | 12 | 48 | 36 | 35 | .49295775 | 24 | 49 | 40 | 775 | 50 | −10 |
| TOTALS | 425 | 367 | 345 | 1786 | 609 | 1402 | | 1218 | 1988 | 1630 | 28515 | 1825 | −195 |

## MERCER

| MNCPLTY | STF-1 Tbl 18 Ovrerwded Units | STF-1 Tbl 13 Lack Com Plumbing | STF-1 Tbl 15 Net Units Lack Com Plumbing not o/c | STF-3 XII-35 Units Lack Ctrl Heat Heaters not o/c | STF-3 X-17 Room Lack Heating w/flue | STF-3 X-17 Other Units Heating | % Units w/o Ctrl Htn, With Inad Htng | Units Lacking Adequate Heating | Total Present Need | Adjusted Present Need | Occupied Dwelling Units | Fair Share Cap | Surplus Present Need |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MERCER | | | | | | | | | | | | | |
| East Wnsr | 124 | 33 | 32 | 190 | 98 | 115 | .53990610 | 103 | 259 | 212 | 7516 | 308 | –96 |
| Ewing | 174 | 68 | 65 | 476 | 379 | 122 | .24351297 | 116 | 355 | 291 | 11660 | 478 | –187 |
| Hamilton | 460 | 155 | 148 | 1065 | 908 | 366 | .28728414 | 306 | 914 | 749 | 29356 | 1204 | –454 |
| Hightstown | 45 | 16 | 13 | 127 | 69 | 62 | .47328244 | 60 | 118 | 97 | 1696 | 70 | 27 |
| HpwellBoro | 5 | 12 | 12 | 25 | 11 | 17 | .60714286 | 15 | 32 | 26 | 765 | 31 | –5 |
| HpwellTwp | 21 | 27 | 27 | 151 | 66 | 110 | .625 | 94 | 142 | 117 | 3527 | 145 | –28 |
| Lawrence | 83 | 27 | 26 | 129 | 73 | 70 | .48951049 | 63 | 172 | 141 | 6114 | 251 | –110 |
| Penington | 3 | 3 | 3 | 24 | 12 | 14 | .53846154 | 13 | 19 | 16 | 752 | 31 | –15 |
| PrnctnBor | 62 | 32 | 28 | 39 | 27 | 17 | .38636364 | 15 | 105 | 86 | 3179 | 130 | –44 |
| PrnctnTwp | 48 | 31 | 29 | 353 | 254 | 129 | .33681462 | 119 | 196 | 161 | 4862 | 199 | –39 |
| Trenton | 1829 | 768 | 685 | 2652 | 2641 | 844 | .24218077 | 642 | 3156 | 2588 | 32463 | 1331 | 1257 |
| Washington | 23 | 8 | 7 | 51 | 30 | 21 | .41176471 | 21 | 51 | 42 | 1234 | 51 | –9 |
| West Wnsr | 32 | 11 | 11 | 52 | 19 | 33 | .63461538 | 33 | 76 | 62 | 2695 | 110 | –48 |
| TOTALS | 2909 | 1191 | 1086 | 5334 | 4587 | 1920 | | 1600 | 5595 | 4588 | 105819 | 4339 | |

## MIDDLESEX

| MNCPLTY | STF-1 Tbl 18 Ovrcrwded Units | STF-1 Tbl 13 Lack Com Plumbing Units | STF-1 Tbl 15 Net Units Lack Com Plumbing not o/c | STF-3 XII-35 Ctrl Heat Lack Units not o/c | STF-3 X-17 Heaters Room w/flue | STF-3 X-17 Lack Ctr Heating Other Units | % Units w/o Ctrl Htn, Inad Htng | Units Lacking Adequate Heating | Total Present Need | Adjusted Present Need | Occupied Dwelling Units | Fair Share Cap | Surplus Present Need |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MIDDLESEX | | | | | | | | | | | | | |
| Carteret | 221 | 118 | 112 | 358 | 329 | 103 | .23842593 | 85 | 418 | 343 | 6919 | 443 | -100 |
| Cranbury | 11 | 10 | 10 | 15 | 13 | 12 | .48 | 7 | 28 | 23 | 691 | 44 | -21 |
| Dunellen | 46 | 86 | 84 | 74 | 23 | 51 | .68918919 | 51 | 181 | 148 | 2414 | 154 | -6 |
| East Bruns | 154 | 37 | 35 | 188 | 171 | 27 | .13636364 | 26 | 215 | 176 | 11189 | 716 | -540 |
| Edison | 446 | 139 | 130 | 516 | 401 | 155 | .27877698 | 144 | 720 | 590 | 23427 | 1499 | -909 |
| Helmetta | 10 | 5 | 5 | 30 | 27 | 6 | .18181818 | 5 | 20 | 17 | 313 | 20 | -3 |
| Hghland Pk | 109 | 48 | 46 | 105 | 96 | 40 | .29411765 | 31 | 186 | 152 | 5605 | 359 | -206 |
| Jamesburg | 60 | 15 | 14 | 80 | 72 | 13 | .15294118 | 12 | 86 | 71 | 1398 | 89 | -19 |
| Metuchen | 70 | 27 | 27 | 57 | 41 | 36 | .46758247 | 27 | 124 | 101 | 4959 | 317 | -216 |
| Middlesex | 91 | 22 | 22 | 87 | 79 | 15 | .15957447 | 14 | 127 | 104 | 4478 | 287 | -183 |
| Milltown | 30 | 13 | 13 | 17 | 11 | 6 | .35294118 | 6 | 49 | 40 | 2411 | 154 | -114 |
| Monroe | 91 | 33 | 29 | 76 | 55 | 68 | .55284553 | 42 | 162 | 133 | 5765 | 369 | -236 |
| New Bruns | 1042 | 741 | 663 | 699 | 626 | 223 | .26266196 | 184 | 1889 | 1549 | 13244 | 848 | 701 |
| Nrth Bruns | 703 | 85 | 81 | 127 | 112 | 47 | .29559748 | 38 | 222 | 182 | 7484 | 479 | -297 |
| Old Bridg | 427 | 78 | 73 | 344 | 317 | 96 | .23244552 | 80 | 580 | 476 | 16593 | 1062 | -586 |
| Perth Amb | 1096 | 644 | 567 | 1216 | 1080 | 400 | .27027027 | 329 | 1992 | 1633 | 13617 | 871 | 762 |
| Piscataway | 393 | 64 | 60 | 262 | 171 | 128 | .42809365 | 112 | 565 | 463 | 12299 | 787 | -324 |

| MNCPLTY | STF-1 Tbl 18 Ttl Units Ovrerwded Units | STF-1 Tbl 15 Lack Com Plumbing Units Plumbing | STF-3 XII-35 Net Units Lack Com Plumbing not o/c | STF-3 X-17 Units Lack Ctr not o/c | STF-3 X-17 Room Heaters Lack w/flue | Other Units Lack Ctr Heating | % Units w/o Ctrl Htn, Inad Htng | Units Lacking Adequate Heating | Total Present Need | Adjusted Present Need | Occupied Dwelling Units | Fair Share Cap | Surplus Present Need |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Plainsboro | 25 | 14 | 13 | 67 | 47 | 25 | .34722222 | 23 | 61 | 50 | 3080 | 197 | −147 |
| Sayreville | 184 | 45 | 44 | 319 | 246 | 92 | .27218935 | 87 | 315 | 258 | 9396 | 601 | −343 |
| SouthAmboy | 92 | 54 | 50 | 137 | 86 | 72 | .45569620 | 62 | 204 | 168 | 2877 | 184 | −16 |
| Sth Bruns | 92 | 32 | 27 | 137 | 84 | 73 | .46496815 | 64 | 183 | 150 | 5443 | 348 | −199 |
| SthPlnfld | 114 | 24 | 22 | 153 | 116 | 51 | .30538922 | 47 | 183 | 150 | 6224 | 398 | −249 |
| SouthRiver | 154 | 96 | 93 | 328 | 40 | 26 | .39393939 | 129 | 376 | 308 | 5091 | 326 | −17 |
| Spotswood | 75 | 16 | 14 | 55 | 40 | 26 | .39393939 | 22 | 111 | 91 | 2494 | 160 | −69 |
| Woodbridge | 572 | 185 | 172 | 760 | 579 | 250 | .30156815 | 229 | 973 | 798 | 29297 | 1875 | −1077 |
| TOTALS | 5708 | 2631 | 2406 | 6207 | 4862 | 2041 | | 1855 | 9969 | 8175 | 196708 | 12589 | −4415 |

## MONMOUTH

| MNCPLTY | STF-1 Tbl 18 Ovrcrwded Units | STF-1 Tbl 15 Net Units Lack Com Plumbing not o/e | STF-3 XII-35 Lack Ctrl Heat Units not o/e | STF-3 X-17 Room Heaters w/flue | STF-3 X-17 Other Units Lack Ctr Heating | % Units w/o Ctrl Htn, With Inad Htng | Units Lacking Adequate Heating | Total Present Need | Adjusted Present Need | Occupied Dwelling Units | Fair Share Cap | Surplus Present Need |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **MONMOUTH** | | | | | | | | | | | | |
| Aberdeen | 151 | 33 | 209 | 141 | 87 | .38157895 | 80 | 264 | 216 | 5293 | 191 | 25 |
| Allenhurst | 1 | 0 | 13 | 10 | 5 | .33333333 | 4 | 5 | 4 | 328 | 12 | −7 |
| Allentown | 17 | 5 | 23 | 19 | 6 | .24 | 6 | 28 | 23 | 662 | 24 | −1 |
| Asbury Pk | 477 | 299 | 810 | 863 | 250 | .22461815 | 182 | 958 | 786 | 7207 | 260 | 525 |
| Atl Hghland | 27 | 17 | 39 | 33 | 12 | .26666667 | 10 | 54 | 45 | 1776 | 64 | −20 |
| Avon | 3 | 9 | 34 | 33 | 45 | .57692308 | 20 | 32 | 26 | 1004 | 36 | −10 |
| Belmar | 55 | 55 | 191 | 152 | 209 | .57894737 | 111 | 221 | 181 | 3019 | 109 | 72 |
| Brdly Bch | 71 | 37 | 124 | 76 | 113 | .59788360 | 74 | 182 | 149 | 2013 | 73 | 77 |
| Brielle | 17 | 2 | 44 | 38 | 19 | .33333333 | 15 | 34 | 28 | 1489 | 54 | −26 |
| Colts Neck | 12 | 12 | 7 | 7 | 0 | 0 | 0 | 24 | 20 | 2151 | 78 | −58 |
| Deal | 3 | 4 | 0 | 0 | 0 | 0 | 0 | 7 | 6 | 650 | 23 | −18 |
| Eatontown | 83 | 27 | 69 | 73 | 25 | .25510204 | 18 | 128 | 105 | 4959 | 179 | −74 |
| Englshtwn | 11 | 9 | 21 | 18 | 3 | .14285714 | 3 | 23 | 19 | 339 | 12 | 7 |
| Fair Haven | 11 | 1 | 69 | 44 | 25 | .36231884 | 25 | 37 | 30 | 1895 | 68 | −38 |
| Farmngdale | 7 | 3 | 19 | 11 | 11 | .5 | 10 | 20 | 16 | 521 | 19 | −3 |
| Freehld Br | 148 | 35 | 137 | 148 | 68 | .31481481 | 43 | 226 | 185 | 8573 | 129 | 56 |
| Freehld Tp | 57 | 30 | 107 | 113 | 39 | .25667895 | 27 | 114 | 94 | 5565 | 201 | −107 |

| MNCPLTY | Overcrwded Units (STF-1 Tbl 18) | Lack Com Plumbing not o/c (STF-1 Tbl 15 Units) | Lack Ctrl Heat not o/c (STF-3 XII-35 Units) | Room Heaters w/flue (STF-3 X-17) | Other Units Lack Ctr Heating (STF-3 X-17) | % Units w/o Ctrl Htn, With Inad Htng | Units Lacking Adequate Heating | Total Present Need | Adjusted Present Need | Occupied Dwelling Units | Fair Share Cap | Surplus Present Need |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Hazlet | 123 | 11 | 193 | 174 | 34 | .16346154 | 32 | 166 | 136 | 6595 | 238 | −102 |
| Highlands | 48 | 17 | 244 | 240 | 62 | .20529801 | 50 | 115 | 94 | 2216 | 80 | 14 |
| Holmdel | 18 | 5 | 22 | 15 | 7 | .31818182 | 7 | 30 | 25 | 2229 | 80 | −56 |
| Howell | 226 | 48 | 384 | 290 | 156 | .34977578 | 134 | 408 | 335 | 7822 | 282 | 52 |
| Interlaken | 1 | 1 | 7 | 3 | 4 | .57142857 | 4 | 6 | 5 | 389 | 14 | −9 |
| Keansburg | 182 | 34 | 421 | 337 | 131 | .27991453 | 118 | 334 | 274 | 3431 | 124 | 150 |
| Keyport | 94 | 73 | 70 | 55 | 18 | .24657534 | 17 | 184 | 151 | 2957 | 107 | 44 |
| Lttle Slvr | 6 | 0 | 30 | 11 | 19 | .63333333 | 19 | 25 | 20 | 1840 | 66 | −46 |
| Loch Arbr | 0 | 0 | 9 | 5 | 4 | .44444444 | 4 | 4 | 3 | 125 | 5 | −1 |
| Long Brnch | 586 | 201 | 529 | 383 | 248 | .39302694 | 208 | 995 | 816 | 11672 | 421 | 394 |
| Manalapan | 88 | 23 | 120 | 50 | 94 | .65277778 | 78 | 189 | 155 | 5578 | 201 | −46 |
| Manasquan | 27 | 29 | 82 | 19 | 63 | .76829268 | 63 | 119 | 98 | 2119 | 76 | 21 |
| Marlboro | 35 | 41 | 85 | 76 | 23 | .23232323 | 20 | 96 | 79 | 4542 | 164 | −85 |
| Matawan | 63 | 19 | 48 | 26 | 22 | .45833333 | 22 | 104 | 85 | 3086 | 111 | −26 |
| Middletown | 272 | 56 | 431 | 332 | 138 | .29361702 | 127 | 455 | 373 | 18841 | 680 | −307 |
| Millstone | 35 | 15 | 118 | 54 | 64 | .54237288 | 64 | 114 | 93 | 1146 | 41 | 52 |
| Mon Beach | 12 | 7 | 4 | 4 | 37 | .90243902 | 4 | 23 | 19 | 1336 | 48 | −30 |
| Nptne Twp | 334 | 157 | 522 | 408 | 236 | .36645963 | 191 | 682 | 559 | 9917 | 358 | 201 |

| MNCPLTY | STF-1 Tbl 18 Ovrcrwded Units | STF-1 Tbl 15 Units Lack Com Plumbing not o/c | STF-3 XII-35 Units Lack Ctrl Heat not o/c | STF-3 X-17 Room Heaters w/flue | STF-3 X-17 Other Units Lack Ctr Heating | % Units w/o Ctrl Htn, With Inad Htng | Units Lacking Adequate Heating | Total Present Need | Adjusted Present Need | Occupied Dwelling Units | Fair Share Cap | Surplus Present Need |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Nptne City | 44 | 18 | 107 | 99 | 20 | .16806723 | 18 | 80 | 66 | 2204 | 80 | −14 |
| Ocean Twp | 67 | 40 | 149 | 122 | 53 | .30285714 | 45 | 152 | 125 | 8449 | 305 | −180 |
| Oceanport | 13 | 3 | 19 | 7 | 12 | .63157895 | 12 | 28 | 23 | 1768 | 64 | −41 |
| Red Bank | 135 | 62 | 209 | 161 | 96 | .37354086 | 78 | 275 | 226 | 4908 | 177 | 48 |
| Roosevelt | 6 | 0 | 16 | 6 | 11 | .64705882 | 10 | 16 | 13 | 282 | 10 | 3 |
| Rumson | 23 | 4 | 58 | 42 | 35 | .45454545 | 26 | 53 | 44 | 2502 | 90 | −47 |
| Sea Bright | 16 | 7 | 80 | 69 | 15 | .17857143 | 14 | 37 | 31 | 941 | 34 | −3 |
| Sea Girt | 3 | 1 | 11 | 9 | 2 | .18181818 | 2 | 6 | 5 | 977 | 35 | −30 |
| Shrewsbury | 11 | 0 | 10 | 4 | 6 | .6 | 6 | 17 | 14 | 995 | 36 | −22 |
| Shrews Twp | 22 | 3 | 17 | 11 | 9 | .45 | 8 | 33 | 27 | 400 | 14 | 12 |
| S. Belmar | 17 | 6 | 40 | 39 | 34 | .46575342 | 19 | 42 | 34 | 654 | 24 | 11 |
| Spring Lke | 12 | 3 | 66 | 46 | 39 | .45882353 | 30 | 45 | 37 | 1476 | 53 | −16 |
| S.L. Hghts | 21 | 6 | 40 | 26 | 14 | .35 | 14 | 41 | 34 | 2341 | 85 | −51 |
| Tinton Fls | 67 | 6 | 56 | 48 | 14 | .22580645 | 13 | 86 | 70 | 2315 | 84 | −13 |
| Union Bch | 94 | 18 | 161 | 154 | 39 | .20207254 | 33 | 145 | 119 | 1967 | 71 | 48 |
| Up Freehld | 16 | 14 | 47 | 26 | 37 | .58730159 | 28 | 58 | 47 | 892 | 32 | 15 |
| Wall Twp | 63 | 24 | 331 | 211 | 167 | .44179894 | 146 | 233 | 191 | 6533 | 236 | −45 |
| W Long Br | 16 | 7 | 32 | 34 | 6 | .15 | 5 | 28 | 23 | 2241 | 81 | −58 |
| TOTALS | 3947 | 1537 | 6684 | 5375 | 2886 | .15 | 2295 | 7779 | 6379 | 170130 | 6142 | |

498

| MNCPLTY | STF-1 Tbl 18 Ovrcrwded Units | STF-1 Tbl 13 Lack Com Plumbing | STF-1 Tbl 15 Net Units Lack Com Plumbing not o/c | STF-3 XII-35 Lack Com Ctrl Units not o/c | STF-3 X-17 Room Heaters Lack Room w/flue Heating | STF-3 X-17 Other Units Lack Ctr Heating | % Units w/o Ctrl Htn, With Inad Htng | Units lacking Adequate Heating | Total Need Present Heating | Adjusted Need Present Share | Occupied Dwelling Units | Fair Share Cap | Surplus Present Need |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **MORRIS** | | | | | | | | | | | | | |
| Boonton | 92 | 67 | 63 | 122 | 61 | 61 | .5 | 61 | 216 | 177 | 3035 | 194 | -17 |
| BoontonTwp | 11 | 2 | 2 | 76 | 12 | 64 | .84210526 | 64 | 77 | 63 | 1040 | 67 | -3 |
| Butler | 56 | 10 | 9 | 87 | 49 | 38 | .43678161 | 38 | 103 | 84 | 2567 | 164 | -80 |
| Chatham | 15 | 11 | 11 | 56 | 38 | 18 | .32142857 | 18 | 44 | 36 | 3163 | 202 | -166 |
| ChathamTwp | 7 | 6 | 6 | 18 | 6 | 12 | .66666667 | 12 | 25 | 20 | 2985 | 191 | -171 |
| Chester | 5 | 3 | 3 | 16 | 27 | 47 | .63513514 | 10 | 18 | 15 | 469 | 30 | -15 |
| ChesterTwp | 14 | 5 | 5 | 62 | 9 | 9 | .5 | 31 | 50 | 41 | 1507 | 96 | -55 |
| Denville | 60 | 12 | 11 | 144 | 89 | 75 | .45731707 | 66 | 137 | 112 | 4571 | 293 | -180 |
| Dover | 277 | 104 | 84 | 216 | 200 | 88 | .30555556 | 66 | 427 | 350 | 4901 | 314 | 36 |
| EastHanovr | 19 | 11 | 10 | 53 | 21 | 32 | .60377358 | 32 | 61 | 50 | 2576 | 165 | -115 |
| FlorhamPk | 5 | 3 | 3 | 16 | 16 | 0 | 0 | 0 | 8 | 7 | 2357 | 151 | -144 |
| Hanover | 26 | 10 | 10 | 19 | 6 | 13 | .68421053 | 13 | 49 | 40 | 3553 | 227 | -187 |
| Harding | 7 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1102 | 71 | -71 |
| Jefferson | 144 | 55 | 45 | 407 | 142 | 341 | .70600414 | 287 | 476 | 391 | 5364 | 343 | 47 |
| Kinnelon | 20 | 4 | 2 | 55 | 9 | 52 | .85245902 | 47 | 69 | 56 | 2285 | 146 | -90 |
| Lincoln Pk | 45 | 17 | 16 | 38 | 26 | 13 | .33333333 | 13 | 74 | 60 | 2610 | 167 | -107 |
| Madison | 73 | 51 | 49 | 42 | 37 | 11 | .22916667 | 10 | 132 | 108 | 4878 | 312 | -204 |

| MNCPLTY | STF-1 Tbl 18 Ovrcrwded Units | STF-1 Tbl 13 Ttl Units Lack Com Plumbing | STF-1 Tbl 15 Net Units Lack Com Plumbing Ctrl not o/c | STF-3 XII-35 Units Lack Heat not o/c | STF-3 X-17 Room Heaters w/flue | STF-3 X-17 Other Units Lack Ctr Heating | % Units w/o Ctrl Htn, Inad Htng | Units lacking Adequate Heating | Total Present Need | Adjusted Present Need | Occupied Dwelling Units | Fair Share Cap | Surplus Present Need |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Mendham | 7 | 7 | 7 | 24 | 10 | 14 | .58333333 | 14 | 28 | 23 | 1460 | 93 | −70 |
| MendhamTwp | 3 | 4 | 3 | 64 | 30 | 34 | .53125 | 34 | 40 | 33 | 1408 | 90 | −57 |
| Mine Hill | 19 | 14 | 14 | 27 | 38 | 7 | .15555556 | 4 | 37 | 31 | 1094 | 70 | −40 |
| Montville | 45 | 11 | 10 | 110 | 55 | 80 | .59259259 | 65 | 120 | 99 | 4016 | 257 | −158 |
| Morris | 45 | 30 | 28 | 103 | 57 | 50 | .46728972 | 48 | 121 | 99 | 5968 | 382 | −283 |
| MorrisPlns | 17 | 8 | 7 | 27 | 22 | 5 | .18518519 | 5 | 29 | 24 | 1710 | 109 | −86 |
| Morristwn | 225 | 154 | 188 | 206 | 153 | 67 | .30454545 | 63 | 426 | 349 | 6534 | 418 | −69 |
| Main Lakes | 4 | 1 | 1 | 14 | 8 | 6 | .42857143 | 6 | 11 | 9 | 1180 | 76 | −67 |
| MtArlingtn | 29 | 8 | 7 | 37 | 39 | 13 | .25 | 9 | 45 | 37 | 1395 | 89 | −52 |
| Mt Olive | 82 | 32 | 31 | 182 | 104 | 99 | .48768473 | 89 | 202 | 165 | 6369 | 408 | −242 |
| Netcong | 31 | 12 | 12 | 13 | 13 | 0 | 0 | 0 | 43 | 35 | 1297 | 83 | −48 |
| Parsippany | 275 | 87 | 81 | 341 | 290 | 94 | .24479167 | 83 | 439 | 360 | 17874 | 1112 | −752 |
| Passaic | 25 | 5 | 5 | 48 | 43 | 15 | .25862069 | 12 | 42 | 35 | 2326 | 149 | −114 |
| Pequannock | 44 | 11 | 11 | 49 | 25 | 24 | .48979592 | 24 | 79 | 65 | 4139 | 265 | −200 |
| Randolph | 76 | 32 | 32 | 151 | 41 | 115 | .73717949 | 111 | 219 | 180 | 5946 | 381 | −201 |
| Riverdale | 12 | 3 | 3 | 36 | 10 | 26 | .72222222 | 26 | 41 | 34 | 842 | 54 | −20 |
| Rockaway | 41 | 34 | 33 | 85 | 65 | 20 | .23529412 | 20 | 94 | 77 | 2323 | 149 | −72 |
| RocknwyTwp | 82 | 32 | 27 | 239 | 143 | 158 | .51689189 | 124 | 233 | 191 | 6251 | 400 | −209 |
| Roxbury | 102 | 40 | 36 | 125 | 29 | 110 | .79136691 | 99 | 287 | 194 | 5575 | 357 | −163 |
| VictGrdns | 35 | 2 | 2 | 23 | 24 | 2 | .07692308 | 2 | 39 | 32 | 398 | 25 | 6 |
| Washington | 35 | 17 | 17 | 170 | 76 | 107 | .58469945 | 99 | 151 | 124 | 3341 | 214 | −90 |
| Wharton | 59 | 13 | 12 | 47 | 21 | 26 | .55319149 | 26 | 97 | 80 | 1911 | 122 | −43 |
| TOTALS | 2169 | 930 | 848 | 3548 | 2044 | 1941 | | 1732 | 4740 | 3886 | 131820 | 8436 | −4550 |

OCEAN

| MNCPLTY | STF-1 Tbl 18 Ovrcrwded Units | STF-1 Tbl 15 Not Units Lack Com Plumbing not o/c | STF-3 XII-35 Units Lack Ctrl Heat not o/c | STF-3 X-17 Room Heaters w/flue | STF-3 X-17 Other Units Lack Ctr Heating | % Units w/o Ctrl Htn, With Inad Htng | Units Lacking Adequate Heating | Total Present Need | Adjusted Present Need | Occupied Dwelling Units | Fair Share Cap | Surplus Present Need |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OCEAN | | | | | | | | | | | | |
| Brnegat Tp | 45 | 10 | 203 | 132 | 110 | .45454545 | 92 | 147 | 121 | 2820 | 102 | 19 |
| Brnegat Lt | 6 | 0 | 27 | 23 | 16 | .41025641 | 11 | 17 | 14 | 259 | 9 | 5 |
| Bay Head | 2 | 1 | 19 | 13 | 10 | .43478261 | 8 | 11 | 9 | 521 | 19 | −10 |
| Bch Haven | 11 | 4 | 46 | 57 | 33 | .36666667 | 17 | 32 | 26 | 760 | 27 | −1 |
| Beachwood | 44 | 6 | 113 | 67 | 62 | .48062016 | 54 | 104 | 86 | 2477 | 89 | −4 |
| Berkeley | 110 | 25 | 388 | 260 | 227 | .46611910 | 181 | 316 | 259 | 9614 | 347 | −88 |
| Brick Twp | 360 | 40 | 624 | 510 | 244 | .32360743 | 202 | 602 | 494 | 18930 | 683 | −190 |
| Dover Twp | 316 | 53 | 860 | 747 | 373 | .33303571 | 286 | 655 | 537 | 22175 | 801 | −263 |
| Eagleswood | 10 | 4 | 70 | 61 | 24 | .28235294 | 20 | 34 | 28 | 362 | 13 | 15 |
| Harvey Ced | 0 | 1 | 15 | 20 | 23 | .53488872 | 8 | 9 | 7 | 167 | 6 | 1 |
| Island Hts | 14 | 2 | 17 | 13 | 11 | .45833333 | 8 | 24 | 20 | 576 | 21 | −1 |
| Jackson Tp | 102 | 55 | 437 | 271 | 243 | .47276265 | 207 | 364 | 298 | 7756 | 280 | 18 |
| Lacey Twp | 63 | 10 | 370 | 192 | 250 | .56561086 | 209 | 282 | 231 | 5107 | 184 | 47 |
| Lakehurst | 59 | 18 | 89 | 75 | 44 | .36974790 | 33 | 110 | 90 | 893 | 32 | 58 |
| Lakewood | 669 | 125 | 377 | 287 | 119 | .29310845 | 111 | 905 | 742 | 14489 | 523 | 219 |
| Lavallette | 9 | 6 | 44 | 67 | 37 | .35576923 | 16 | 31 | 25 | 916 | 33 | −8 |

| MNCPLTY | STF-1 Tbl 18 Ovrcrwded Units | STF-1 Tbl 15 Not Units Lack Com Plumbing not o/c | STF-3 XII-35 Units Lack Ctrl Heat not o/c | STF-3 X-17 Room Heaters w/flue | STF-3 X-17 Other Units Lack Ctr Heating Heating | % Units w/o Ctrl Htn, With Inad Htng | Units Lacking Adequate Heating | Total Present Need | Adjusted Present Need | Occupied Dwelling Units | Fair Share Cap | Surplus Present Need |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ltl Fgg Hr | 62 | 7 | 201 | 91 | 128 | .53447489 | 117 | 186 | 153 | 3145 | 114 | 39 |
| Long Beach | 15 | 7 | 77 | 77 | 136 | .68849765 | 49 | 71 | 58 | 1543 | 56 | 3 |
| Manchester | 113 | 9 | 231 | 172 | 75 | .30364372 | 70 | 192 | 158 | 13863 | 500 | -343 |
| Mantolokng | 1 | 0 | 2 | 0 | 20 | 1 | 2 | 3 | 2 | 184 | 7 | -4 |
| Ocean Twp | 21 | 7 | 152 | 107 | 51 | .32278481 | 49 | 77 | 63 | 1492 | 54 | 9 |
| Ocean Gate | 14 | 11 | 40 | 28 | 18 | .39130435 | 16 | 41 | 33 | 560 | 20 | 13 |
| Pine Beach | 5 | 3 | 5 | 11 | 4 | .26666667 | 1 | 9 | 8 | 658 | 24 | -16 |
| Plumsted | 74 | 17 | 209 | 145 | 102 | .41295547 | 86 | 177 | 145 | 1564 | 56 | 89 |
| Pt Pleasnt | 99 | 23 | 208 | 188 | 51 | .21333912 | 44 | 166 | 136 | 6561 | 237 | -100 |
| Pt Pls Bch | 42 | 13 | 96 | 74 | 52 | .41269841 | 40 | 95 | 78 | 2167 | 78 | -1 |
| Seaside Ht | 29 | 20 | 93 | 82 | 80 | .49982716 | 46 | 95 | 78 | 832 | 30 | 48 |
| Seaside Pk | 14 | 12 | 44 | 64 | 70 | .52238806 | 23 | 49 | 40 | 784 | 28 | 12 |
| Ship Bottm | 9 | 7 | 56 | 46 | 41 | .47126437 | 26 | 42 | 35 | 608 | 22 | 13 |
| S Toms Rvr | 87 | 3 | 41 | 40 | 10 | .2 | 8 | 98 | 81 | 1042 | 38 | 43 |
| Stafford | 71 | 9 | 352 | 250 | 147 | .37027708 | 130 | 210 | 172 | 3789 | 137 | 36 |
| Surf City | 8 | 6 | 46 | 35 | 41 | .53947368 | 25 | 39 | 32 | 709 | 26 | 6 |
| Tuckerton | 28 | 9 | 127 | 74 | 61 | .45185185 | 57 | 94 | 77 | 981 | 35 | 42 |
| TOTALS | 2512 | 523 | 5679 | 4279 | 2913 | | 2254 | 5289 | 4337 | 128304 | 4632 | |

PASSAIC

| MNCPLTY | STF-1 Tbl 18 Ovrcrwded Units | STF-1 Tbl 13 Lack Com Plumbing Units | STF-1 Tbl 15 Net Units Lack Com Plumbing not o/c | STF-3 XII-35 Units Lack Ctr Htn Heating not o/c | STF-3 X-17 Room Heaters Lack Ctr Heating w/flue | STF-3 X-17 Other Units Lack Ctr Heating | % Units w/o Ctrl Htn, Inad Htng | Units Lacking Adequate Heating | Total Present Need | Adjusted Present Need | Occupied Dwelling Units | Fair Share Cap | Surplus Present Need |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PASSAIC | | | | | | | | | | | | | |
| Bloomgdle | 57 | 16 | 14 | 156 | 107 | 68 | .38857143 | 61 | 132 | 108 | 2591 | 166 | −58 |
| Clifton | 450 | 366 | 352 | 1114 | 655 | 539 | .45142379 | 503 | 1305 | 1070 | 28887 | 1849 | −779 |
| Haledon | 49 | 55 | 54 | 149 | 123 | 48 | .28070175 | 42 | 145 | 119 | 2609 | 167 | −48 |
| Hawthorne | 87 | 92 | 91 | 161 | 109 | 59 | .35119048 | 57 | 235 | 192 | 6871 | 440 | −247 |
| LittleFalls | 52 | 29 | 29 | 129 | 113 | 32 | .22068966 | 28 | 109 | 90 | 4208 | 269 | −180 |
| No Haledon | 29 | 11 | 11 | 33 | 15 | 24 | .61538462 | 20 | 60 | 49 | 2441 | 156 | −107 |
| Passaic | 1835 | 758 | 634 | 3008 | 1904 | 1801 | .48609987 | 1462 | 3931 | 3224 | 19161 | 1226 | 1997 |
| Paterson | 4723 | 1942 | 1653 | 6158 | 4968 | 2740 | .35547483 | 2189 | 8565 | 7023 | 46113 | 2951 | 4072 |
| PomptonLks | 47 | 23 | 20 | 47 | 31 | 16 | .34042553 | 16 | 83 | 68 | 3570 | 228 | −160 |
| ProspectPk | 72 | 41 | 38 | 125 | 91 | 51 | .35915493 | 45 | 155 | 127 | 1897 | 121 | 6 |
| Ringwood | 69 | 10 | 10 | 93 | 33 | 71 | .68269231 | 63 | 142 | 117 | 3617 | 231 | −115 |
| Totowa | 54 | 24 | 21 | 83 | 49 | 34 | .40963855 | 34 | 109 | 89 | 3395 | 217 | −128 |
| Wanaque | 86 | 27 | 25 | 131 | 100 | 43 | .30069930 | 39 | 150 | 123 | 3007 | 192 | −69 |
| Wayne | 154 | 42 | 37 | 298 | 204 | 103 | .33550489 | 100 | 291 | 239 | 14298 | 915 | −676 |
| WMilford | 179 | 60 | 50 | 452 | 130 | 390 | .75 | 339 | 568 | 466 | 6795 | 435 | 31 |
| WPaterson | 85 | 66 | 61 | 75 | 66 | 22 | .25 | 19 | 165 | 135 | 4003 | 256 | −121 |
| TOTALS | 8028 | 3562 | 3100 | 12212 | 8698 | 6041 | | 5017 | 16145 | 13239 | 153463 | 9822 | 3418 |

## SALEM

| MNCPLTY | STF-1 Tbl 18 Overcrwded Units | STF-1 Tbl 15 Units Lack Com Plumbing not o/c | STF-3 XII-35 Units Lack Heat Ctrl Heat not o/c | STF-3 X-17 Room Heaters w/flue | STF-3 X-17 Other Units Lack Ctr Heating | STF-3 X-17 % Units w/o Ctrl Htn, With Inad Htng | Units Lacking Adequate Heating | Total Present Need | Adjusted Present Need | Occupied Dwelling Units | Fair Share Cap | Surplus Present Need |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SALEM | | | | | | | | | | | | |
| Alloway | 14 | 17 | 127 | 76 | 99 | .56571429 | 72 | 103 | 84 | 850 | 55 | 30 |
| CarneysPt | 59 | 19 | 174 | 161 | 59 | .26818182 | 47 | 125 | 102 | 2977 | 192 | −89 |
| Elmer | 13 | 7 | 25 | 32 | 2 | .05882353 | 1 | 21 | 18 | 561 | 36 | −19 |
| Elsinboro | 10 | 5 | 36 | 20 | 27 | .57446809 | 21 | 36 | 29 | 489 | 31 | −2 |
| LAllowayCr | 10 | 18 | 58 | 28 | 48 | .63157895 | 37 | 65 | 53 | 515 | 33 | 20 |
| Mannington | 24 | 20 | 67 | 36 | 63 | .63636364 | 43 | 87 | 71 | 532 | 34 | 37 |
| Cldmans | 16 | 7 | 47 | 40 | 18 | .31034483 | 15 | 38 | 31 | 589 | 38 | −7 |
| PennsGrove | 91 | 31 | 258 | 177 | 123 | .41 | 106 | 228 | 187 | 2099 | 135 | 52 |
| Pennsville | 73 | 19 | 324 | 195 | 166 | .45983380 | 149 | 241 | 198 | 4835 | 311 | −114 |
| Pilesgrove | 23 | 23 | 51 | 25 | 61 | .70930233 | 36 | 82 | 67 | 927 | 60 | 8 |
| Pittsgrove | 71 | 20 | 105 | 72 | 80 | .52631579 | 55 | 146 | 120 | 2189 | 141 | −21 |
| Quinton | 35 | 17 | 85 | 39 | 79 | .66949153 | 57 | 109 | 89 | 959 | 62 | 28 |
| Salem | 89 | 27 | 393 | 350 | 170 | .32692308 | 128 | 244 | 200 | 2567 | 165 | 35 |
| UpPittsgrv | 33 | 15 | 107 | 78 | 54 | .40909091 | 44 | 92 | 75 | 987 | 64 | 12 |
| Woodstown | 13 | 15 | 90 | 86 | 36 | .29508197 | 27 | 55 | 45 | 1254 | 81 | −36 |
| TOTALS | 574 | 260 | 1947 | 1415 | 1085 | | 836 | 1670 | 1370 | 22330 | 1438 | |

## SOMERSET

| MNCPLTY | STF-1 Tbl 18 Ovrcrwded Units | STF-1 Tbl 13 Ttl Units Lack Com Plumbing | STF-1 Tbl 15 Net Units Lack Com Plumbing not o/c | STF-3 XII-35 Units Lack Ctrl Heat not o/c | STF-3 X-17 Room Heaters w/flue | STF-3 X-17 Other Units Lack Ctr Heating | % Units w/o Ctrl Htn, With Inad Htng | Units Lacking Adequate Heating | Total Present Need Heating | Adjusted Present Need | Occupied Dwelling Units | Fair Share Cap | Surplus Present Need |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **SOMERSET** | | | | | | | | | | | | | |
| Bedminster | 6 | 9 | 9 | 34 | 5 | 37 | .88095238 | 30 | 45 | 37 | 884 | 57 | −20 |
| Bernards | 16 | 5 | 5 | 75 | 45 | 30 | .4 | 30 | 51 | 42 | 3711 | 238 | −196 |
| Brnrdsvlle | 11 | 13 | 13 | 65 | 28 | 42 | .64615385 | 42 | 66 | 54 | 2278 | 146 | −92 |
| BoundBrook | 134 | 73 | 67 | 107 | 81 | 56 | .40875912 | 44 | 245 | 201 | 3564 | 228 | −27 |
| Branchburg | 17 | 7 | 7 | 46 | 29 | 17 | .36956522 | 17 | 41 | 34 | 2396 | 153 | −120 |
| Bridgewatr | 97 | 28 | 28 | 135 | 71 | 76 | .51700680 | 70 | 195 | 160 | 8804 | 563 | −404 |
| Far Hills | 1 | 1 | 1 | 7 | 0 | 7 | 1 | 7 | 9 | 7 | 241 | 15 | −8 |
| Franklin | 265 | 61 | 60 | 207 | 125 | 105 | .45552174 | 95 | 420 | 344 | 10060 | 644 | −300 |
| GreenBrook | 15 | 3 | 3 | 28 | 7 | 21 | .75 | 21 | 39 | 32 | 1368 | 88 | −56 |
| Hillsbor | 49 | 28 | 26 | 120 | 84 | 61 | .42068966 | 50 | 125 | 103 | 6439 | 412 | −309 |
| Manville | 111 | 77 | 71 | 80 | 47 | 51 | .52040816 | 42 | 224 | 183 | 3878 | 248 | −65 |
| Millstone | 2 | 1 | 1 | 2 | 2 | 0 | 0 | 0 | 3 | 2 | 171 | 11 | −8 |
| Montgomery | 17 | 19 | 19 | 37 | 26 | 36 | .58064516 | 21 | 57 | 47 | 1975 | 126 | −79 |
| NPlainfld | 143 | 78 | 76 | 90 | 63 | 39 | .38235294 | 34 | 253 | 208 | 7525 | 482 | −274 |
| Peapk-Glad | 5 | 16 | 15 | 21 | 13 | 14 | .51851852 | 11 | 31 | 25 | 698 | 45 | −19 |
| Raritan | 55 | 68 | 64 | 73 | 66 | 45 | .40540541 | 30 | 149 | 122 | 2212 | 142 | −20 |
| Rocky Hill | 0 | 3 | 3 | 6 | 2 | 4 | .66666667 | 4 | 7 | 6 | 267 | 17 | −11 |

| MNCPLTY | STF-1 Tbl 18 Ovrcrwded Units | STF-1 Tbl 13 Ttl Units Lack Com Plumbing | STF-1 Tbl 15 Net Units Lack Com Plumbing not o/c | STF-3 XII-35 Units Lack Heat Heaters not o/c | STF-3 X-17 Room Heat Heaters w/flue | STF-3 X-17 Other Units Lack Ctr Heating | % Units w/o Ctrl Htn, Inad Htng | Units Lacking Adequate Heating | Present Need | Total Adjusted Present Need | Occupied Dwelling Units | Fair Share Cap | Surplus Present Need |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Somerville | 119 | 58 | 53 | 69 | 58 | 18 | .23684211 | 16 | 188 | 154 | 4686 | 300 | −145 |
| SBndBrook | 52 | 26 | 26 | 40 | 28 | 19 | .40425532 | 16 | 94 | 77 | 1582 | 101 | −24 |
| Warren | 20 | 5 | 5 | 51 | 13 | 38 | .74509804 | 38 | 63 | 52 | 2999 | 192 | −140 |
| Watchung | 11 | 2 | 2 | 47 | 45 | 9 | .16666667 | 8 | 21 | 17 | 1630 | 104 | −87 |
| TOTALS | 1146 | 581 | 554 | 1340 | 833 | 725 | | 626 | 2326 | 1907 | 67368 | 4312 | −2404 |

## SUSSEX

| MNCPLTY | STF-1 Tbl 18 Ttl Units Ovrcrwded Units | STF-1 Tbl 13 Lack Com Plumbing | STF-1 Tbl 15 Net Units Lack Com Plumbing not o/c | STF-3 XII-35 Units Lack Ctrl Heat not o/c | STF-3 X-17 Room Heaters w/flue | STF-3 X-17 Other Units Lack Ctr Heating | % Units w/o Ctrl Htn, With Inad Htng | Units Lacking Adequate Heating | Total Present Need | Adjusted Present Need | Occupied Dwelling Units | Fair Share Cap | Surplus Present Need |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **SUSSEX** | | | | | | | | | | | | | |
| Andover | 12 | 8 | 6 | 10 | 6 | 7 | .53846154 | 5 | 23 | 19 | 289 | 18 | 1 |
| AndoverTwp | 19 | 6 | 5 | 68 | 32 | 48 | .6 | 41 | 65 | 53 | 1250 | 80 | −27 |
| Branchvlle | 4 | 4 | 4 | 16 | 10 | 7 | .41176471 | 7 | 15 | 12 | 343 | 22 | −10 |
| Byram | 37 | 9 | 8 | 108 | 19 | 96 | .83478261 | 90 | 135 | 111 | 2266 | 145 | −34 |
| Frankford | 42 | 29 | 25 | 100 | 28 | 130 | .82278481 | 82 | 149 | 122 | 1435 | 92 | 31 |
| Franklin | 57 | 6 | 6 | 72 | 40 | 59 | .59595960 | 43 | 106 | 87 | 1540 | 99 | −12 |
| Fredon | 9 | 2 | 2 | 28 | 6 | 28 | .82352941 | 23 | 34 | 28 | 692 | 44 | −16 |
| Green | 8 | 2 | 2 | 51 | 6 | 50 | .89285714 | 46 | 56 | 46 | 727 | 47 | −1 |
| Hamburg | 18 | 4 | 4 | 37 | 8 | 33 | .80487805 | 30 | 52 | 42 | 593 | 38 | 5 |
| Hampton | 23 | 7 | 6 | 80 | 33 | 57 | .63333333 | 51 | 80 | 65 | 1244 | 80 | −14 |
| Hardyston | 38 | 13 | 10 | 100 | 5 | 128 | .96240602 | 96 | 144 | 118 | 1560 | 100 | 18 |
| Hopatcong | 136 | 25 | 23 | 241 | 145 | 158 | .52145215 | 126 | 285 | 233 | 4939 | 316 | −83 |
| Lafayette | 9 | 6 | 5 | 54 | 9 | 55 | .859375 | 46 | 60 | 50 | 504 | 32 | 17 |
| Montague | 22 | 10 | 9 | 96 | 26 | 93 | .78151261 | 75 | 106 | 87 | 778 | 50 | 37 |
| Newton | 69 | 78 | 70 | 117 | 87 | 51 | .36956522 | 43 | 182 | 149 | 2889 | 185 | −35 |
| Ogdensburg | 26 | 3 | 3 | 58 | 32 | 31 | .49206349 | 29 | 58 | 47 | 805 | 52 | −4 |

| MNCPLTY | STF-1 Tbl 18 Ovrcrwded Units | STF-1 Tbl 13 Lack Com Plumbing | STF-1 Tbl 15 Net Units Lack Com Plumbing not o/c | STF-3 XII-35 Units Lack Ctrl Heat not o/c | STF-3 X-17 Room Heaters Lack Heating w/flue | STF-3 X-17 Other Units Lack Ctr Heating Inad Htng | % Units w/o Ctrl Htn, With Adequate Htng | Units Lacking Present Heating | Total Present Need | Adjusted Present Need | Occupied Dwelling Units | Fair Share Cap | Surplus Present Need |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sandyston | 13 | 15 | 15 | 126 | 127 | 181 | .58766234 | 74 | 102 | 84 | 568 | 36 | 47 |
| Sparta | 26 | 26 | 25 | 141 | 32 | 114 | .78082192 | 110 | 161 | 132 | 4254 | 272 | −140 |
| Stanhope | 27 | 16 | 15 | 31 | 19 | 12 | .38709677 | 12 | 54 | 44 | 1250 | 80 | −36 |
| Stillwater | 24 | 14 | 14 | 104 | 24 | 101 | .808 | 84 | 122 | 100 | 1284 | 82 | 18 |
| Sussex | 37 | 39 | 36 | 57 | 28 | 35 | .55555556 | 32 | 105 | 86 | 873 | 56 | 30 |
| Vernon | 85 | 19 | 19 | 390 | 61 | 408 | .86993603 | 339 | 443 | 363 | 4886 | 313 | 51 |
| Walpack | 1 | 1 | 1 | 7 | 4 | 6 | .6 | 4 | 6 | 5 | 54 | 3 | 2 |
| Wantage | 54 | 26 | 24 | 250 | 49 | 217 | .81578947 | 204 | 282 | 231 | 2198 | 141 | 91 |
| TOTALS | 796 | 368 | 337 | 2342 | 836 | 2105 | | 1692 | 2825 | 2316 | 37221 | 2382 | −66 |

## UNION

| MNCPLTY | STF-1 Tbl 18 Ovrcrwded Units | STF-1 Tbl 13 Ttl Units Lack Com Plumbing | STF-1 Tbl 15 Net Units Lack Com Plumbing not o/c | STF-3 XII-35 Units Lack Ctrl Heat not o/c | STF-3 X-17 Room Heaters w/flue | STF-3 X-17 Other Units Lack Ctr Heating | % Units w/o Ctrl Htn, With Inad Htng | Units Lacking Adequate Heating | Present With Htng Need | Total Adjusted Present Need | Occupied Dwelling Units | Fair Share Cap | Surplus Present Need |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| UNION | | | | | | | | | | | | | |
| BerklyHts | 10 | 6 | 6 | 35 | 22 | 13 | .37142857 | 13 | 29 | 24 | 3698 | 237 | −213 |
| Clark | 40 | 16 | 15 | 16 | 16 | 0 | 0 | 0 | 55 | 45 | 5564 | 356 | −311 |
| Crawford | 83 | 44 | 42 | 95 | 72 | 23 | .24210526 | 23 | 148 | 121 | 8232 | 527 | −405 |
| Elizabeth | 3143 | 1371 | 1160 | 3295 | 2726 | 1441 | .34581234 | 1139 | 5442 | 4463 | 38878 | 2488 | 1975 |
| Fanwood | 20 | 4 | 4 | 5 | 5 | 0 | 0 | 0 | 24 | 20 | 2497 | 160 | −140 |
| Garwood | 14 | 25 | 25 | 48 | 24 | 29 | .54716981 | 26 | 65 | 54 | 1736 | 111 | −58 |
| Hillside | 202 | 87 | 83 | 446 | 197 | 279 | .5861345 | 261 | 546 | 448 | 7184 | 460 | −12 |
| Kenilworth | 37 | 15 | 15 | 82 | 85 | 22 | .20560748 | 17 | 69 | 56 | 2751 | 176 | −120 |
| Linden | 409 | 195 | 185 | 555 | 399 | 242 | .37753510 | 210 | 804 | 659 | 14232 | 911 | −252 |
| Mntnside | 8 | 3 | 3 | 0 | 0 | 0 | 0 | 0 | 11 | 9 | 2362 | 151 | −192 |
| NewProvdnc | 19 | 25 | 25 | 24 | 14 | 10 | .41666667 | 10 | 54 | 44 | 4135 | 265 | −220 |
| Plainfld | 985 | 294 | 247 | 1058 | 1005 | 284 | .22032583 | 233 | 1465 | 1201 | 15269 | 977 | 224 |
| Rahway | 306 | 137 | 125 | 389 | 257 | 114 | .30727763 | 104 | 535 | 439 | 9793 | 627 | −188 |
| Roselle | 278 | 93 | 81 | 198 | 185 | 63 | .25403226 | 50 | 409 | 336 | 7545 | 483 | −147 |
| RosellePk | 95 | 57 | 56 | 65 | 49 | 23 | .31944444 | 21 | 172 | 141 | 5088 | 322 | −182 |
| ScotchPlns | 54 | 30 | 29 | 84 | 44 | 40 | .47619048 | 40 | 123 | 101 | 6682 | 428 | −327 |
| Springfld | 33 | 11 | 10 | 115 | 81 | 34 | .29565217 | 34 | 77 | 63 | 5538 | 354 | −291 |

| MNCPLTY | STF-1 Tbl 18 Ovrcrwded Units | STF-1 Tbl 13 Lack Com Plumbing Units | STF-1 Tbl 15 Net Units Lack Com Plumbing not o/c | STF-3 XII-35 Ttl Units Lack Com Ctr Heating not o/c | STF-3 X-17 Room Heaters w/flue | STF-3 X-17 Other Units Lack Ctr Heating | % Units w/o Ctrl Htn, Inad Htng | Units Lacking Adequate Heating | Total Present Need | Adjusted Present Need | Occupied Dwelling Units | Fair Share Cap | Surplus Present Need |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Summit | 75 | 80 | 77 | 172 | 132 | 43 | .24571429 | 42 | 194 | 159 | 7738 | 495 | -336 |
| Union | 198 | 130 | 126 | 245 | 221 | 58 | .20788530 | 51 | 375 | 307 | 18132 | 1160 | -853 |
| Westfield | 83 | 67 | 64 | 183 | 142 | 44 | .23655914 | 43 | 190 | 156 | 10271 | 657 | -501 |
| Winfield | 39 | 2 | 2 | 56 | 50 | 6 | .10714286 | 6 | 47 | 39 | 698 | 45 | -6 |
| TOTALS | 6131 | 2692 | 2380 | 7116 | 5726 | 2768 | | 2324 | 10824 | 8876 | 177973 | 11390 | -2363 |

WARREN

| MNCPLTY | STF-1 Tbl 18 Ovrcrwded Units | STF-1 Tbl 13 Ttl Units Lack Com Plumbing | STF-1 Tbl 15 Net Units Lack Com Plumbing not o/c | STF-3 XII-35 Units Lack Ctrl Heat Heaters not o/c | STF-3 X-17 Room w/flue | STF-3 X-17 Other Units Lack Ctr Htn Inad Htng | % Units w/o Ctrl Htn, With Adequate Heating | Units Lacking Adequate Heating | Total Need | Adjusted Present Need | Occupied Dwelling Units | Fair Share Cap | Surplus Present Need |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WARREN | | | | | | | | | | | | | |
| Allamuchy | 15 | 8 | 8 | 29 | 24 | 19 | .44186047 | 13 | 36 | 29 | 969 | 62 | −33 |
| Alpha | 13 | 7 | 7 | 33 | 10 | 23 | .69696970 | 23 | 43 | 35 | 949 | 61 | −25 |
| Belvidere | 14 | 19 | 19 | 12 | 12 | 13 | .52 | 6 | 39 | 32 | 935 | 60 | −28 |
| Blairstown | 14 | 21 | 20 | 134 | 4 | 160 | .97560976 | 131 | 165 | 135 | 1380 | 88 | 47 |
| Franklin | 12 | 11 | 10 | 67 | 28 | 44 | .61111111 | 41 | 63 | 52 | 741 | 47 | 4 |
| Frelnghysn | 4 | 7 | 7 | 48 | 9 | 49 | .84482759 | 41 | 52 | 42 | 456 | 29 | 13 |
| Greenwich | 7 | 11 | 11 | 31 | 5 | 28 | .84848485 | 26 | 44 | 36 | 573 | 37 | 0 |
| Hacketstwn | 66 | 38 | 38 | 89 | 35 | 71 | .66981132 | 60 | 164 | 134 | 2863 | 183 | −49 |
| Hardwick | 1 | 3 | 3 | 61 | 4 | 75 | .94936709 | 58 | 62 | 51 | 287 | 18 | 32 |
| Harmony | 19 | 16 | 16 | 75 | 18 | 68 | .79069767 | 59 | 94 | 77 | 865 | 55 | 22 |
| Hope | 14 | 8 | 8 | 42 | 24 | 46 | .65714286 | 28 | 50 | 41 | 494 | 32 | 9 |
| Indepndnce | 34 | 11 | 10 | 37 | 10 | 30 | .75 | 28 | 72 | 59 | 953 | 61 | −2 |
| Knowlton | 21 | 12 | 12 | 85 | 44 | 61 | .58095238 | 49 | 82 | 68 | 682 | 44 | 24 |
| Liberty | 11 | 3 | 3 | 70 | 23 | 55 | .70512821 | 49 | 63 | 52 | 574 | 37 | 15 |
| Lopatcong | 16 | 7 | 5 | 45 | 0 | 45 | 1 | 45 | 66 | 54 | 1807 | 116 | −62 |
| Mansfield | 24 | 28 | 28 | 129 | 55 | 110 | .66666667 | 86 | 138 | 113 | 2015 | 129 | −16 |

| MNCPLTY | STF-1 Tbl 18 Ovrcrwded Units | STF-1 Tbl 13 Ttl Units Lack Plumbing not o/c | STF-1 Tbl 15 Net Units Lack Com Plumbing Ctrl not o/c | STF-3 XII-35 Units Lack Heat Heaters not o/c | STF-3 X-17 Room Heating w/flue | STF-3 X-17 Other Units Lack Ctr Heating | % Units w/o Ctrl Htn, Inad Htng | Units Lacking Adequate Heating | Total Present Need | Adjusted Present Need | Occupied Dwelling Units | Fair Share Cap | Surplus Present Need |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Oxford | 13 | 22 | 22 | 40 | 15 | 43 | .74187931 | 30 | 65 | 53 | 570 | 36 | 17 |
| Pahaquarry | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 13 | 1 | −1 |
| Phlpsburg | 111 | 138 | 134 | 296 | 259 | 116 | .30933333 | 92 | 337 | 276 | 6242 | 399 | −124 |
| Pohatcong | 23 | 14 | 14 | 105 | 51 | 64 | .55652174 | 58 | 95 | 78 | 1315 | 84 | −6 |
| Washington | 53 | 42 | 40 | 125 | 80 | 52 | .39393939 | 49 | 142 | 117 | 2414 | 154 | −88 |
| WshngtnTwp | 13 | 20 | 19 | 96 | 22 | 95 | .81196581 | 78 | 110 | 90 | 1388 | 89 | 1 |
| White | 20 | 11 | 10 | 85 | 40 | 72 | .64285714 | 55 | 85 | 69 | 921 | 59 | 10 |
| TOTALS | 518 | 457 | 444 | 1734 | 772 | 1339 | | 1104 | 2066 | 1694 | 29406 | 1882 | −187 |

## APPENDIX D

### PROSPECTIVE NEED DATA

**DISCLAIMER**

This appendix is based on documents prepared by members of the Urban League advisory group. It is provided *for informational purposes only* as to those municipalities not included in Warren Township's prospective need region.

**PURPOSE OF APPENDIX D**

The summary sheet is designed to enable the reader to understand the derivation of the need of Warren's prospective need region, as set forth in Appendix F. The summary sheet also permits the reader to identify the prospective need for any other municipality in the State, providing that the regional configurations selected follow county lines and providing that the same methodology is used to identify the prospective regional need.

The remainder of Appendix D is the source data for the prospective need for each county in the State. With regard to Warren's prospective need region, no litigant has challenged the mathematical accuracy of the data. With regard to the counties not in Warren's prospective need region, the source data has not been the subject of adversarial litigation before this court.

Projected Mt. Laurel Households, 1990, by County

| | County | 1990 Households | Less | 1980 Households | × | .394 | = | Additional Mt. Laurel Households |
|---|---|---|---|---|---|---|---|---|
| 1. | Atlantic | 90,680 | — | 71,806 | × | .394 | = | 7,436 |
| 2. | Bergen | 340,666 | — | 300,410 | × | .394 | = | 15,860 |
| 3. | Burlington | 154,987 | — | 114,890 | × | .394 | = | 15,798 |
| 4. | Camden | 183,897 | — | 162,508 | × | .394 | = | 8,427 |
| 5. | Cape May | 40,186 | — | 32,347 | × | .394 | = | 3,089 |
| 6. | Cumberland | 51,940 | — | 44,287 | × | .394 | = | 3,015 |
| 7 | Essex | 287,009 | — | 299,934 | × | .394 | = | −5,092 |
| 8. | Gloucester | 84,892 | — | 65,129 | × | .394 | = | 7,787 |
| 9. | Hudson | 194,964 | — | 207,857 | × | .394 | = | −5,080 |
| 10. | Hunterdon | 37,857 | — | 28,515 | × | .394 | = | 3,680 |
| 11. | Mercer | 118,997 | — | 105,819 | × | .394 | = | 5,192 |
| 12. | Middlesex | 245,989 | — | 196,708 | × | .394 | = | 19,417 |
| 13. | Monmouth | 214,573 | — | 170,130 | × | .394 | = | 17,510 |
| 14. | Morris | 171,692 | — | 131,820 | × | .394 | = | 15,702 |
| 15. | Ocean | 170,941 | — | 128,304 | × | .394 | = | 16,798 |
| 16. | Passaic | 163,202 | — | 153,463 | × | .394 | = | 3,837 |
| 17. | Salem | 25,291 | — | 22,330 | × | .394 | = | 1,167 |
| 18. | Somerset | 89,681 | — | 67,368 | × | .394 | = | 8,791 |
| 19. | Sussex | 53,829 | — | 37,221 | × | .394 | = | 6,543 |
| 20. | Union | 194,487 | — | 177,973 | × | .394 | = | 6,506 |
| 21. | Warren | 35,306 | — | 29,406 | × | .394 | = | 2,325 |

FEBRUARY 15, 1984
PROSPECTIVE NEED—AVERAGE OF ECONOMIC/DEMOGR
AND DEMOGRAPHIC MODELS N.J. DEPT. OF LABOR

| COUNTY | YEAR 2000 | | | YEAR 1990 | | |
|---|---|---|---|---|---|---|
| | MODEL 1 ECO/DEM | MODEL 2 DEM | AVERAGE | MODEL 1 | MODEL 2 | AVERAGE |
| ATLANTIC | 277400 | 245800 | 261600 | 240200 | 220000 | 230100 |
| BERGEN | 951400 | 707800 | 829600 | 915600 | 767100 | 841350 |
| BURLINGTON | 471900 | 487000 | 479450 | 407300 | 422300 | 414800 |
| CAMDEN | 555900 | 526400 | 541150 | 508900 | 497400 | 503150 |
| CAPE MAY | 91600 | 138300 | 114950 | 87800 | 109100 | 98450 |
| CUMBERLAND | 142600 | 153700 | 148150 | 139300 | 143700 | 141500 |
| ESSEX | 760700 | 739900 | 750300 | 789400 | 785400 | 787400 |
| GLOUCESTER | 269100 | 265700 | 267400 | 233200 | 233600 | 233400 |
| HUDSON | 516500 | 506000 | 511250 | 530500 | 524400 | 527450 |
| HUNTERDON | 112800 | 113200 | 113000 | 98600 | 101300 | 99950 |
| MERCER | 359400 | 301900 | 330650 | 340000 | 306300 | 323150 |
| MIDDLESEX | 757100 | 603300 | 680200 | 690400 | 601200 | 645800 |
| MONMOUTH | 588200 | 580800 | 584500 | 534400 | 546400 | 540400 |
| MORRIS | 511300 | 423900 | 467600 | 467700 | 418200 | 442950 |
| OCEAN | 447300 | 605700 | 526500 | 393500 | 470200 | 431850 |
| PASSAIC | 445100 | 421200 | 433150 | 451000 | 434800 | 442900 |
| SALEM | 69100 | 71400 | 70250 | 66600 | 68700 | 67650 |
| SOMERSET | 284000 | 199600 | 241800 | 246800 | 201700 | 224250 |
| SUSSEX | 172600 | 198200 | 185400 | 141200 | 156700 | 148950 |
| UNION | 518800 | 454200 | 486500 | 526500 | 467800 | 497150 |
| WARREN | 93800 | 107400 | 100600 | 89100 | 96300 | 92700 |
| NEW JERSEY | 8396600 | 7851500 | 8124050 | 7898000 | 7572300 | 7735150 |

NEW JERSEY LOW AND MODERATE INCOME
HOUSEHOLDS 1990
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| COUNTY | 1990 HOUSEHOLDS | PCT. LOW AND MOD | = LOW AND MODERATE |
|---|---|---|---|
| ATLANTIC | 90680 | .394 | 35728 |
| BERGEN | 34066 | .394 | 134222 |
| BURLINGTON | 154988 | 394 | 61065 |
| CAMDEN | 183897 | .394 | 72455 |
| CAPE MAY | 40186 | .394 | 15833 |
| CUMBERLAND | 51940 | .394 | 20464 |
| ESSEX | 287010 | .394 | 113082 |
| GLOUCESTER | 84892 | .394 | 33447 |
| HUDSON | 194965 | .394 | 76816 |
| HUNTERDON | 37858 | .394 | 14916 |
| MERCER | 118998 | .394 | 46885 |
| MIDDLESEX | 245989 | .394 | 96920 |
| MONMOUTH | 214573 | .394 | 84542 |
| MORRIS | 171693 | .394 | 67647 |
| OCEAN | 170941 | .394 | 67351 |
| PASSAIC | 163202 | .394 | 64302 |
| SALEM | 25291 | .394 | 9965 |
| SOMERSET | 89682 | .394 | 35335 |
| SUSSEX | 53829 | .394 | 21209 |
| UNION | 194487 | 394 | 76628 |
| WARREN | 35307 | .394 | 13911 |
| TOTAL STATE | 2,951,074 | 394 | 1,162,723. |

COHORT PROJECTIONS 1990
****************************
FEBRUARY 15, 1984

ATLANTIC COUNTY

| COHORT | MODEL 1 | MODEL 2 | AVERAGE | COHORT AGGREGATE | HEADSHIP RATE | NUMBER | HOUSEHOLDS |
|---|---|---|---|---|---|---|---|
| UNDER 5 | 15200 | 13900 | 14550 | | | | |
| 5-9 | 13000 | 12400 | 12700 | | | | |
| 10-14 | 12600 | 12300 | 12450 | | | | |
| 15-19 | 16000 | 14800 | 15400 | | | | |
| 20-24 | 16100 | 15700 | 15900 | LESS THAN 25 YRS | .0453 | 71000 | 3216.30 |
| 25-29 | 18500 | 17600 | 18050 | 25-29 YEARS | .4253 | 18050 | 7676.67 |
| 30-34 | 24000 | 21400 | 22700 | 30-34 YEARS | .4972 | 22700 | 11286.44 |
| 35-39 | 28000 | 19400 | 23700 | | | | |
| 40-44 | 16900 | 15200 | 16050 | 35-44 YEARS | .5408 | 39750 | 21496.80 |
| 45-49 | 11600 | 11200 | 11400 | | | | |
| 50-54 | 9800 | 9400 | 9600 | 45-54 YEARS | .5623 | 21000 | 11808.30 |
| 55-59 | 9700 | 9200 | 9450 | | | | |
| 60-64 | 11100 | 10600 | 10850 | 55-64 YEARS | .5844 | 20300 | 11863.32 |
| 65-69 | 11700 | 10900 | 11300 | | | | |
| 70-74 | 9300 | 9300 | 9300 | 65-74 YEARS | .6305 | 20600 | 12988.30 |
| 75-79 | 7300 | 7300 | 7300 | | | | |
| 80-84 | 4600 | 4600 | 4600 | | | | |
| 85 + OVER | 4800 | 4800 | 4800 | 75 + OVER | .6194 | 16700 | 10343.98 |
| TOTALS | | | | | | 230100 | 90680.11 |

| BERGEN COHORT | MODEL 1 | MODEL 2 | AVERAGE | COHORT AGGREGATE | HEADSHIP RATE | NUMBER | HOUSEHOLDS |
|---|---|---|---|---|---|---|---|
| UNDER 5 | 47200 | 40400 | 48800 | | | | |
| 5-9 | 44400 | 42600 | 43500 | | | | |
| 10-14 | 47500 | 42600 | 45050 | | | | |
| 15-19 | 56300 | 46600 | 51450 | | | | |
| 20-24 | 69000 | 49700 | 59350 | LESS THAN 25 YRS | .0453 | 243150 | 11014.70 |
| 25-29 | 78800 | 48700 | 63500 | 25-29 YEARS | .4253 | 63500 | 27006.55 |
| 30-34 | 82000 | 59000 | 70500 | 30-34 YEARS | .4972 | 70500 | 35052.60 |
| 35-39 | 81100 | 66300 | 73700 | | | | |
| 40-44 | 74600 | 63900 | 69250 | 35-44 YEARS | .5408 | 142950 | 77307.36 |
| 45-49 | 61400 | 54600 | 58000 | | | | |
| 50-54 | 50800 | 46000 | 48150 | 45-54 YEARS | .5623 | 106150 | 59688.15 |
| 55-59 | 49200 | 44800 | 47000 | | | | |
| 60-64 | 54200 | 47000 | 50600 | 55-64 YEARS | .5844 | 97600 | 57037.44 |
| 65-69 | 46300 | 41000 | 43650 | | | | |
| 70-74 | 29400 | 29400 | 29400 | 65-74 YEARS | .6305 | 73050 | 46058.03 |
| 75-79 | 21000 | 21000 | 21000 | | | | |
| 80-84 | 13600 | 13600 | 13600 | | | | |
| 85 + OVER | 9800 | 9800 | 9800 | 75 + OVER | .6194 | 44400 | 27501.36 |
| | | | | | TOTALS | 841300 | 340666.2 |

BURLINGTON

| COHORT | MODEL 1 | MODEL 2 | AVERAGE | COHORT AGGREGATE | HEADSHIP RATE | NUMBER | HOUSEHOLDS |
|---|---|---|---|---|---|---|---|
| UNDER 5 | 25500 | 27200 | 26350 | | | | |
| 5-9 | 25100 | 25700 | 25400 | | | | |
| 10-14 | 26500 | 27100 | 26800 | | | | |
| 15-19 | 33100 | 33400 | 33250 | | | | |
| 20-24 | 32300 | 32700 | 32500 | LESS THAN 25 YRS | .0453 | 144300 | 6536.79 |
| 25-29 | 26300 | 31200 | 28750 | 25-29 YEARS | .4253 | 28750 | 12227.38 |
| 30-34 | 34600 | 35200 | 34900 | 30-34 YEARS | .4972 | 34900 | 17352.28 |
| 35-39 | 36100 | 39000 | 37550 | | | | |
| 40-44 | 32800 | 34700 | 33750 | 35-44 YEARS | .5408 | 71300 | 38559.04 |
| 45-49 | 26100 | 26700 | 26400 | | | | |
| 50-54 | 20700 | 20800 | 20750 | 45-54 YEARS | .5623 | 47150 | 26512.45 |
| 55-59 | 20100 | 20000 | 20050 | | | | |
| 60-64 | 19400 | 19700 | 19550 | 55-64 YEARS | .5844 | 39600 | 23142.24 |
| 65-69 | 17100 | 17600 | 17350 | | | | |
| 70-74 | 13100 | 13100 | 13100 | 65-74 YEARS | .6305 | 30450 | 19198.73 |
| 75-79 | 8600 | 8600 | 8600 | | | | |
| 80-84 | 5200 | 5200 | 5200 | | | | |
| 85 + OVER | 4700 | 4700 | 4700 | 75 + OVER | .6194 | 18500 | 11458.90 |
| | | | | | TOTALS | 414950 | 154987.8 |

| CAMDEN COHORT | MODEL 1 | MODEL 2 | AVERAGE | COHORT AGGREGATE | HEADSHIP RATE | NUMBER | HOUSEHOLDS |
|---|---|---|---|---|---|---|---|
| UNDER 5 | 39000 | 38700 | 38850 | | | | |
| 5-9 | 36700 | 36500 | 36600 | | | | |
| 10-14 | 35200 | 34800 | 35000 | | | | |
| 15-19 | 35800 | 34700 | 35250 | | | | |
| 20-24 | 37200 | 33800 | 35500 | LESS THAN 25 YRS | .0453 | 181200 | 8208.36 |
| 25-29 | 38600 | 37900 | 38250 | 25-29 YEARS | .4253 | 38250 | 16267.73 |
| 30-34 | 49200 | 46300 | 47750 | 30-34 YEARS | .4972 | 47750 | 23741.30 |
| 35-39 | 45800 | 45000 | 45400 | | | | |
| 40-44 | 37100 | 37200 | 37150 | 35-44 YEARS | .5408 | 82550 | 44643.04 |
| 45-49 | 28800 | 28500 | 28650 | | | | |
| 50-54 | 22500 | 21900 | 22200 | 45-54 YEARS | .5623 | 50850 | 28592.96 |
| 55-59 | 21400 | 20700 | 21050 | | | | |
| 60-64 | 22500 | 21800 | 22150 | 55-64 YEARS | .5844 | 43200 | 25246.08 |
| 65-69 | 20400 | 20600 | 20500 | | | | |
| 70-74 | 16000 | 16000 | 16000 | 65-74 YEARS | .6305 | 36500 | 23013.25 |
| 75-79 | 11200 | 11200 | 11200 | | | | |
| 80-84 | 6700 | 6700 | 6700 | | | | |
| 85 + OVER | 5000 | 5000 | 5000 | 75 + OVER | .6194 | 22900 | 14184.26 |
| TOTALS | | | | | | 503200 | 183897.0 |

| CAPE MAY COHORT | MODEL 1 | MODEL 2 | AVERAGE | COHORT AGGREGATE | HEADSHIP RATE | NUMBER | HOUSEHOLDS |
|---|---|---|---|---|---|---|---|
| UNDER 5 | 5300 | 6500 | 5900 | | | | |
| 5-9 | 5100 | 5600 | 5350 | | | | |
| 10-14 | 4800 | 5800 | 5300 | | | | |
| 15-19 | 5300 | 6600 | 5950 | | | | |
| 20-24 | 6000 | 7700 | 6850 | LESS THAN 25 YRS | .0453 | 29350 | 1329.56 |
| 25-29 | 6100 | 8200 | 7150 | 25-29 YEARS | .4253 | 7150 | 3040.90 |
| 30-34 | 6000 | 8900 | 7450 | 30-34 YEARS | .4972 | 7450 | 3704.14 |
| 35-39 | 5900 | 8700 | 7300 | | | | |
| 40-44 | 5100 | 6700 | 5900 | 35-44 YEARS | .5408 | 13200 | 7188.56 |
| 45-49 | 4100 | 5000 | 4550 | | | | |
| 50-54 | 3300 | 4300 | 3800 | 45-54 YEARS | .5623 | 8850 | 4695.21 |
| 55-59 | 3300 | 4600 | 3950 | | | | |
| 60-64 | 3900 | 5700 | 4800 | 55-64 YEARS | .5844 | 8750 | 5113.50 |
| 65-69 | 5500 | 6800 | 6150 | | | | |
| 70-74 | 6800 | 6800 | 6800 | 65-74 YEARS | .6305 | 12950 | 8164.98 |
| 75-79 | 5400 | 5400 | 5400 | | | | |
| 80-84 | 3300 | 3300 | 3300 | | | | |
| 85 + OVER | 2600 | 2600 | 2600 | 75 + OVER | .6194 | 11300 | 6999.22 |
| | | | | | TOTALS | 98500 | 40186.05 |

COHORT PROJECTIONS 1990
*********************************
FEBRUARY 16, 1984

CUMBERLAND COUNTY

| COHORT | MODEL 1 | MODEL 2 | AVERAGE | COHORT AGGREGATE | HEADSHIP RATE | NUMBER | HOUSEHOLDS |
|---|---|---|---|---|---|---|---|
| UNDER 5 | 9800 | 10100 | 9950 | | | | |
| 5-9 | 9000 | 9400 | 9200 | | | | |
| 10-14 | 9600 | 9800 | 9700 | | | | |
| 15-19 | 11200 | 11500 | 11350 | | | | |
| 20-24 | 10800 | 11100 | 10950 | LESS THAN 25 YRS | .0453 | 51150 | 2317.10 |
| 25-29 | 10500 | 11600 | 11050 | 25-29 YEARS | .4253 | 11050 | 4699.57 |
| 30-34 | 11200 | 11500 | 11350 | 30-34 YEARS | .4972 | 11350 | 5643.22 |
| 35-39 | 10500 | 11300 | 10900 | | | | |
| 40-44 | 9400 | 9700 | 9550 | 35-44 YEARS | .5408 | 20450 | 11059.36 |
| 45-49 | 7800 | 7900 | 7850 | | | | |
| 50-54 | 6500 | 6600 | 6550 | 45-54 YEARS | .5623 | 14400 | 8097.12 |
| 55-59 | 6100 | 6200 | 6150 | | | | |
| 60-64 | 6600 | 6600 | 6600 | 55-64 YEARS | .5844 | 12750 | 7451.10 |
| 65-69 | 6300 | 6400 | 6350 | | | | |
| 70-74 | 5300 | 5300 | 5300 | 65-74 YEARS | .6305 | 11650 | 7345.33 |
| 75-79 | 4100 | 4100 | 4100 | | | | |
| 80-84 | 2400 | 2400 | 2400 | | | | |
| 85 + OVER | 2100 | 2100 | 2100 | 75 + OVER | .6194 | 8600 | 5326.84 |
| | | | | TOTALS | | 141400 | 51939.63 |

ESSEX

| COHORT | MODEL 1 | MODEL 2 | AVERAGE | COHORT AGGREGATE | HEADSHIP RATE | NUMBER | HOUSEHOLDS |
|---|---|---|---|---|---|---|---|
| UNDER 5 | 54300 | 55400 | 54850 | | | | |
| 5-9 | 54400 | 53500 | 53950 | | | | |
| 10-14 | 54100 | 53200 | 53650 | | | | |
| 15-19 | 59400 | 58400 | 58900 | | | | |
| 20-24 | 66400 | 63100 | 64750 | LESS THAN 25 YRS | .0453 | 286100 | 12960.33 |
| 25-29 | 64300 | 63600 | 63950 | 25-29 YEARS | .4253 | 63950 | 27197.94 |
| 30-34 | 62500 | 64800 | 63650 | 30-34 YEARS | .4972 | 63650 | 31646.78 |
| 35-39 | 61800 | 61700 | 61750 | | | | |
| 40-44 | 55400 | 55300 | 55350 | 35-44 YEARS | .5408 | 117100 | 63327.68 |
| 45-49 | 47400 | 46900 | 47150 | | | | |
| 50-54 | 40100 | 39400 | 39750 | 45-54 YEARS | .5623 | 86900 | 48863.87 |
| 55-59 | 37900 | 37200 | 37550 | | | | |
| 60-64 | 38400 | 37700 | 38050 | 55-64 YEARS | .5844 | 75600 | 44180.64 |
| 65-69 | 31800 | 33900 | 32850 | | | | |
| 70-74 | 24800 | 24800 | 24800 | 65-74 YEARS | .6305 | 57650 | 36348.33 |
| 75-79 | 17700 | 17700 | 17700 | | | | |
| 80-84 | 10300 | 10300 | 10300 | | | | |
| 85 + OVER | 8300 | 8300 | 8300 | 75 + OVER | .6194 | 36300 | 22484.22 |
| | | | | TOTALS | | 787250 | 287009.8 |

GLOUCESTER COUNTY

| COHORT | MODEL 1 | MODEL 2 | AVERAGE | COHORT AGGREGATE | HEADSHIP RATE | NUMBER | HOUSEHOLDS |
|---|---|---|---|---|---|---|---|
| UNDER 5 | 16500 | 16800 | 16650 | | | | |
| 5-9 | 16300 | 16100 | 16200 | | | | |
| 10-14 | 16200 | 16600 | 16400 | | | | |
| 15-19 | 16900 | 17300 | 17100 | | | | |
| 20-24 | 17700 | 17000 | 17350 | LESS THAN 25 YRS | .0453 | 83700 | 3791.61 |
| 25-29 | 18100 | 18600 | 18350 | 25-29 YEARS | .4253 | 18850 | 7804.26 |
| 30-34 | 27600 | 23100 | 25350 | 30-34 YEARS | .4972 | 25350 | 12604.02 |
| 35-39 | 19500 | 22100 | 20800 | | | | |
| 40-44 | 16800 | 18200 | 17500 | 35-44 YEARS | .5408 | 38300 | 20712.64 |
| 45-49 | 12900 | 13000 | 12950 | | | | |
| 50-54 | 9800 | 9900 | 9850 | 45-54 YEARS | .5623 | 22800 | 12820.44 |
| 55-59 | 9500 | 9400 | 9450 | | | | |
| 60-64 | 9700 | 9700 | 9700 | 55-64 YEARS | .5844 | 19150 | 11191.26 |
| 65-69 | 8600 | 8800 | 8700 | | | | |
| 70-74 | 6900 | 6900 | 6900 | 65-74 YEARS | .6305 | 15600 | 9835.80 |
| 75-79 | 4600 | 4600 | 4600 | | | | |
| 80-84 | 2800 | 2800 | 2800 | | | | |
| 85 + OVER | 2500 | 2500 | 2500 | 75 + OVER | .6194 | 9900 | 6132.06 |
| | | | | | TOTALS | 233150 | 84892.09 |

## HUDSON

| COHORT | MODEL 1 | MODEL 2 | AVERAGE | COHORT AGGREGATE | HEADSHIP RATE | NUMBER | HOUSEHOLDS |
|---|---|---|---|---|---|---|---|
| UNDER 5 | 39000 | 38800 | 38900 | | | | |
| 5-9 | 36400 | 36000 | 36200 | | | | |
| 10-14 | 33700 | 32700 | 33200 | | | | |
| 15-19 | 36400 | 36000 | 36200 | | | | |
| 20-24 | 41300 | 41100 | 41200 | LESS THAN 25 YRS | .0453 | 185700 | 8412.21 |
| 25-29 | 46700 | 46500 | 46600 | 25-29 YEARS | .4253 | 46600 | 19818.98 |
| 30-34 | 47000 | 45400 | 46200 | 30-34 YEARS | .4972 | 46200 | 22970.64 |
| 35-39 | 41400 | 40200 | 40800 | | | | |
| 40-44 | 35300 | 35300 | 35300 | 35-44 YEARS | .5408 | 76100 | 41154.88 |
| 45-49 | 29500 | 29300 | 29400 | | | | |
| 50-54 | 26200 | 25700 | 25950 | 45-54 YEARS | .5623 | 55350 | 31123.31 |
| 55-59 | 24800 | 24400 | 24600 | | | | |
| 60-64 | 25600 | 25200 | 25400 | 55-64 YEARS | .5844 | 50000 | 29220.00 |
| 65-69 | 22800 | 23200 | 23000 | | | | |
| 70-74 | 18000 | 18000 | 18000 | 65-74 YEARS | .6305 | 41000 | 25850.50 |
| 75-79 | 13100 | 13100 | 13100 | | | | |
| 80-84 | 7400 | 7400 | 7400 | | | | |
| 85 + OVER | 6000 | 6000 | 6000 | 75 + OVER | .6194 | 26500 | 16414.10 |
| | | | | | TOTALS | 527450 | 194964.6 |

HUNTERDON COUNTY

| COHORT | MODEL 1 | MODEL 2 | AVERAGE | COHORT AGGREGATE | HEADSHIP RATE | NUMBER | HOUSEHOLDS |
|---|---|---|---|---|---|---|---|
| UNDER 5 | 6000 | 6200 | 6100 | | | | |
| 5-9 | 5800 | 6000 | 5900 | | | | |
| 10-14 | 6400 | 6700 | 6550 | | | | |
| 15-19 | 7600 | 8000 | 7800 | | | | |
| 20-24 | 7000 | 7200 | 7100 | LESS THAN 25 YRS | .0453 | 33450 | 1515.29 |
| 25-29 | 5500 | 6600 | 6050 | 25-29 YEARS | .4253 | 6050 | 2573.07 |
| 30-34 | 7700 | 7200 | 7450 | 30-34 YEARS | .4972 | 7450 | 3704.14 |
| 35-39 | 9600 | 9100 | 9350 | | | | |
| 40-44 | 9600 | 10000 | 9800 | 35-44 YEARS | .5408 | 19150 | 10356.32 |
| 45-49 | 8400 | 8900 | 8650 | | | | |
| 50-54 | 5900 | 6200 | 6050 | 45-54 YEARS | .5623 | 14700 | 8265.81 |
| 55-59 | 4900 | 5000 | 4950 | | | | |
| 60-64 | 4400 | 4500 | 4450 | 55-64 YEARS | .5844 | 9400 | 5493.36 |
| 65-69 | 3400 | 3400 | 3400 | | | | |
| 70-74 | 2500 | 2500 | 2500 | 65-74 YEARS | .6305 | 5900 | 3719.95 |
| 75-79 | 1700 | 1700 | 1700 | | | | |
| 80-84 | 1100 | 1100 | 1100 | | | | |
| 85 + OVER | 800 | 800 | 800 | 75 + OVER | .6194 | 3600 | 2229.84 |
| | | | | TOTALS | | 99700 | 37857.77 |

MERCER COUNTY

| COHORT | MODEL 1 | MODEL 2 | AVERAGE | COHORT AGGREGATE | HEADSHIP RATE | NUMBER | HOUSEHOLDS |
|---|---|---|---|---|---|---|---|
| UNDER 5 | 21000 | 18700 | 19850 | | | | |
| 5-9 | 19500 | 17300 | 18400 | | | | |
| 10-14 | 19800 | 17400 | 18850 | | | | |
| 15-19 | 27400 | 25000 | 26200 | | | | |
| 20-24 | 34200 | 30700 | 32450 | LESS THAN 25 YRS | .0453 | 115250 | 5220.83 |
| 25-29 | 29200 | 24800 | 27000 | 25-29 YEARS | .4253 | 27000 | 11483.10 |
| 30-34 | 28300 | 23200 | 25750 | 30-34 YEARS | .4972 | 25750 | 12802.90 |
| 35-39 | 26700 | 24000 | 25350 | | | | |
| 40-44 | 23600 | 22300 | 22950 | 35-44 YEARS | .5408 | 48300 | 26120.64 |
| 45-49 | 19500 | 18200 | 18850 | | | | |
| 50-54 | 15900 | 14700 | 15300 | 45-54 YEARS | .5623 | 34150 | 19202.55 |
| 55-59 | 15600 | 14100 | 14850 | | | | |
| 60-64 | 17400 | 14800 | 16100 | 55-64 YEARS | .5844 | 30950 | 18087.18 |
| 65-69 | 15400 | 14100 | 14750 | | | | |
| 70-74 | 10700 | 10700 | 10700 | 65-74 YEARS | .6305 | 25450 | 16046.23 |
| 75-79 | 7700 | 7700 | 7700 | | | | |
| 80-84 | 4600 | 4600 | 4600 | | | | |
| 85 + OVER | 3900 | 3900 | 3900 | 75 + OVER | .6194 | 16200 | 10034.28 |
| | | | | | TOTALS | 323050 | 118997.7 |

MIDDLESEX COUNTY

| COHORT | MODEL 1 | MODEL 2 | AVERAGE | COHORT AGGREGATE | HEADSHIP RATE | NUMBER | HOUSEHOLDS |
|---|---|---|---|---|---|---|---|
| UNDER 5 | 39000 | 35100 | 37050 | | | | |
| 5-9 | 34800 | 34200 | 34500 | | | | |
| 10-14 | 37200 | 33600 | 35400 | | | | |
| 15-19 | 50600 | 43900 | 47250 | | | | |
| 20-24 | 61500 | 53600 | 57550 | LESS THAN 25 YRS | .0453 | 211750 | 9592.28 |
| 25-29 | 61200 | 51400 | 56300 | 25-29 YEARS | .4253 | 56300 | 23944.39 |
| 30-34 | 67300 | 55400 | 61350 | 30-34 YEARS | .4972 | 61350 | 30508.22 |
| 35-39 | 64300 | 51000 | 57650 | | | | |
| 40-44 | 53700 | 43400 | 48550 | 35-44 YEARS | .5408 | 106200 | 57432.96 |
| 45-49 | 41300 | 34900 | 38100 | | | | |
| 50-54 | 33100 | 28600 | 30850 | 45-54 YEARS | .5623 | 68950 | 38770.59 |
| 55-59 | 32000 | 28300 | 30150 | | | | |
| 60-64 | 34300 | 30200 | 32250 | 55-64 YEARS | .5844 | 62400 | 36466.56 |
| 65-69 | 30700 | 28200 | 29450 | | | | |
| 70-74 | 21300 | 21300 | 21300 | 65-74 YEARS | .6305 | 50750 | 31997.88 |
| 75-79 | 14100 | 14100 | 14100 | | | | |
| 80-84 | 7800 | 7800 | 7800 | | | | |
| 85 + OVER | 6000 | 6000 | 6000 | 75 + OVER | .6194 | 27900 | 17281.26 |
| | | | | | TOTALS | 645600 | 245989.1 |

MONMOUTH COUNTY

| COHORT | MODEL 1 | MODEL 2 | AVERAGE | COHORT AGGREGATE | HEADSHIP RATE | NUMBER | HOUSEHOLDS |
|---|---|---|---|---|---|---|---|
| UNDER 5 | 31700 | 32700 | 32200 | | | | |
| 5-9 | 31600 | 31800 | 31700 | | | | |
| 10-14 | 33100 | 33400 | 33250 | | | | |
| 15-19 | 36400 | 36800 | 36600 | | | | |
| 20-24 | 33900 | 33500 | 33700 | LESS THAN 25 YRS | .0453 | 167450 | 7585.49 |
| 25-29 | 30700 | 34300 | 32500 | 25-29 YEARS | .4253 | 32500 | 18822.25 |
| 30-34 | 42700 | 43500 | 43100 | 30-34 YEARS | .4972 | 43100 | 21429.32 |
| 35-39 | 47400 | 49900 | 48650 | | | | |
| 40-44 | 44300 | 46000 | 45150 | 35-44 YEARS | .5408 | 93800 | 50727.04 |
| 45-49 | 36300 | 36800 | 36550 | | | | |
| 50-54 | 28000 | 28300 | 28150 | 45-54 YEARS | .5623 | 64700 | 36380.81 |
| 55-59 | 26600 | 26800 | 26700 | | | | |
| 60-64 | 27500 | 28000 | 27750 | 55-64 YEARS | .5844 | 54450 | 31820.58 |
| 65-69 | 25800 | 26200 | 26000 | | | | |
| 70-74 | 21800 | 21800 | 21800 | 65-74 YEARS | .6305 | 47800 | 30137.90 |
| 75-79 | 16200 | 16200 | 16200 | | | | |
| 80-84 | 10400 | 10400 | 10400 | | | | |
| 85 + OVER | 10000 | 10000 | 10000 | 75 + OVER | .6194 | 36600 | 22670.04 |
| | | | | | TOTALS | 540400 | 214573.4 |

MORRIS COUNTY

| COHORT | MODEL 1 | MODEL 2 | AVERAGE | COHORT AGGREGATE | HEADSHIP RATE | NUMBER | HOUSEHOLDS |
|---|---|---|---|---|---|---|---|
| UNDER 5 | 27800 | 24900 | 26350 | | | | |
| 5-9 | 24900 | 24700 | 24800 | | | | |
| 10-14 | 26700 | 25300 | 26000 | | | | |
| 15-19 | 31000 | 29300 | 30150 | | | | |
| 20-24 | 35200 | 28800 | 32000 | LESS THAN 25 YRS | .0453 | 139300 | 6310.29 |
| 25-29 | 39700 | 29200 | 34450 | 25-29 YEARS | .4253 | 34450 | 14651.59 |
| 30-34 | 40400 | 36000 | 38200 | 30-34 YEARS | .4972 | 38200 | 18993.04 |
| 35-39 | 52500 | 40800 | 46650 | | | | |
| 40-44 | 42600 | 38100 | 40350 | 35-44 YEARS | .5408 | 87000 | 47049.60 |
| 45-49 | 33700 | 32700 | 33200 | | | | |
| 50-54 | 25100 | 24400 | 24750 | 45-54 YEARS | .5623 | 57950 | 32585.29 |
| 55-59 | 22100 | 21300 | 21700 | | | | |
| 60-64 | 20800 | 19400 | 20100 | 55-64 YEARS | .5844 | 41800 | 24427.92 |
| 65-69 | 17300 | 15500 | 16400 | | | | |
| 70-74 | 10400 | 10400 | 10400 | 65-74 YEARS | .6305 | 26800 | 16897.40 |
| 75-79 | 7300 | 7300 | 7300 | | | | |
| 80-84 | 5200 | 5200 | 5200 | | | | |
| 85 + OVER | 4900 | 4900 | 4900 | 75 + OVER | .6194 | 17400 | 10777.56 |
| | | | | TOTALS | | 442900 | 171692.7 |

OCEAN COUNTY

| COHORT | MODEL 1 | MODEL 2 | AVERAGE | COHORT AGGREGATE | HEADSHIP RATE | NUMBER | HOUSEHOLDS |
|---|---|---|---|---|---|---|---|
| UNDER 5 | 25200 | 29800 | 27500 | | | | |
| 5-9 | 23600 | 26800 | 25200 | | | | |
| 10-14 | 24400 | 30000 | 27200 | | | | |
| 15-19 | 26400 | 32600 | 29500 | | | | |
| 20-24 | 27000 | 31600 | 29300 | LESS THAN 25 YRS | .0453 | 138700 | 6283.11 |
| 25-29 | 26200 | 32300 | 29250 | 25-29 YEARS | .4253 | 29250 | 12440.03 |
| 30-34 | 24300 | 32400 | 28350 | 30-34 YEARS | .4972 | 28350 | 14095.62 |
| 35-39 | 26200 | 35500 | 30850 | | | | |
| 40-44 | 27500 | 35200 | 31350 | 35-44 YEARS | .5408 | 62200 | 33637.76 |
| 45-49 | 20800 | 25100 | 22950 | | | | |
| 50-54 | 15300 | 18900 | 17100 | 45-54 YEARS | .5623 | 40050 | 22520.12 |
| 55-59 | 14000 | 18400 | 16200 | | | | |
| 60-64 | 15000 | 20300 | 17650 | 55-64 YEARS | .5844 | 33850 | 19781.94 |
| 65-69 | 19200 | 22900 | 21050 | | | | |
| 70-74 | 25900 | 25900 | 25900 | 65-74 YEARS | .6305 | 46950 | 29601.98 |
| 75-79 | 25000 | 25000 | 25000 | | | | |
| 80-84 | 16800 | 16800 | 16800 | | | | |
| 85 + OVER | 10800 | 10800 | 10800 | 75 + OVER | .6194 | 52600 | 32580.44 |
| | | | | | TOTALS | 431950 | 170941.0 |

PASSAIC COUNTY

| COHORT | MODEL 1 | MODEL 2 | AVERAGE | COHORT AGGREGATE | HEADSHIP RATE | NUMBER | HOUSEHOLDS |
|---|---|---|---|---|---|---|---|
| UNDER 5 | 32800 | 31500 | 32150 | | | | |
| 5-9 | 30400 | 29800 | 30100 | | | | |
| 10-14 | 28900 | 27800 | 28350 | | | | |
| 15-19 | 32000 | 30700 | 31350 | | | | |
| 20-24 | 35800 | 34300 | 35050 | LESS THAN 25 YRS | .0453 | 157000 | 7112.10 |
| 25-29 | 38500 | 36700 | 37600 | 25-29 YEARS | .4253 | 37600 | 15991.28 |
| 30-34 | 39200 | 38100 | 38650 | 30-34 YEARS | .4972 | 38650 | 19216.78 |
| 35-39 | 35600 | 34100 | 34850 | | | | |
| 40-44 | 31600 | 30100 | 30850 | 35-44 YEARS | .5408 | 65700 | 35530.56 |
| 45-49 | 26500 | 25600 | 26050 | | | | |
| 50-54 | 21600 | 20900 | 21250 | 45-54 YEARS | .5623 | 47300 | 26596.79 |
| 55-59 | 20400 | 19500 | 19950 | | | | |
| 60-64 | 21100 | 20100 | 20600 | 55-64 YEARS | .5844 | 40550 | 23697.42 |
| 65-69 | 19800 | 18800 | 19300 | | | | |
| 70-74 | 14100 | 14100 | 14100 | 65-74 YEARS | .6305 | 33400 | 21058.70 |
| 75-79 | 10400 | 10400 | 10400 | | | | |
| 80-84 | 6600 | 6600 | 6600 | | | | |
| 85 + OVER | 5600 | 5600 | 5600 | 75 + OVER | .6194 | 22600 | 13998.44 |
| | | | | | TOTALS | 442800 | 168202.1 |

SALEM COUNTY

| COHORT | MODEL 1 | MODEL 2 | AVERAGE | COHORT AGGREGATE | HEADSHIP RATE | NUMBER | HOUSEHOLDS |
|---|---|---|---|---|---|---|---|
| UNDER 5 | 4800 | 4900 | 4850 | | | | |
| 5-9 | 4800 | 4900 | 4850 | | | | |
| 10-14 | 4900 | 5000 | 4950 | | | | |
| 15-19 | 5100 | 5200 | 5150 | | | | |
| 20-24 | 3900 | 4400 | 4150 | LESS THAN 25 YRS | .0453 | 23950 | 1084.94 |
| 25-29 | 4000 | 4400 | 4200 | 25-29 YEARS | .4253 | 4200 | 1786.26 |
| 30-34 | 4900 | 5300 | 5100 | 30-34 YEARS | .4972 | 5100 | 2535.72 |
| 35-39 | 5800 | 5900 | 5850 | | | | |
| 40-44 | 5000 | 5100 | 5050 | 35-44 YEARS | .5408 | 10900 | 5894.72 |
| 45-49 | 3900 | 3900 | 3900 | | | | |
| 50-54 | 3300 | 3300 | 3300 | 45-54 YEARS | .5623 | 7200 | 4048.56 |
| 55-59 | 3100 | 3100 | 3100 | | | | |
| 60-64 | 3200 | 3200 | 3200 | 55-64 YEARS | .5844 | 6300 | 3681.72 |
| 65-69 | 3200 | 3200 | 3200 | | | | |
| 70-74 | 2700 | 2700 | 2700 | 65-74 YEARS | .6305 | 5900 | 3719.95 |
| 75-79 | 1900 | 1900 | 1900 | | | | |
| 80-84 | 1100 | 1100 | 1100 | | | | |
| 85 + OVER | 1100 | 1100 | 1100 | 75 + OVER | .6194 | 4100 | 2539.54 |
| | | | | TOTALS | | 67650 | 25291.41 |

SOMERSET COUNTY

| COHORT | MODEL 1 | MODEL 2 | AVERAGE | COHORT AGGREGATE | HEADSHIP RATE | NUMBER | HOUSEHOLDS |
|---|---|---|---|---|---|---|---|
| UNDER 5 | 15100 | 11600 | 13350 | | | | |
| 5-9 | 12000 | 12000 | 12000 | | | | |
| 10-14 | 13200 | 12100 | 12650 | | | | |
| 15-19 | 13800 | 12500 | 13150 | | | | |
| 20-24 | 15700 | 11800 | 13750 | LESS THAN 25 YRS | .0453 | 64900 | 2939.97 |
| 25-29 | 25600 | 13600 | 19600 | 25-29 YEARS | .4253 | 19600 | 8335.08 |
| 30-34 | 22100 | 18200 | 20150 | 30-34 YEARS | .4972 | 20150 | 10018.58 |
| 35-39 | 29800 | 19800 | 24800 | | | | |
| 40-44 | 20900 | 17300 | 19100 | 35-44 YEARS | .5408 | 43900 | 23741.12 |
| 45-49 | 15700 | 14800 | 15250 | | | | |
| 50-54 | 12800 | 12400 | 12600 | 45-54 YEARS | .5623 | 27850 | 15660.06 |
| 55-59 | 12600 | 11700 | 12150 | | | | |
| 60-64 | 12000 | 10700 | 11350 | 55-64 YEARS | .5844 | 23500 | 13733.40 |
| 65-69 | 10500 | 8400 | 9450 | | | | |
| 70-74 | 5900 | 5900 | 5900 | 65-74 YEARS | .6305 | 15350 | 9678.18 |
| 75-79 | 4000 | 4000 | 4000 | | | | |
| 80-84 | 2600 | 2600 | 2600 | | | | |
| 85 + OVER | 2400 | 2400 | 2400 | 75 + OVER | .6194 | 9000 | 5574.60 |
| | | | | | TOTALS | 224250 | 89681.78 |

## SUSSEX COUNTY

| COHORT | MODEL 1 | MODEL 2 | AVERAGE | COHORT AGGREGATE | HEADSHIP RATE | NUMBER | HOUSEHOLDS |
|---|---|---|---|---|---|---|---|
| UNDER 5 | 10700 | 11600 | 11150 | | | | |
| 5-9 | 9800 | 11000 | 10400 | | | | |
| 10-14 | 10600 | 12400 | 11500 | | | | |
| 15-19 | 11000 | 12500 | 11750 | | | | |
| 20-24 | 9800 | 10600 | 10200 | LESS THAN 25 YRS | .0453 | 55000 | 2491.50 |
| 25-29 | 8600 | 10600 | 9600 | 25-29 YEARS | .4253 | 9600 | 4082.88 |
| 30-34 | 10500 | 11600 | 11050 | 30-34 YEARS | .4972 | 11050 | 5494.06 |
| 35-39 | 14200 | 15200 | 14700 | | | | |
| 40-44 | 14000 | 16100 | 15050 | 35-44 YEARS | .5408 | 29750 | 16088.80 |
| 45-49 | 10300 | 11500 | 10900 | | | | |
| 50-54 | 6800 | 7300 | 7050 | 45-54 YEARS | .5623 | 17950 | 10093.29 |
| 55-59 | 5200 | 5700 | 5450 | | | | |
| 60-64 | 5000 | 5500 | 5250 | 55-64 YEARS | .5844 | 10700 | 6253.08 |
| 65-69 | 4700 | 4900 | 4800 | | | | |
| 70-74 | 3900 | 3900 | 3900 | 65-74 YEARS | .6305 | 8700 | 5485.35 |
| 75-79 | 2700 | 2700 | 2700 | | | | |
| 80-84 | 1800 | 1800 | 1800 | | | | |
| 85 + OVER | 1700 | 1700 | 1700 | 75 + OVER | .6194 | 6200 | 3040.28 |
| | | | | | TOTALS | 148950 | 53829.24 |

UNION COUNTY

| COHORT | MODEL 1 | MODEL 2 | AVERAGE | COHORT AGGREGATE | HEADSHIP RATE | NUMBER | HOUSEHOLDS |
|---|---|---|---|---|---|---|---|
| UNDER 5 | 31900 | 28300 | 30100 | | | | |
| 5-9 | 29100 | 28300 | 28700 | | | | |
| 10-14 | 29800 | 27900 | 28850 | | | | |
| 15-19 | 34500 | 30800 | 32650 | | | | |
| 20-24 | 40200 | 32800 | 36500 | LESS THAN 25 YRS | .0453 | 156800 | 7103.04 |
| 25-29 | 43200 | 32800 | 38000 | 25-29 YEARS | .4253 | 38000 | 16161.40 |
| 30-34 | 46600 | 37400 | 42000 | 30-34 YEARS | .4972 | 42000 | 20882.40 |
| 35-39 | 43300 | 38700 | 41000 | | | | |
| 40-44 | 39800 | 36500 | 38150 | 35-44 YEARS | .5408 | 79150 | 42804.32 |
| 45-49 | 33100 | 30900 | 32000 | | | | |
| 50-54 | 27600 | 25500 | 26550 | 45-54 YEARS | .5623 | 58550 | 32922.67 |
| 55-59 | 27500 | 24800 | 26150 | | | | |
| 60-64 | 29900 | 26100 | 28000 | 55-64 YEARS | .5844 | 54150 | 31645.26 |
| 65-69 | 27000 | 24000 | 25500 | | | | |
| 70-74 | 17500 | 17500 | 17500 | 65-74 YEARS | .6305 | 43000 | 27111.50 |
| 75-79 | 12400 | 12400 | 12400 | | | | |
| 80-84 | 7700 | 7700 | 7700 | | | | |
| 85 + OVER | 5500 | 5500 | 5500 | 75 + OVER | .6194 | 25600 | 15856.64 |
| | | | | TOTALS | | 497250 | 194487.2 |

WARREN COUNTY

| COHORT | MODEL 1 | MODEL 2 | AVERAGE | COHORT AGGREGATE | HEADSHIP RATE | NUMBER | HOUSEHOLDS |
|---|---|---|---|---|---|---|---|
| UNDER 5 | 6000 | 6200 | 6100 | | | | |
| 5-9 | 5500 | 5900 | 5700 | | | | |
| 10-14 | 5900 | 6300 | 6100 | | | | |
| 15-19 | 6800 | 7100 | 6950 | | | | |
| 20-24 | 6200 | 6700 | 6450 | LESS THAN 25 YRS | .0453 | 31300 | 1417.89 |
| 25-29 | 5800 | 6500 | 6150 | 25-29 YEARS | .4253 | 6150 | 2615.60 |
| 30-34 | 6300 | 8000 | 7150 | 30-34 YEARS | .4972 | 7150 | 3554.98 |
| 35-39 | 7800 | 9200 | 8500 | | | | |
| 40-44 | 7300 | 8000 | 7650 | 35-44 YEARS | .5408 | 16150 | 8733.92 |
| 45-49 | 5900 | 6200 | 6050 | | | | |
| 50-54 | 4200 | 4400 | 4300 | 45-54 YEARS | .5623 | 10350 | 5819.81 |
| 55-59 | 4100 | 4200 | 4150 | | | | |
| 60-64 | 4300 | 4500 | 4400 | 55-64 YEARS | .5844 | 8550 | 4996.62 |
| 65-69 | 4100 | 4200 | 4150 | | | | |
| 70-74 | 3500 | 3500 | 3500 | 65-74 YEARS | .6305 | 7650 | 4823.33 |
| 75-79 | 2600 | 2600 | 2600 | | | | |
| 80-84 | 1500 | 1500 | 1500 | | | | |
| 85 + OVER | 1300 | 1300 | 1300 | 75 + OVER | .6194 | 5400 | 3344.76 |
| | | | | TOTALS | | 92700 | 35306.90 |

# APPENDIX E

## SELECTED URBAN AID MUNICIPALITIES

ATLANTIC COUNTY

None

BERGEN COUNTY

Lodi
Garfield

BURLINGTON COUNTY

None

CAMDEN COUNTY

Camden
Winslow

CAPE MAY COUNTY

None

CUMBERLAND COUNTY

Vineland
Bridgeton

ESSEX COUNTY

Belleville
Bloomfield
East Orange
Irvington
Montclair
Newark
Orange

GLOUCESTER COUNTY

Glassboro

HUDSON COUNTY

Bayonne
Hoboken
Jersey City
North Bergen
Union City
Weehawken
West New York

HUNTERDON COUNTY

None

MERCER COUNTY

Trenton

MIDDLESEX COUNTY

New Brunswick
Perth Amboy

MONMOUTH COUNTY

Asbury Park
Keansburg
Long Branch

MORRIS COUNTY

None

OCEAN COUNTY

Lakewood

PASSAIC COUNTY

Passaic
Paterson

SALEM COUNTY

None

SOMERSET COUNTY

None

SUSSEX COUNTY

None

UNION COUNTY

Elizabeth
Hillside
Plainfield

WARREN COUNTY

None

## DISCLAIMER

This appendix was prepared by a member of the Urban League advisory group.

It is provided *for informational purposes only* as to those municipalities not included in Warren Township's present and prospective need regions.

APPENDIX F

6-COUNTY
COMMUTERSHED REGION
FOR
WARREN TOWNSHIP

142